**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHERINE JACKSON, MELISSA ADAMS, CARRIE GREENE, VID DESAI, SHAWN CHENAULT, BRENDAN DEMICH, and FONDA KORNEGAY, individually, and on behalf of all others similarly situated, | Case No.: _____ |
| *Plaintiffs*, | |
| vs. | **CLASS ACTION COMPLAINT** |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br>     200 Independence Avenue SW <br>     Washington, DC 20201, | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br>     200 Independence Avenue SW <br>     Washington, DC 20201, | |
| RUSSELL VOUGHT, in his official capacity as Director of Office of Management and Budget, <br>     725 17th Street NW <br>     Washington, DC 20503, | |
| OFFICE OF MANAGEMENT AND BUDGET, <br>     725 17th Street NW <br>     Washington, DC 20503, | |
| ELON MUSK, in his official capacity as *de facto* leader of DOGE, <br>     1650 Pennsylvania Avenue NW <br>     Washington, DC 20504, | |
| AMY GLEASON, in her official capacity as DOGE Administrator, <br>     1650 Pennsylvania Avenue NW <br>     Washington, DC 20504, | |

U.S. DOGE SERVICE,
       1650 Pennsylvania Avenue NW
       Washington, DC 20504,

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION,
       1650 Pennsylvania Avenue NW
       Washington, DC 20504,

CHARLES EZELL, in his official capacity as
Acting Director of U.S. Office of Personnel
Management,
       1900 E Street NW
       Washington, DC 20415,

U.S. OFFICE OF PERSONNEL
MANAGEMENT,
       1900 E Street NW
       Washington, DC 20415,

ANDREW GRADISON, in his official
capacity as Acting Assistant Secretary at the
Administration for Children and Families,
       330 C Street SW
       Washington, DC 20201,

ADMINISTRATION FOR CHILDREN AND
FAMILIES,
       330 C Street SW
       Washington, DC 20201,

MARTIN MAKARY, in his official capacity
as Commissioner of U.S. Food and Drug
Administration,
       10903 New Hampshire Avenue
       Silver Spring, MD 20993,

U.S. FOOD AND DRUG
ADMINISTRATION,
       10903 New Hampshire Avenue
       Silver Spring, MD 20993,

SUSAN MONAREZ, in her official capacity
as Acting Director of Centers for Disease
Control and Prevention, and
      1600 Clifton Road
      Atlanta, GA 30329,

CENTERS FOR DISEASE CONTROL AND
PREVENTION,
      1600 Clifton Road
      Atlanta, GA 30329,

        *Defendants*.

## INTRODUCTION

1.      On April 1, 2025, the U.S. Department of Health and Human Services (HHS or Department) notified thousands of federal workers that they were being terminated.  In the weeks leading up to those notices, HHS and its subcomponents shared personnel records with the U.S. DOGE Service (DOGE), the U.S. Office of Personnel Management (OPM), and the Office of Management and Budget (OMB).  These agencies knew that the records were hopelessly error-ridden, and that the records should have been used, if at all, with great caution.  Instead of taking steps to verify the contents of the records and correct the systemic inaccuracies, the agencies promptly used them to fire 10,000 employees.  That was unlawful and actionable under the Privacy Act.

2.      The federal workers of HHS play a critical role in advancing the health and wellness of all Americans.  At the beginning of 2025, HHS—which encompasses critical agencies like the Centers for Medicare & Medicaid Services (CMS), U.S. Food and Drug Administration (FDA), Centers for Disease Control and Prevention (CDC), National Institutes of Health (NIH), National Institute for Occupational Safety and Health (NIOSH), and Administration for Children and Families (ACF)—employed over 80,000 employees.  The President has requested approximately $1.8 trillion for HHS's FY2025 annual budget.

3.      HHS first revealed the scope of cuts on March 27, 2025.  Almost immediately, concerns about the underlying data and records took center stage.  According to an HHS spokesperson, the distribution of Reduction-in-Force (RIF) notices was originally delayed so that

"all the data could be triple checked over the weekend."[1]  (Others reported that the delay was also caused by infighting between DOGE and HHS officials.[2])

4.     But one weekend was not long enough to sort out the systemic issues plaguing HHS's personnel records.  As RIF notices began going out in the very early hours of April 1, 2025, affected workers quickly spotted glaring errors.

5.     Catherine Jackson worked in the Seattle, WA regional office for the Office of Child Care at ACF, supporting the state of Alaska and American Indian tribes in their implementation of programs that help low-income families afford childcare.  Her office also promotes children's learning and education by improving the quality of early care and after-school programs.  On April 1, Ms. Jackson received her RIF notice and was surprised to see recent performance ratings that were flatly incorrect.  The notice reflected a recent performance rating of 3, but she had never received a score lower than 4.  Defendants had clearly used an inaccurate personnel record in determining to include her in the RIF.  She has not received an offer of reinstatement or reassignment.  Ms. Jackson is 68 and struggling to find a new career to support her through to retirement; her retirement annuity would have vested in a few months.

6.     Melissa Adams, working in the Office of Grants Management, Strategic Operations and Innovation Division of ACF, also had incorrect performance ratings on her RIF notice, but faced an even more fundamental issue: Defendants did not seem to know where she worked.  Her competitive area was listed as "Office of Grants Management-" [*sic*] and her notice said everyone in her competitive area would be separated.  But that was not true.  Neither Ms. Adams's supervisor nor her direct report in Strategic Operations were included in the RIF.  And many others in the

---

[1]  https://www.reuters.com/world/us/backlash-hhs-delays-plan-slash-10000-jobs-politico-reports-2025-03-31/; https://www.politico.com/news/2025/03/31/doge-hhs-firings-delayed-00262115.
[2] *Id.*

broader Office of Grants Management remain fully employed and unaffected by the RIF.  On information and belief, Defendants believed Ms. Adams was part of the Boston, MA regional office because she worked remotely in Massachusetts pursuant to a longstanding reasonable accommodation.  The Boston office, unlike the D.C.-based office for which Ms. Adams actually worked, was expressly targeted and thoroughly dismantled by the RIF.  Ms. Adams is a single mother searching for a new job to support her and her family.

7.     Plaintiffs represent a range of offices and positions at HHS, from the Chief Information Officer of FDA, to an engineer working on mining safety at NIOSH, to an IT specialist with 34 years of experience at CDC's National Center for Health Statistics.  They all suffered the same experience: losing their jobs as a result of flawed personnel records.

8.     Under the Privacy Act, an individual has a cause of action when an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual." 5 U.S.C. § 552a(g)(1)(C).  In other words, individuals have recourse when an agency takes adverse action against them based on an inaccurate, irrelevant, untimely, or incomplete record.

9.     HHS leadership knew that the records and data being used to make employment decisions were inaccurate and incomplete.  Almost immediately after the April 1 cuts, a spokesperson for HHS reported to multiple media outlets that "to the extent there are errors, ***it is because the data collected by HHS's multiple, siloed HR divisions is inaccurate***."[3]  The spokesperson added that the April 1 cuts would "streamline operations and fix the broken

---

[3] https://perma.cc/L567XSRY.

systems."[4]  These were the same systems from which HHS collected records to send to DOGE, OPM, and OMB, violating the Privacy Act's separate requirements regarding matching programs.

10.     For his part, the Secretary of Health and Human Services, Robert F. Kennedy, Jr., acknowledged that the Department knew they were making mistakes in carrying out the RIF: "Personnel that should not have been cut, were cut.  We're reinstating them.  And ***that was always the plan***.  Part of the — at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, ***but 20% of those are going to have to be reinstated, because we'll make mistakes***."[5]

11.     It is, of course, little solace to these Plaintiffs that they were fired because of "siloed" recordkeeping.  Nor is it any comfort to know that many of them had been fired by "mistake."  For these Plaintiffs, HHS's intentional failure to maintain complete and accurate records before making life-changing employment decisions was a clear violation of the law.  And Plaintiffs suffered real harm immediately, which will remain unredressed even if their jobs are eventually reinstated.

12.     This unlawful "mistakes on purpose" approach appeared to be driven by a political strategy of moving fast and breaking things.  As Defendants have stated publicly, the agencies intended to save time by skipping over any attempt to ensure that the records on which they relied were accurate and complete.  Secretary Kennedy said in an April 9 interview that reviewing employee cuts before firing them "***takes too long and you lose political momentum***."[6]  "There are going to be casualties," he continued.[7]  Others involved in the April 1 cuts, including Elon Musk's

---

[4] *Id.*
[5] https://perma.cc/EBD7-LEAH.
[6] https://www.youtube.com/watch?v=o2U0csKvqMY.
[7] *Id.*

DOGE and Russell Vought's OMB, shared similar motivations to cut quickly without taking the time to ensure complete and accurate records as required by the Privacy Act.

13.     Defendants' unlawful conduct in carrying out the RIF also appeared to be motivated by a deep-seated animus toward federal workers.  On March 31, 2025, a group of DOGE representatives visited an FDA office in Maryland.  That afternoon, while an FDA employee was heading to her car to leave for the day and alone in the parking garage, a car pulled up near her with its window open.  A young man in business attire shouted at her from the car: "This is DOGE and this is your Last Supper!"  He laughed and drove off.  The employee was shaken, but didn't understand the incident at the time.  She received her RIF notice the next morning.

14.     Before taking his position, Mr. Vought infamously stated that his goal was for federal workers to be "traumatically affected."[8]  Defendants have done just that by terminating people based on the obviously flawed personnel records maintained first at HHS and then at the other agencies.

15.     Through the Privacy Act, Congress has provided for at least some relief.

## PARTIES

16.     Plaintiff Catherine Jackson is an individual who primarily resides in Renton, WA.  As of April 1, 2025, she was employed by HHS in the Administration for Children and Families, Office of Child Care.

17.     Plaintiff Melissa Adams is an individual who primarily resides in Ashburnham, MA.  As of April 1, 2025, she was employed by HHS in the Administration for Children and Families, Office of Grants Management.

---

[8] https://perma.cc/8PTU-ZQ2T.

18.     Plaintiff Carrie Greene is an individual who primarily resides in Auburn, CA.  As of April 1, 2025, she was employed by HHS in the Administration for Children and Families, Office of Family Assistance.

19.     Plaintiff Vid Desai is an individual who primarily resides in Cary, NC.  As of April 1, 2025, he was employed by HHS as the Chief Information Officer for the U.S. Food and Drug Administration.

20.     Plaintiff Shawn Chenault is an individual who primarily resides in Washington, DC.  As of April 1, 2025, he was employed by HHS in the Office of Digital Transformation at the U.S. Food and Drug Administration.

21.     Plaintiff Brendan Demich is an individual who primarily resides in Pittsburgh, PA.  As of April 1, 2025, he was employed by HHS as an engineer at the National Institute for Occupational Safety and Health, Pittsburgh Mining Research Division.

22.     Plaintiff Fonda Kornegay is an individual who primarily resides in Wake Forest, NC.  As of April 1, 2025, she was employed by HHS in the National Center for Health Statistics at the Centers for Disease Control and Prevention.

23.     Defendant Robert F. Kennedy, Jr., is the Secretary of HHS, the highest-level official in the Department.  He is sued in his official capacity.

24.     Defendant HHS is an agency within the meaning of the Privacy Act.  It is part of the executive branch of the United States government.  *See* 42 U.S.C. §§ 3501.

25.     Defendant Russell Vought is the Director of OMB.  He is sued in his official capacity.

26.     Defendant OMB is an agency within the meaning of the Privacy Act.  It is a subdivision within the Executive Office of the President.

27.     Defendant Elon Musk is and was the *de facto* leader of DOGE and a Special Government Employee.  He is sued in his official capacity.

28.     Defendant Amy Gleason is the DOGE Administrator.  She is sued in her official capacity.

29.     Defendant DOGE is an agency within the meaning of the Privacy Act.

30.     Defendant U.S. DOGE Service Temporary Organization is an agency within the meaning of the Privacy Act.  It is a subdivision within DOGE.

31.     Defendant Charles Ezell is the Acting Director of OPM.  He is sued in his official capacity.

32.     Defendant OPM is an agency within the meaning of the Privacy Act.  *See* 5 U.S.C. § 1101.

33.     Defendant Andrew Gradison is the Acting Assistant Secretary at the Administration for Children and Families.  He is sued in his official capacity.

34.     Defendant ACF is an agency within the meaning of the Privacy Act.  It is an executive branch agency and a component of HHS.  *See* 5 U.S.C. § 552(f).

35.     Defendant Martin Makary is the Commissioner of FDA.  He is sued in her official capacity.

36.     Defendant FDA is an agency within the meaning of the Privacy Act.  It is an agency within HHS.  *See* 21 U.S.C. § 393.

37.     Defendant Susan Monarez is the Acting Director of CDC.  She is sued in her official capacity.

38.     Defendant CDC is an agency within the meaning of the Privacy Act.  It is an agency within HHS.  *See* 42 U.S.C. § 242c.

## JURISDICTION AND VENUE

39.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Privacy Act, 5 U.S.C. § 552a. The Privacy Act also grants this Court jurisdiction under 5 U.S.C. § 552a(g)(1).

40.     Venue is proper in this District under 5 U.S.C. § 552(g)(5), which allows Privacy Act claims to be brought in the U.S. District Court for the District of Columbia.  Venue is also proper under 28 U.S.C. § 1391(e)(1)(A) because the Defendants are officers or employees of the United States acting in their official capacity or under color of legal authority, and at least one of them resides in this District, and under Section 1391(e)(1)(C) because Plaintiff Shawn Chenault resides in this District and no real property is involved in the action.

41.     Sovereign immunity is waived by 5 U.S.C. § 552a(g).

## BACKGROUND

### I.     The April 1 Cuts and the Role of Flawed Personnel Data

42.     On March 27, 2025, HHS announced formal plans to terminate "about 10,000 full-time employees."[9]  The announcement also disclosed the agency's plan to "consolidate" the 28 divisions of HHS into 15, and to reduce regional offices from 10 to 5.[10]

43.     The HHS plan was initially delayed by a few days, reportedly due to infighting at DOGE and concerns about the reliability of the relevant data.  According to news reports, RIF notices did not go out as planned on Friday, March 28, "so that all the data could be triple checked over the weekend."[11]

---

[9] https://www.hhs.gov/press-room/hhs-restructuring-doge.html.
[10] *Id.*
[11] https://www.reuters.com/world/us/backlash-hhs-delays-plan-slash-10000-jobs-politico-reports-2025-03-31/; https://www.politico.com/news/2025/03/31/doge-hhs-firings-delayed-00262115.

44.    Despite the agency's awareness of systemic errors in the underlying personnel records, the cuts were implemented on April 1, 2025, just five days after the public announcement. Some affected employees recognized the callous irony of the date, describing the RIF as a "cruel April Fool's joke."[12]

45.    Beginning in the early morning hours on April 1—for some, as early as 2:00 A.M. local time—thousands of employees were notified by email that they were being placed on administrative leave, effective immediately, and directed to forward the email to their personal email address. RIF notices were attached to the emails, informing employees that they were being laid off and would be formally separated on June 2, 2025. Employees promptly lost access to their offices and electronic resources, including their government email accounts. Some employees who were on leave or otherwise away from email that morning learned they had been terminated from news reports or messages from friends, and in some cases were unable to get a copy of their individual RIF notice for weeks. Supervisors had no notice that members on their team had been cut.

46.    The rushed nature of the RIF led to a chaotic scene at some offices as employees arrived to begin the workday, only to find out their security badge had been deactivated. As one worker explained, "[t]he way people are finding out whether they are RIF'd this morning is to go through this very long process to get to the building and to go through security, and then badge-in at the main atrium. If their badge doesn't work, they are corralled in front of everyone to wait for an escort to their office to pick up their things."[13]

---

[12] https://perma.cc/L567XSRY.
[13] https://perma.cc/6XSW-J5R9.

47.     Immediately, impacted employees began discovering obvious problems throughout nearly every communication from HHS.  Employees at FDA and ACF were directed to raise Equal Employment Opportunity (EEO) concerns with individuals who no longer worked at HHS.[14]  At ACF, there did not appear to be anyone left to review EEO issues, since members of that team had themselves been impacted by the RIF.  And employees at CMS were directed to contact someone who passed away last year.[15]

48.     Especially concerning were the obviously inaccurate personnel records reflected by the RIF notices.

49.     One common error across HHS was the use of inaccurate performance ratings. HHS uses the Performance Management Appraisal Program (PMAP) to measure employee performance.[16]  As part of PMAP, each HHS employee is given an annual appraisal of their performance.[17]  Employees are rated from 1 (Achieved Unsatisfactory Results) to 5 (Achieved Outstanding Results).[18]  The RIF notices received by HHS employees purported to include the most recent PMAP ratings, but the scores listed were often inaccurate.

50.     The "competitive area" listed on the RIF notices also reflected consistent errors in the underlying personnel records.  In the context of a RIF, a "competitive area" is an organizational and geographic subdivision within an agency.[19]  Employees compete for retention only within their competitive area.  For many employees impacted by the April 1 RIF, their competitive area reflected confusion and inaccuracies with respect to their office structure, location, position

---

[14] *Id.*

[15] *Id.*

[16] https://www.hhs.gov/about/agencies/asa/ohr/hr-library/430-1-2021/index.html#430-1-50.

[17] *Id.*

[18] *Id.*

[19] https://perma.cc/3QJ4-8LS4.

description, and/or job responsibilities. The timing of HHS's process was also highly irregular: although agencies are required to establish competitive areas at least 90 days in advance of a RIF action, the list on which HHS relied appears to have been created on April 22 and modified on April 30—weeks after Defendants implemented the April 1 RIF.[20]

51.    The "competitive level" also reflected inaccurate or incomplete records. In an agency with a functioning records system, the competitive level would group together comparable employees of a certain position within a competitive area.[21] But that was not the case here. For some people, the field was blank. For others, it was an indecipherable combination of letters and numbers that had apparently never been used before at HHS. These widespread issues provide further evidence that Defendants relied on flawed personnel records in executing the April 1 RIF.

52.    These examples are non-exhaustive. Many of the fields on the RIF notice reflected personnel-related errors for employees across HHS.

53.    The inaccurate and incomplete records reflected in the RIF notices caused Plaintiffs' terminations in at least two ways. First, these unreliable records hopelessly marred the image of various HHS offices and subcomponents that were being considered by Defendants for significant cuts, making entire offices more likely to be targeted by DOGE and others for elimination. Indeed, in many cases the error-ridden data prevented Defendants from understanding even the basic composition of HHS offices. Second, these inaccurate and incomplete records fed directly into agency retention registers—the formal standings that rank employees against each other—making it less likely that Plaintiffs caught up in the RIF would be retained or offered favorable reassignment.

---

[20] https://www.hhs.gov/sites/default/files/hhs-competitive-areas.pdf.
[21] *Id.* at p.33.

54.    Take the performance ratings.  The Trump Administration has consistently insisted that performance is an important and decisive factor in its approach to cutting the federal government.  In early March, for example, President Trump noted the importance of keeping high-performing employees: "It's very important that we cut levels down to where they should be, but it's also important to keep the best and most productive people."[22]  In a joint memorandum from OPM and OMB, discussed in more depth below, those Defendants directed agencies to prioritize "[r]emoving underperforming employees."[23]

55.    To that end, OPM requested in February that all agencies send a report listing "all employees who received less than a 'fully successful' performance rating in the past three years."[24]

56.    On information and belief, Defendants considered inaccurate performance ratings when determining which employees and offices in HHS to cut, and gave preference to higher-performing offices as measured by the inaccurate records.

57.    When it came to the retention registers, performance ratings directly impacted an employee's chance of termination.  During a RIF, impacted employees are literally ranked according to four factors: tenure of employment (*i.e.* type of appointment), veterans' preference, total creditable federal civilian and uniformed service, and performance ratings.[25]  People higher on the list are retained and people lower on the list are separated.  An employee's standing can also affect whether they are offered a reassignment within the agency or preferential treatment in agency hiring for vacancies.

---

[22] https://truthsocial.com/@realDonaldTrump/posts/114117008305421663.
[23] https://perma.cc/ZLK2-FGTP.
[24] https://perma.cc/VJ9L-Y9J3.
[25] https://perma.cc/55W8-ZEN8.

58.    Recent performance ratings have the effect of adding years of service for a given employee.  For example, an employee with three recent ratings of "outstanding" (a 5 on the HHS scale) would receive 20 additional years of service credit.[26]  Mistaken lower ratings, then, reduce the adjusted number of years of service and hurt an employee's standing in the retention register. The HHS RIF notices recognize this, noting the impact of "performance ratings" on "retention standing."

59.    On information and belief, Defendants' maintenance and use of inaccurate PMAP ratings for HHS employees hurt employees' standing on the retention register and increased their chance of an adverse action.

60.    Being terminated based on false performance ratings is particularly harmful to employees because it tarnishes their reputation and may make it more difficult for them to find a new job.  Impacted employees seeking new jobs are stuck trying to explain incorrect performance ratings on official government employment documents to prospective employers.  This harm is exacerbated by Defendants' consistent disparagement of federal workers as lazy,[27] repeated statements that federal employees are being terminated due to poor performance, and refusal to correct well-documented errors on the RIF notices.  Without accurate records reflecting their outstanding performance, affected employees are materially disadvantaged in their efforts to secure new employment.

61.    Defendants' use of flawed records documenting employees' assigned offices and positions—as evidenced by incorrect competitive areas and competitive levels listed on their RIF notices—was also deeply impactful.

---

[26] *Id.*
[27]    https://www.washingtonpost.com/business/2025/01/29/elon-musk-opm-federal-workers-buy out-trump/.

62.     According to HHS communications, Defendants were targeting certain offices and positions for reductions, and the magnitude of reduction varied greatly by area.

63.     For example, HHS planned varying cuts across the many subagencies of HHS: 3500 at FDA, 2400 at CDC, 1200 at NIH, and 300 at CMS, among others.[28]  Some entire offices and divisions of HHS were eliminated.  Others were consolidated.

64.     On information and belief, incorrect listings of competitive areas reflected inaccurate records regarding which offices or subdivisions employees were assigned to. Moreover, Defendants' failure to effectively review and/or track reasonable accommodation requests and approvals in an accurate and timely way added another layer of mistakes to employees' personnel files.  Rather than taking the time to verify the necessary records, Defendants instead proceeded with incomplete and inaccurate personnel records about the employees in the offices they were debating cutting.  And once Defendants determined that a particular group or office would be cut, inaccurate and incomplete record information swept employees into the RIF who should not have been.

65.     Problems with the competitive areas would also have skewed the retention registers, because those registers are compiled according to competitive area.  Errors in retention registers, in turn, affect whether employees are more likely to be retained, reassigned, or terminated.

66.     The RIF notices themselves offer strong evidence that the records underlying the competitive area determinations were inaccurate and incomplete.  Many notices claim that "[a]ll employees in your competitive area will be separated."  But in many instances that was flatly

---

[28] https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

incorrect, because at least some personnel in the impacted employees' former offices were retained.

67.    Incorrect competitive levels also affected whether employees were terminated in the RIF.  The personnel records used to determine competitive levels were relevant to Defendants' determination of where to cut, because those levels reflected the seniority and level of experience within each office.

68.    In addition, the use of erroneous competitive levels—again, based on inaccurate and incomplete personnel records—to generate erroneous retention registers wrongly diminished employees' prospects for being retained.

69.    The widespread, consistent nature of these mistakes is striking.  Plaintiffs represent offices across the HHS org chart, and their experiences are the same.[29]  That reflects systemic error.  On information and belief, thousands of people were impacted by these mistakes.

### *Flawed HHS Record-Keeping*

70.    As more and more errors came to light, those who remained at HHS scrambled to explain what had gone wrong.

71.    HHS spokesperson Andrew Nixon blamed the problems on inaccuracies in the underlying records at HHS: "To the extent there are errors, *it is because the data collected by HHS's multiple, siloed HR divisions is inaccurate*. . . . This is exactly why HHS is reorganizing its administrative functions to streamline operations and fix the broken systems."[30]

---

[29] In a recent court filing, an employee at the CDC's National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention also attested to uncorrected errors on her RIF notice.  *See* Decl. of Jane Doe 5, *New York v. Kennedy*, No. 1:25-cv-00196 (D.R.I. May 19, 2025), ECF No. 55-6 ¶ 24.
[30] https://www.politico.com/newsletters/future-pulse/2025/04/11/the-downside-of-rifs-at-nih-002 83243; https://perma.cc/L567-XSRY.

72.    That aligned with complaints made shortly before the cuts by Brad Smith, DOGE's health-czar, that there were "700 different IT systems" at NIH alone and that the systems "can't speak to each other."[31]

73.    For personnel, Secretary Kennedy noted in a recent interview that HHS has "nine HR departments and many of them have computer systems that can't talk to each other, that are incompatible."[32]

74.    It is true that HHS utilizes many different personnel systems of records.  FDA alone has over 30 separate systems of records that handle information for the same set of employees. These systems do not always communicate with each other, leading to serious inaccuracies.  This disconnect also leads to a strong risk that records will be incomplete when data is pulled from multiple sources, reconciled across varying systems, or manipulated into different formats.

75.    Consider one hypothetical FDA employee.  The **Enterprise Human Capital Management (EHCM) system**, housed at the HHS level, would include some of that employee's personnel records.  EHCM is used to process personnel actions and administer benefits.  The **ATLAS system**, meanwhile, does many of the same things, but is housed at FDA.

76.    Official government forms recording personnel actions, like SF-50s and SF-52s, are kept in the electronic Official Personnel Folder, known as **eOPF**.  The eOPF system is owned by OPM, but there are also agency-specific instances of eOPF that differ from the centralized version.

#77.    None of those systems contain employee performance ratings, a key input for Defendants in executing the April 1 RIF.  At FDA, those ratings are maintained in **ePMAP**, a

---

[31] https://perma.cc/2J7H-T57H.
[32] https://www.youtube.com/watch?v=o2U0csKvqMY.

system specific to FDA. At CDC, the system maintaining performance ratings is called **PMAS**. At ACF, at least for the last two years, they are kept in a system called **USA Performance**. In other divisions of HHS, PMAP scores are kept in still different systems. There is no way for the records in these varying PMAP systems to be transferred to EHCM. The records must be retrieved manually.

78.    The records that reflect employee offices and positions—more key inputs for Defendants in determining the April 1 cuts—are maintained as part of still different systems. At FDA, for example, the **Enterprise Administrative Support Environment (EASE)** includes "Standard Administrative Codes" (SAC Codes). SAC codes are unique identifiers assigned by the Secretary of HHS to each organizational component within HHS. They are associated with the organizational chart and staff manual guide. On information and belief, SAC Codes were an important determiner of competitive areas and competitive levels used by HHS for the April 1 cuts. The SAC code designations *for individual employees* are kept by a different office, the FDA Office of Operations, in a still different system. Additional information on position descriptions is maintained in a system called **eClass**.

79.    The list continues. Time reporting for HHS employees is kept in a system called **Integrated Time and Attendance System (ITAS)**. Records keeping track of when employees swipe their badges at government offices are kept in a different system.

80.    And again, none of these systems communicate with each other. Some systems are updated more than others. Some systems receive corrections faster than others. Nearly all have inaccuracies that are slowly compounded. Consequently, any attempt to match these records together *en masse* will result in systemically inaccurate and incomplete results. They must be

checked for inaccuracies and missing data.  On information and belief, that is also true for the systems maintained across HHS.

81.    In April 2020, Booz Allen Hamilton published an assessment of FDA's personnel systems and processes that reached similar conclusions.[33]  The report noted "data management issues," including "reliance on homegrown approaches for manually tracking data (e.g., Access databases, Excel spreadsheets) and not reconciling manually tracked data with the appropriate system of record (e.g., the Enterprise Human Capital Management [EHCM] system)."[34]  The "lack of integration," the report continued, "introduces quality control issues given that seemingly *conflicting data may be pulled from various systems*."[35]

82.    FDA's IT employees, including the Office of Digital Transformation, worked diligently for years to try to fix these problems.  But the larger changes that were needed lacked support from senior leadership.

83.    Defendant OPM, in seeking to replace its own outdated personnel record systems, succinctly explained the problem: "OPM's ability to execute its HR mission is constrained by a patchwork of aging, siloed systems—including HR Links and other legacy platforms—that were not designed to meet the interoperability, transparency, or compliance standards required of a 21st-century federal agency.  These systems suffer from significant functional and architectural limitations.  They do not reliably validate or audit changes, cannot properly sequence concurrent personnel actions, and *often propagate incorrect data across records*—creating widespread downstream effects on payroll, benefits, and employee entitlements.  Additionally, basic processes

---

[33] https://www.fda.gov/media/138662/download?attachment.
[34] *Id.* at 27 (alteration in original).
[35] *Id.* (emphasis added).

such as onboarding, promotions, and leave tracking require time-consuming workarounds that *increase the risk of error* and delay service delivery."[36]

### Sending Records to Other Agencies

84.     The inaccurate records maintained at HHS steadily spread to the other Defendant agencies that were involved in the April 1 cuts.  There were many calls for personnel data in the weeks and months leading up to the RIF.

85.     On February 6, 2025, Defendant Charles Ezell, Acting Director of OPM, sent a memo to agencies directing them to "submit data regarding their performance management plans and policies . . . and identify any barriers to ensuring that . . . the agency has the ability to swiftly terminate poor performing employees who cannot or will not improve."[37]  Mr. Ezell gave a deadline of March 7, 2025 to comply.[38]

86.     Specifically, Mr. Ezell requested information including "[a]ll employees who received less than a 'fully successful' performance rating in the past three years."  For each employee, Mr. Ezell requested "[n]ame, job title, pay plan, series, grade, agency, component, and duty station."[39]  This information unquestionably included "records" under the Privacy Act.  *See* 5 U.S.C. § 552a(a)(4).

87.     HHS sought to comply.  HR officials throughout the department dutifully collected PMAP scores for employees as directed.  On information and belief, HHS then sent those records—along with records gathered from other portions of HHS—to the other Defendants.

---

[36] https://perma.cc/A3PF-98F4 (emphasis added).
[37] https://perma.cc/VJ9L-Y9J3.
[38] *Id.*
[39] *Id.*

88.    Then, pursuant to Executive Order 14210, "Implementing the President's Department of Government Efficiency Workforce Optimization Initiative" (Feb. 11, 2025), Mr. Ezell and Defendant Russell Vought, Director of OMB, sent a joint memorandum to federal agencies, including HHS, directing that "Agency RIF and Reorganization Plans" (ARRP) be sent to OMB and OPM for review.[40]   "Phase 1 ARRPs" were due to OMB and OPM by March 13, 2025.[41]   HHS complied with this deadline.[42]

89.    In that memo, OMB and OPM gave guidance to agencies on how to cut their workforce, including by pursuing "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required."[43]   Agencies were also directed to, among other things, "seek to consolidate areas of the agency organization chart that are duplicative," "consolidate management layers where unnecessary layers exist," "seek reductions in components and positions that are non-critical," and "close and/or consolidate regional field offices to the extent consistent with efficient service delivery."[44]

90.    Notably, OMB and OPM also mandated that agencies send granular record data about their employees as part of the ARRPs.  As part of the Phase 1 ARRP, for example, HHS was required to identify "[a]ll agency components *and employees* performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations."[45]   They were also required to send information that very well could have included specific employee data, including "[a] list by job position of all positions categorized as essential

---

[40] https://perma.cc/ZLK2-FGTP.
[41] *Id.*
[42] Defs' Mem. In Opp. To Pl.'s Mot. For Prelim. Inj., *New York v. Kennedy*, No. 1:25-cv-00196 (D.R.I. May 16, 2025), ECF No. 52 at 8.
[43] https://perma.cc/ZLK2-FGTP.
[44] *Id.*
[45] *Id.* (emphasis added).

for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent."[46]

91.    Perhaps recognizing their obligations under the Privacy Act, OMB and OPM directed agencies to confirm "that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status."[47]  But critically, OMB and OPM did not require agencies to do so until they submitted their Phase 2 ARRPs on April 14, 2025—two weeks *after* the HHS cuts took place.[48]

92.    OMB and OPM also directed agency heads to "collaborate with their Department of Government Efficiency ('DOGE') team leads within the agency in developing competitive areas for ARRPs."[49]

93.    Right on cue, DOGE entered the picture.  In late February and early March, representatives from DOGE began meeting with HHS personnel.  In one such meeting at FDA, agency personnel gave a high-level overview of FDA's structure and functions to Clark Minor, an ex-Palantir executive and current DOGE representative.

94.    On information and belief, similar meetings happened across HHS.  In early March, it was reported that DOGE staff met with career officials at NIH to review proposed layoffs and reiterate the directive that more than 3000 employees should be terminated—a target that was set by DOGE, not anyone at NIH.[50]  At CDC, it was reported that members of DOGE "stalked the

---

[46] *Id.* (emphasis added).
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] https://perma.cc/E6HY-3TME.

halls" of the Atlanta headquarters throughout February and March,[51] "combing through records" and looking for people to fire.[52]

95.    DOGE representatives also began requesting office-specific personnel data with very little notice. One such vignette played out at FDA's Office of Digital Transformation, which leads FDA's enterprise IT functions. On March 21, 2025, Dorn Carranza, an HHS employee who served as a liaison to DOGE, requested data on FDA "mission critical" systems and the personnel leading and supporting those systems. The request was received around 11:00 A.M., with an ASAP deadline and a directive to provide an update that afternoon. Because Plaintiff Desai, the Chief Information Officer at the time, was out on leave, the request fell to FDA's Chief Information Security Officer (CISO). Perhaps due to the urgency of the request, the CISO submitted responses supporting his view of "mission critical" without discussing the matter with Mr. Desai or other department leadership. On information and belief, the data was sent to the DOGE representative that evening, less than 24 hours after the request came in. On information and belief, and based on the underlying data systems, the irregular process, and the impossible deadline, the records that were submitted included inaccurate and/or incomplete personnel-related information that had a direct impact on the subsequent RIF decisions. Following the April 1 cuts, it appears that the individuals identified as supporting "mission critical" systems in the responses to DOGE (including the CISO who complied with DOGE's demands) were not included in the RIF, while others in the office were—even though FDA and HHS did not take adequate steps to review the accuracy or completeness of that information. This incident is emblematic of the haphazard way employee data was collected across HHS and transmitted to other agencies.

---

[51] https://perma.cc/X7XR-TWSJ.
[52] https://perma.cc/JS6X-AJXW.

96.    The incident is also consistent with the model of DOGE's conduct across agencies. At the Social Security Administration, for example, DOGE used unconventional channels to access desired data, sacrificing accuracy. As Leland Dudek put it in a now-deleted LinkedIn post: "I confess. I helped DOGE understand SSA. . . . I bullied agency executives, shared executive contact information, and circumvented the chain of command to connect DOGE with the people who get stuff done."[53]    Mr. Musk celebrated Mr. Dudek, who was then promoted to Acting Commissioner of Social Security.[54]

97.    At HHS, DOGE representatives were granted access to the HHS Enterprise Human Capital Management System on February 28, 2025.[55]    DOGE has also been able to access other HR databases, including the NIH Workforce Analytics Workbench.[56]

98.    Additionally, for months, all workers at HHS were required to submit five bullet points to OPM about their work on a weekly basis. On February 22, 2025, Mr. Musk tweeted: "Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week. Failure to respond will be taken as a resignation."[57]    From late February through at least April 1, many HHS employees dutifully sent this information. On information and belief, OPM, DOGE, and/or other Defendants were compiling those submissions into a system of records to "determine whether someone's work is mission-critical or not" and where to make corresponding cuts to federal agencies like HHS.[58]

---

[53] https://perma.cc/JQK7-QCD3.
[54] https://perma.cc/MK7Z-SGYC.
[55] Defs' Obj. Resp. Plfs' Requests, *AFL-CIO v. Dep't of Labor*, No. 1:25-cv-00339-JDB (D.D.C. Mar. 29, 2025), ECF No. 73-2 at 8.
[56] https://perma.cc/C4HD-ELKK.
[57] https://perma.cc/5Y2H-P7MC.
[58] https://www.nbcnews.com/politics/doge/federal-workers-agencies-push-back-elon-musks-email-ultimatum-rcna193439.

99.     All of these developments make clear that the relevant personnel records ended up outside of HHS.  In late March, it was reported that the White House and DOGE were reviewing agencies' plans for mass layoffs.[59]  As the cuts approached at HHS, the Acting FDA Commissioner told a colleague that the ultimate decisions were being made by HHS, OPM, and DOGE.  And public reporting suggests that the layoffs were initially delayed by a few days due in part to infighting within DOGE about who and where to cut.[60]  On information and belief, officials from DOGE, OPM, and OMB played an important role in directing where to cut at HHS.

100.     On information and belief, to inform and carry out the April 1 cuts, Defendants matched together various employee-record inputs for HHS personnel.  They then executed those cuts with the knowledge that the underlying data and records were unreliable, inaccurate, and/or incomplete.  And Plaintiffs suffered the consequences by being abruptly locked out of their offices, immediately placed on administrative leave, and terminated from their positions.

### *Planning to Make Mistakes*

101.     Secretary Kennedy went so far as to concede that the mistakes made by the agency were planned and purposeful: "Personnel that should not have been cut, were cut.  We're reinstating them.  And that was always the plan.  Part of the — at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."[61]

---

[59] https://www.reuters.com/world/us/backlash-hhs-delays-plan-slash-10000-jobs-politico-reports-2025-03-31/.
[60] https://www.politico.com/news/2025/03/31/doge-hhs-firings-delayed-00262115.
[61] https://perma.cc/EBD7-LEAH.

102.    According to Secretary Kennedy in an April 9 interview with CBS, the agency could not slow down to fix these issues because of the fleeting political opportunity: checking employee information before firing them "takes too long and you lose political momentum."[62]

103.    As these mistakes piled up and threatened to impair core, popular government functions, HHS backtracked on some, but certainly not all, of their April 1 mistakes.

104.    For example, HHS rescinded the April 1 RIF notices for employees at FDA's food safety labs in Chicago and San Francisco.[63]

105.    After more than six weeks of uncertainty, HHS decided to reinstate hundreds of employees from NIOSH, including those overseeing health screenings for coal miners and 9/11 first responders.[64]

106.    In some instances, it seems HHS still does not know who they fired.  Despite Secretary Kennedy's congressional testimony that HHS had "not fired any working scientists," dozens of scientists, including at the National Institute of Neurological Disorders and Stroke as well as the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention, were subject to the April 1 cuts and—at least as of mid-May—had not had their RIF notices canceled or rescinded.[65]

107.    HHS has rejected the need for more widespread reconsideration of the April 1 cuts.

---

[62] https://www.youtube.com/watch?v=o2U0csKvqMY; https://www.npr.org/sections/shots-health-news/2025/05/13/nx-s1-5381022/rfk-hhs-layoffs-restructuring-trump-budget.

[63] https://perma.cc/9BDJ-4UBN.

[64]  https://www.nbcnews.com/health/health-news/hhs-reinstates-hundreds-health-workers-rcna20 6856; *see also* Defs' Mem. In Opp. To Pl.'s Mot. For Prelim. Inj., *New York v. Kennedy*, No. 1:25-cv-00196 (D.R.I. May 16, 2025), ECF No. 52 at 9-10.

[65] https://perma.cc/Y7GU-TWWT; Decl. of Jane Doe 5, *New York v. Kennedy*, No. 1:25-cv-00196 (D.R.I. May 19, 2025), ECF No. 55-6 ¶ 19.

108.    At the time of this filing, HHS is subject to at least one preliminary injunction preventing the agency from separating the employees cut on April 1.  Most of those workers remain on administrative leave.  Plaintiffs understand that there is another lawsuit seeking injunctive relief brought by a group of states in the U.S. District Court for the District of Rhode Island.  Even if those lawsuits are ultimately successful, they will not remedy past wrongs or damages suffered by the named Plaintiffs and the putative class.

109.    This lawsuit is not focused on whether HHS should have engaged in layoffs or restructuring generally, whether its decision to do so was legal, or whether the agency complied with RIF-specific rules and regulations.  Instead, this lawsuit is focused on whether, in choosing to cut this set of employees—including Plaintiffs here—HHS violated its obligations under the Privacy Act.  In fact, these firings were caused by Defendants' intentional failure to maintain complete, accurate, and timely personnel records, in violation of the Privacy Act, and Defendants' determination to proceed with the cuts anyway.

## II.    Plaintiffs' Experiences

110.    Plaintiff **Catherine Jackson** is a resident of Renton, WA.  As of April 1, she worked in the Seattle, WA regional office for the Office of Child Care at ACF, supporting the state of Alaska and American Indian tribes in their implementation of programs that help low-income families afford childcare.  She has worked for HHS for four and a half years.

111.    On April 1, Ms. Jackson received her RIF notice.  Under the section listing most recent performance ratings, the notice showed "3,5,5"—reflecting that she had received a 3 in a recent performance evaluation.  But this was inaccurate: she had never received a score lower than 4.  In fact, she had received several performance awards in her role with the Office of Child Care.  As a direct result of the incorrect ratings, Ms. Jackson lost two years of retention credit, which

should have been used to determine whether she would be retained, terminated, or offered alternative assignments.  The Seattle regional office also appeared to decisionmakers to have lower-performing employees than was accurate.  After collecting and reviewing this erroneous data, Defendants chose to cut Seattle while keeping many other regional offices open.

112.     Ms. Jackson's RIF notice also reflected other inaccurate or incomplete records.  Ms. Jackson's competitive area is designated as "OFFICE OF CHILD CARE REGIONAL-" [*sic*], and the notice said "NOTE: All employees in your competitive area will be separated."  This information was inaccurate, as there were 10 regional offices that each included employees in the Office of Child Care, but only 5 were closed.  In addition, Ms. Jackson's competitive level is listed as "CCP1," which does not appear to correspond to any of the defined competitive level codes that HHS has published.[66]

113.     Ms. Jackson is 68 years old and now in need of a new job.  Because she is being terminated just short of five years of federal service, her retirement annuity that would have paid out for the rest of her life did not vest.  As a result of Defendants' actions, Ms. Jackson will suffer both lost wages and the loss of a lifetime annuity.  Additionally, Ms. Jackson has spent money on career search tools to help her find a new job.  Moreover, Ms. Jackson already earned a cash performance award for her work in 2024 that she has not received; on information and belief, that is because ACF has decided not to pay out those awards to individuals included in the April 1 RIF.  Her unexpected termination, based on false performance information, has also caused her substantial mental distress for which she has incurred increased healthcare costs for treatment.

---

[66] https://www.hhs.gov/about/agencies/asa/ohr/hr-library/351-1/index.html#appendix.

114.    Plaintiff **Melissa Adams** is a resident of Ashburnham, MA.  As of April 1, she was a supervisory grants management specialist in the Strategic Operations and Innovation Division in the Office of Grants Management at ACF.  She has worked at HHS since July 2020.

115.    On April 1, Ms. Adams received her RIF notice.  Under the section listing most recent performance ratings, the notice showed "3,5,5"—reflecting that she had received a 3 in a recent performance evaluation.  But this was inaccurate: each of her three most recent performance ratings was a "5."  Indeed, at the end of fiscal year 2024, Ms. Adams received multiple incentive awards in the form of additional compensation and extra time off in recognition of her exceptional performance and many significant contributions to ACF's work on behalf of children and families throughout the year.  As a direct result of Defendants' actions, Ms. Adams lost two years of retention credit, which should have been used to determine whether she would be retained, terminated, or offered alternative assignments within the agency.

116.    Ms. Adams's competitive area is designated as "Office of Grants Management-" [*sic*].  The notice also said "NOTE: All employees in your competitive area will be separated." This information was inaccurate for a number of reasons.  Much of the Office of Grants Management was untouched by the RIF, and multiple people in Ms. Adams's Division were similarly not impacted.  Indeed, the listed competitive area makes no reference to Ms. Adams's actual office, the Strategic Operations and Innovation Division.  On information and belief, the RIF notice referred to the Boston regional office.  But although Ms. Adams's *duty station* was Boston because of a reasonable accommodation, that was not her assigned office.

117.    Ms. Adams is a single mother who will need to find new employment.  As a result of Defendants' actions, Ms. Adams will suffer lost wages and loss of other job benefits.  Ms. Adams's retirement annuity was set to vest on July 3, 2025, so Defendants' actions have cost her

that lifelong benefit.  Moreover, Ms. Adams had already earned a cash performance award for her

work in 2024 that she has not received; on information and belief, ACF has declined to pay those

awards to individuals included in the April 1 RIF.  Additionally, Ms. Adams has spent money on

career search tools to help her find a new job.  Ms. Adams's sudden termination has caused

significant, ongoing mental distress.

118.    Plaintiff **Carrie Greene** is a resident of Auburn, CA.  As of April 1, she was branch

chief in the Division of Tribal TANF Management in the Office of Family Assistance at ACF.[67]

She has worked at HHS since March 2018.

119.    On April 1, Ms. Greene received her RIF notice.  Under the section listing most

recent performance ratings, the notice showed "3,5,5"—reflecting that she had received a 3 in a

recent performance evaluation.  But this was inaccurate: she had never received a score lower than

5.  Indeed, Ms. Greene had received incentive awards based on her outstanding performance every

year.  As a direct result of Defendants' actions, Ms. Greene lost two years of retention credit, which

should have been used to determine whether she would be retained, terminated, or offered

alternative assignments within the agency.

120.    Ms. Greene's competitive area is designated as "DIVISION OF TRIBAL TANF

MANAGE-" [*sic*].  The notice also said "NOTE: All employees in your competitive area will be

separated."  But that was not true.  Including Ms. Greene, only two people in her office received a

RIF notice; the rest of the office remains unaffected.  On information and belief, Ms. Greene was

included in the RIF because her personnel records incorrectly listed her duty station as the San

Francisco, CA regional office, which was closed as part of the April 1 cuts.  But Ms. Greene did

not work in the San Francisco office.  She was a Central Office employee, her team was based in

---

[67] TANF stands for "Temporary Assistance for Needy Families."

Washington, DC, and her duty station should have been listed as her home address in Auburn pursuant to a previously approved reasonable accommodation for documented disabilities. Notably, the other member of her office who was affected by the RIF was assigned to a duty station in a different regional office that was closed.

121.    The competitive level on Ms. Greene's RIF notice also appears to be inaccurate or incomplete.  The notice lists Ms. Greene's competitive level as "FAS1," but that code does not appear to correspond to any of the defined competitive level codes that HHS has published.[68]

122.    Since the April 1 RIF, Ms. Greene has faced both medical and financial harm. Losing her job suddenly and erroneously has caused Ms. Greene mental and physical injuries for which she has sought and paid for medical treatment.  In addition, as a result of Defendants' actions, Ms. Greene will suffer lost wages and loss of other job benefits.  Moreover, Ms. Greene has spent money on career search tools to help her find a new job.

123.    Plaintiff **Vid Desai** primarily resides in Cary, NC, although he frequently stayed in Washington, DC for much of his tenure with the government.  As of April 1, he was the Chief Information Officer for FDA.  In that role, he served on the agency's Executive Committee and led FDA's Office of Digital Transformation.  Mr. Desai joined the federal government in 2019, leaving high-level positions in the private sector to pursue public service.

124.    On April 1, Mr. Desai received his RIF notice.  Under the section listing recent performance ratings, the notice showed "3,3,3"—reflecting that he had received a 3 in each of his most recent performance evaluations.  But this was inaccurate: his previous three performance reviews should all have rounded up to 5.  As a direct result, he lost eight years of retention credit, which should have been used to determine whether he would be retained, terminated, or offered

---

[68] https://www.hhs.gov/about/agencies/asa/ohr/hr-library/351-1/index.html#appendix.

alternative assignments.  The Office of Digital Transformation also appeared to decisionmakers as an office led by an under-performing executive when that was not accurate.  As a result, on information and belief, Defendants chose to cut Mr. Desai and much of his team while keeping other IT functions.

125.    Mr. Desai's notice reflected other inaccurate or incomplete records.    The competitive area was listed as "OFC OF DIGITAL TRANSFORMATION-OFC OF THE COMMISSIONER," which does not match any of the competitive areas on the list that HHS recently published.[69]  In addition, Mr. Desai's competitive level was blank.  Without a competitive level, it is impossible to know how Mr. Desai's ranking on the retention register was generated.  And his notice erroneously claimed that "[a]ll employees in [his] competitive area will be separated."  But several people in the Office of Digital Transformation, listed as part of his competitive area, were not impacted by the RIFs, and others who were impacted were selectively reinstated.  Indeed, an employee who was retained is filling Mr. Desai's exact position as Acting CIO.  On information and belief, the designation and/or composition of Mr. Desai's competitive area was inaccurate, impacting Defendants' consideration of the area and the composition and ordering of the retention register.

126.    Mr. Desai's reputation as a high-level IT professional has been especially damaged by Defendants' actions.    Defendants' disparaging comments about IT modernization and efficiency, combined with Mr. Desai's inclusion in the RIF, give the impression that he was responsible for those problems, despite his and his team's efforts over years to improve the IT environment.  Financially, to be eligible for federal retirement benefits, Mr. Desai needs to be at least 62 years old, but he does not turn 62 until August.  As a result of Defendants' actions, Mr.

---

[69] https://www.hhs.gov/sites/default/files/hhs-competitive-areas.pdf.

Desai will suffer not only lost wages but also lost retirement benefits for the rest of his life.  Further, because of the abrupt timing of the RIF, Mr. Desai has incurred out-of-pocket costs to start a new consulting business as new employment.

127.    Plaintiff **Shawn Chenault** is a resident of Washington, DC.  As of April 1, he was a product manager and marketing specialist in FDA's Office of Digital Transformation.  He supported communication and digital strategy initiatives, including managing outreach campaigns and enhancing user engagement across digital platforms.  A veteran of the U.S. Air Force, Mr. Chenault also focused on recruiting and retaining veterans at FDA.

128.    On April 1, Mr. Chenault received his RIF notice.  Under the section listing recent performance ratings, the notice showed "3,4,4"—reflecting that he had received a 3 on one of his most recent performance evaluations.  But this was inaccurate: his previous three performance reviews were all 4s.  As a direct result, he lost one year of retention credit, which should have been used to determine whether he would be retained, terminated, or offered alternative assignments. The Office of Digital Transformation also appeared to decisionmakers to have lower-performing employees than was accurate.  As a result, on information and belief, Defendants chose to cut much of the Office of Digital Transformation while keeping other IT functions.  In addition, Mr. Chenault's competitive level was blank.  Without a competitive level, it is impossible to know how Mr. Chenault's ranking on the retention register was generated.

129.    Mr. Chenault faces lost wages and benefits from his termination.  In addition, Mr. Chenault lost the opportunity to finish the term of service needed to have his student loans forgiven pursuant to the Public Service Loan Forgiveness program.  Since April 1, Mr. Chenault has already incurred out-of-pocket expenses related to receiving his RIF notice.  Specifically, Mr. Chenault's

unexpected termination has caused him substantial mental distress for which he has incurred increased healthcare costs for treatment.

130.    Plaintiff **Brendan Demich** is a resident of Pittsburgh, PA.  As of April 1, he worked as an engineer in the Pittsburgh Mining Research Division of NIOSH, within CDC.  He started as an intern with NIOSH in 2012 and has worked full time with the agency for nine years.  Mr. Demich studies mining emergencies and develops tools to help prevent miners from being injured or killed on the job.

131.    Mr. Demich first received a "Notice of Intent to Conduct a Reduction in Force" on April 1.  He later received his RIF notice on May 2.  Despite the extra month of time, and Defendants' obvious awareness of the record inaccuracies involved in the RIF, Mr. Demich's RIF notice contained similar errors common in the April 1 RIF notices.  Under the section listing most recent performance ratings, the notice showed "5,3,5"—reflecting that he had received a 3 in a recent performance evaluation.  But this was inaccurate: his last three performance ratings were all 5s.  As a direct result of the incorrect ratings, Mr. Demich lost two years of retention credit, which should have been used to determine whether he would be retained, terminated, or offered alternative assignments.   The Pittsburgh Mining Research Division also appeared to decisionmakers to have lower-performing employees than was accurate.  After collecting and reviewing this erroneous data, Defendants chose to cut the Pittsburgh Mining Research Division while ultimately keeping some other portions of NIOSH open.

132.    Mr. Demich faces lost wages and benefits from his termination.  Since April 1, Mr. Demich has already incurred out-of-pocket expenses related to his search for a new job, including for professional supplies.  Moreover, Mr. Demich's unexpected termination has caused him substantial mental distress for which he has incurred increased healthcare costs for treatment.

133.    Plaintiff **Fonda Kornegay** resides in Wake Forest, NC.  As of April 1, she was an IT Specialist (Systems Analyst) in the Office of Informatics, Governance, and Assurance at CDC's National Center for Health Statistics (NCHS), in Durham, NC.  In that role, Ms. Kornegay supported the Center's IT infrastructure by troubleshooting problems with various software applications.  Ms. Kornegay started as a hospital discharge survey coder in 1991 and has worked at NCHS for 34 years.

134.    On April 1, Ms. Kornegay received her RIF notice.  Under the section listing most recent performance ratings, the notice showed "5,3,5"—reflecting that she had received a 3 in a recent performance evaluation.  But this was inaccurate: she had never received a score lower than 4 throughout her entire career in federal service, and for at least the past 11 years, she has received all 5s.  As a direct result of the incorrect ratings, Ms. Kornegay lost two years of retention credit, which should have been used to determine whether she would be retained, terminated, or offered alternative assignments.  The Office of Informatics, Governance, and Assurance also appeared to decisionmakers to have lower-performing employees than was accurate.  After collecting and reviewing this erroneous data, Defendants chose to cut that office while keeping others open.

135.    As a result of Defendants' actions, Ms. Kornegay will suffer both lost wages and the loss of retirement benefits.  Ms. Kornegay's sudden termination has also caused significant, ongoing mental distress.

## III.    The Architects of the April 1 Cuts

136.    On information and belief, the April 1 cuts were the result of a coordinated effort by the leaders of HHS, DOGE, OPM, and OMB.  These architects have long shown antipathy toward the federal workforce.  Their disdain for federal workers like Plaintiffs provides additional support for the intentional nature of the Privacy Act violations that infected the April 1 RIF.

137.    According to Secretary Kennedy's recent congressional testimony, he was the final decisionmaker on the April 1 cuts.[70]

138.    Even before he took office, Secretary Kennedy has relished the possibility of terminating workers at HHS.  Shortly before the election, Secretary Kennedy tweeted: "FDA's war on public health is about to end. This includes its aggressive suppression of psychedelics, peptides, stem cells, raw milk, hyperbaric therapies, chelating compounds, ivermectin, hydroxychloroquine, vitamins, clean foods, sunshine, exercise, nutraceuticals and anything else that advances human health and can't be patented by Pharma. If you work for the FDA and are part of this corrupt system, I have two messages for you: 1. Preserve your records, and 2. Pack your bags."[71]  As for NIH, Secretary Kennedy stated: "We need to act fast, and we want to have those people in place on Jan. 20 so that on Jan. 21, 600 people are going to walk into offices at NIH, and 600 people are going to leave."[72]

139.    Elon Musk was also deeply involved in deciding where HHS would cut.  Secretary Kennedy testified before Congress to that effect: "Elon Musk gave us help in figuring out where there was waste, fraud and abuse in the department, but it was up to me to make the decision."[73] On information and belief, Mr. Musk was acting in his role as *de facto* head of DOGE and exercised substantial authority independently of the President in his communications and coordination with HHS and DOGE, and would have compiled and maintained inaccurate and

---

[70] https://www.washingtonpost.com/health/2025/05/14/rfk-jr-congress-testimony/?_pml=1.
[71] https://perma.cc/V3D3-LCSH.
[72] https://perma.cc/6JWQ-UX25.
[73] https://www.washingtonpost.com/health/2025/05/14/rfk-jr-congress-testimony/?_pml=1.

incomplete HHS records as part of these actions.  At DOGE itself, Brad Smith appears to have played a leading role.[74]

140.    Mr. Musk's derogatory statements about the federal workforce are well-documented.  Of the thousands of workers at the U.S. Agency for International Development (USAID), Mr. Musk quipped "[i]t became apparent that what we have here is not an apple with a worm in it, what we have actually, just a ball of worms."[75]  And Mr. Musk drew outrage by reposting (before later deleting) a tweet that alluded to federal workers as genocidal murderers: "Stalin, Mao, and Hitler didn't murder millions of people.  Their public sector employees did."[76]

141.    OMB was also involved.  Russell Vought spoke with Secretary Kennedy five days before the April 1 cuts, including about "the extent to which they've reorganized the department, the number of people that they're able to let go and be able to find efficiencies at HHS."[77]  Mr. Vought described the cuts as "fantastic."[78]

142.    Further, pursuant to Executive Order 14210, "Implementing the President's Department of Government Efficiency Workforce Optimization Initiative" (Feb. 11, 2025), Secretary Kennedy (as agency head of HHS) was required to submit to Mr. Vought (as Director of OMB) a report that "discuss[ed] whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.* Sec. 3(e).  On information and belief, and considering the more granular personnel-related data subsequently requested by OMB and OPM, that report would have

---

[74] https://www.reuters.com/world/us/backlash-hhs-delays-plan-slash-10000-jobs-politico-reports-2025-03-31/; https://www.politico.com/news/2025/03/31/doge-hhs-firings-delayed-00262115.
[75] https://perma.cc/37AL-C477.
[76] https://perma.cc/86VE-7PYE.
[77] https://thehill.com/homenews/administration/5219328-russell-vought-hhs-layoffs-fantastic/.
[78] *Id.*

been accompanied by and/or associated with inaccurate and/or incomplete records thereafter maintained by OMB.

143.    Mr. Vought has previously called for the villainization of civil servants (or worse): "We want the bureaucrats to be traumatically affected." "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. We want their funding to be shut down so that the EPA can't do all of the rules against our energy industry because they have no bandwidth financially to do so. We want to put them in trauma."[79]

144.    To carry out the April 1 cuts, DOGE, OMB, and OPM (as well as their respective leaders) spent significant time reviewing the details of HHS's restructuring, including by engaging in extensive communications with HHS leadership. On information and belief, each of these agencies were endowed with and exercised substantial authority independent of the President in undertaking this task, including by recommending specific cuts without consulting with the President.

145.    On information and belief, the animus of these architects towards federal workers led them to ignore the many obvious red flags about the accuracy of the personnel data they were relying on, in order to terminate more people more quickly. These architects created an environment within Defendant agencies where inaccurate or incomplete records that could be used to terminate federal workers were readily embraced if not celebrated. On information and belief, Defendants relied upon these records despite knowledge and/or reckless disregard of their inaccuracies and incompleteness.

---

[79] https://perma.cc/8PTU-ZQ2T.

## CLASS ALLEGATIONS

146.    Plaintiffs bring this action on behalf of themselves and on behalf of the members of the following class under Federal Rules of Civil Procedure 23(b)(1), (b)(2), (b)(3), and/or (c)(4):

> *All individuals who were employed by the U.S. Department of Health and Human Services in a non-probationary status on March 31, 2025, were sent a Notice of Reduction in Force or Notice of Intent to Conduct a Reduction in Force on April 1, 2025, and whose Notice of Reduction in Force was inconsistent with official personnel records.*

147.    Subject to additional information obtained through further investigation and discovery, the proposed class definition may be revised, amended, expanded, and/or narrowed.

148.    The class definition provides clear, objective criteria that class members and Defendants can understand, and it allows the parties to identify the members of the class by comparing the RIF notices with previously issued official documents.

149.    Plaintiffs and class members were injured by the same unlawful conduct, namely, Defendants' implementation of the April 1 Reduction in Force in violation of 5 U.S.C. 552a.

150.    The proposed class would meet the requirements of Rule 23(a).

a.    The class is so numerous that joinder of all members is impractical.  On information and belief, the proposed class includes thousands of similarly situated employees. According to HHS, 10,000 employees were laid off as part of the April 1 RIF.[80]  Although the exact number and identity of class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, public reporting and interviews with potential class members suggest that many—and possibly most—of the RIF notices issued by the agency contained personnel-related errors.

---

[80]  https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

b.      There are questions of law or fact common to the class.  Among others, questions common to the class include:

i.      whether Defendants failed to maintain Plaintiffs' records with accuracy in connection with the April 1 RIF;

ii.     whether Defendants failed to maintain Plaintiffs' records with completeness in connection with the April 1 RIF;

iii.    whether Plaintiffs suffered adverse determinations;

iv.     whether Defendants' failure to maintain Plaintiffs' records consistent with the agencies' obligations under the Privacy Act caused determinations adverse to Plaintiffs in connection with the April 1 RIF;

v.      whether Defendants acted intentionally or willfully in failing to maintain Plaintiffs' records consistent with the agencies' obligations under the Privacy Act;

vi.     whether HHS shared records contained in a system of records with DOGE, OPM, and/or OMB for use in a matching program;

vii.    whether HHS, in sharing records contained in a system of records with DOGE, OPM, and/or OMB for use in a matching program, had knowledge that there was no compliant written agreement as required under the Privacy Act;

viii.   whether DOGE, OPM, and/or OMB matched personnel records with other records or data sets, for the purpose of taking adverse action against employees, without verifying the accuracy of the

information or providing individualized notice to the impacted personnel;

ix.    whether Plaintiffs suffered adverse effects;

x.    whether Defendants' failure to comply with the matching program requirements under the Privacy Act caused adverse effects on Plaintiffs in connection with the April 1 RIF; and

xi.    whether Defendants acted intentionally or willfully in failing to comply with the matching program requirements under the Privacy Act.

c.    Plaintiffs' claims are typical of those of the class. Like the class, all of the named Plaintiffs have errors in their RIF notices. Plaintiffs' claims arise from the same common course of conduct giving rise to class members' claims, namely, Defendants' implementation of the April 1 RIF in violation of the agencies' obligations under the Privacy Act. Plaintiffs also seek some relief that is common to the class in the form of a declaratory judgment.

d.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are aligned with, and not contrary to, the interests of the class, and Plaintiffs are committed to vigorous prosecution of these claims on behalf of class members. Plaintiffs are represented by competent counsel experienced in class action practice and litigation against the federal government.

151.    The proposed class would also meet the requirements of Rule 23(b).

a.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

b.     The prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

c.     Defendants have acted or refused to act on grounds that apply generally to the class, making declaratory relief appropriate with respect to the class as a whole.

d.     Common issues of law or fact, including those listed in paragraph 150, predominate over individual issues arising from class members' claims against Defendants for implementing the April 1 RIF in violation of the agencies' obligations under the Privacy Act.  If necessary, the class may be certified pursuant to Federal Rule of Civil Procedure 23(c)(4) with respect to particular issues, including liability, in which case common questions within the certified issues will predominate over any individual ones.

e.     A class action is superior to other available methods for fairly and efficiently adjudicating this dispute.  Individual joinder of all members of the class is impracticable, and a class action will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense associated with numerous individual actions.  The benefits of proceeding with a class action, including providing injured individuals with an opportunity to obtain relief for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in managing this class action.

## CLAIMS

## COUNT 1

## VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(g)(1)(C)

152.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

153.    5 U.S.C. § 552a(g)(1)(C) provides that "[w]henever an agency . . . fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual . . . the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."

154.    Defendants' maintenance and use of inaccurate, irrelevant, untimely, and/or incomplete personnel records caused them to end Plaintiffs' employment, an adverse determination.

155.    As a result, Plaintiffs have suffered harm, including actual damages.

156.    All Defendants are "agencies" as defined by 5 U.S.C. § 552a(1).

157.    All Defendants acted intentionally under the meaning of 5 U.S.C. § 552a(g)(1)(C).

158.    Administrative exhaustion is not required for damages claims under the Privacy Act.  And Plaintiffs have no alternative recourse for these Privacy Act violations.

## COUNT 2

## VIOLATION OF THE PRIVACY ACT – 5 U.S.C. § 552a(g)(1)(D), (o), (p), (q)

159.    Plaintiffs reincorporate by reference the allegations contained in paragraphs 1–151.

160.    5 U.S.C. § 552a(g)(1)(D) provides that "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."

161.    5 U.S.C. §§ 552a(o), (p), and (q) provide requirements for the use of "matching programs."  As relevant here, a "matching program" means "any computerized comparison of . . . two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records."  5 U.S.C. § 552a(a)(8)(A)(ii).

162.    5. U.S.C. § 552a(o) provides that "[n]o record which is contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency" and includes various required terms for the agreement.

163.    5 U.S.C. § 552a(p) provides that "no recipient agency, non-Federal agency, or source agency may suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program to such individual, or take other adverse action against such individual, as a result of information produced by such matching program, until" (1) the agency has "independently verified the information" or used a Data Integrity Board, (2) "the individual receives a notice from the agency containing a statement of its findings and informing the individual of the opportunity to contest such findings," and (3) a waiting period has elapsed.

164.    5 U.S.C. § 552a(q) provides "[n]otwithstanding any other provision of law, no source agency may disclose any record which is contained in a system of records to a recipient agency or non-Federal agency for a matching program if such source agency has reason to believe

that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency."

165.    OPM, HHS, and the agencies HHS includes are "source agencies" under the Privacy Act.  DOGE, OPM, and OMB are "recipient agencies" under the Privacy Act.

166.    On information and belief, HHS shared records contained in a system of records with DOGE, OPM, and OMB for use in a matching program despite knowledge that there was no compliant written agreement required under § 552a(o).  OPM also shared records contained in a system of records with the other Defendants for use in a matching program.

167.    On information and belief, HHS, DOGE, OMB and/or OPM matched personnel records with other records or data sets, for the purpose of taking adverse action against them, without verifying the accuracy of the information or giving individualized notice to the impacted personnel.  Defendants then took adverse action against Plaintiffs based on those records by including Plaintiffs in the April 1 RIF.

168.    As a result, Plaintiffs were subject to an adverse effect:  they were terminated when they otherwise would not have been and suffered harms, including actual damages.

169.    Administrative exhaustion is not required for damages claims under the Privacy Act.  And Plaintiffs have no alternative recourse for these Privacy Act violations.

## COUNT 3

## DECLARATORY JUDGMENT ACT

170.    Plaintiffs reincorporate by reference the allegations contained in paragraphs 1–151.

171.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.  There is an actual controversy within this Court's jurisdiction, and a declaration of rights

is necessary to remedy continuing harm resulting from Defendants' use of inaccurate and/or incomplete records to wrongfully terminate Plaintiffs.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs request that the Court award the following relief:

a.    Award Plaintiffs actual damages under 5 U.S.C. § 552a(g)(4)(A), the exact amount of which is to be determined at trial but is not less than $1000 per person;

b.    Grant a declaratory judgment under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 that Defendants' use of inaccurate and incomplete data in connection with the April 1 RIF was unlawful;

c.    Award Plaintiffs reasonable costs and attorney's fees as provided in 5 U.S.C. § 552a(g)(4)(B);

d.    Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

e.    Grant such other relief as the Court may deem just and proper.


Dated: June 3, 2025                                Respectfully submitted,


                                          */s/ Clayton L. Bailey*

                                          Clayton L. Bailey (DC Bar No. 1644867)
                                          Jessica Merry Samuels* (DC Bar No. 1552258)
                                          **Civil Service Law Center LLP**
                                          1325 G Street NW, Suite 500, PMB 801
                                          Washington, DC 20005
                                          (202) 571-7836
                                          cbailey@civilservicellp.com

                                          *application for admission pending per
                                          LCvR 5.1(c)(2)