# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHERINE JACKSON, *et al.*, individually and on behalf of all others similarly situated<br><br>*Plaintiffs*,<br><br>*v.*<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-1750-BAH |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.       Statutory Background ................................................................................................ 3

         A.       The Civil Service Reform Act ........................................................................ 3

         B.       The Privacy Act .............................................................................................. 5

II.      HHS Reductions in Force ......................................................................................... 7

         A.       Executive Order 14,210 ................................................................................. 7

         B.       February 26, 2025, Workforce Memorandum ................................................ 8

         C.       HHS's Implementation of the Workforce Executive Order and the
                  Workforce Memorandum ................................................................................ 9

III.     Plaintiffs and this Action ....................................................................................... 12

LEGAL STANDARDS ...................................................................................................... 13

ARGUMENT ...................................................................................................................... 14

I.       Because Plaintiffs are ultimately challenging adverse federal personnel decisions,
         the CSRA's exclusive remedy scheme precludes jurisdiction. ............................. 14

II.      Plaintiffs fail to state a claim under the Privacy Act. ........................................... 20

         A.       Plaintiffs fail to establish that any Privacy Act violations were causally
                  linked to their terminations. ......................................................................... 21

         B.       Plaintiffs fail to plausibly allege intentional or willful violations of the
                  Privacy Act. .................................................................................................. 28

III.     Because Plaintiffs fail to state a claim under the Privacy Act, their claim for
         declaratory relief must also be dismissed. ............................................................ 32

IV.      All individual and non-HHS Defendants must be dismissed. ................................ 33

V.       Plaintiffs' class allegations do not prevent dismissal of this action in its entirety. .......... 34

CONCLUSION ................................................................................................................... 35

## TABLE OF AUTHORITIES

**CASES**

*Abdelfattah v. DHS*,
787 F.3d 524 (D.C. Cir. 2015) ........................................................................... 33

*Albright v. United States*,
732 F.2d 181 (D.C. Cir. 1984) ..................................................................... 18, 29

*Ali v. Rumsfeld*,
649 F.3d 762 (D.C. Cir. 2011) ....................................................................... 2, 32

*\*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ............................................................... 4, 14, 15

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
771 F. Supp. 3d 717 (D. Md. 2025) .................................................................... 23

*Armstrong v. U.S. Bureau of Prisons*,
976 F. Supp. 17 (D.D.C. 1997), *aff'd*,
No. 97-5208, 1998 WL 65543 (D.C. Cir. Jan. 30, 1998) ................................... 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 13

*Bailey v. Fulwood*,
780 F. Supp. 2d 20 (D.D.C. 2011) ..................................................................... 34

*Boone v. MountainMade Found.*,
684 F. Supp. 2d 1 (D.D.C. 2010) ....................................................................... 32

*Bowles v. Russell*,
551 U.S. 205 (2007) ............................................................................................ 14

*Cacho v. Chertoff*,
No. 06-cv-00292, 2006 WL 3422548 (D.D.C. Nov. 28, 2006) ............................. 6

*Clarkson v. IRS*,
678 F.2d 1368 (11th Cir. 1982) ............................................................................ 6

*Cloonan v. Holder*,
768 F. Supp. 2d 154 (D.D.C. 2011) ................................................................... 33

*Cnty. of Dorchester v. AT&T Corp.*,
407 F. Supp. 3d 561 (D.S.C. 2019) .................................................................... 34

*Colley v. James*,
254 F. Supp. 3d 45 (D.D.C. 2017) ................................................................ 29, 30

*Deters v. U.S. Parole Comm'n*,
    85 F.3d 655 (D.C. Cir. 1996) .................................................................... 20

\*_Dick v. Holder_,
    67 F. Supp. 3d 167 (D.D.C. 2014) ..................................................... *passim*

*Doe v. FDIC*,
    545 F. App'x 6 (2d Cir. 2013) ................................................................... 18

\*_Elgin v. Dep't of the Treasury_,
    567 U.S. 1 (2012) ............................................................................. *passim*

*Eye Care Ctr. of New Jersey, PA v. Twin City Fire Ins. Co.*,
    522 F. Supp. 3d 72 (D.N.J. 2021), *aff'd sub nom.*
    *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131 (3d Cir. 2023) .................... 34

*Fed. Aviation Admin. v. Cooper*,
    566 U.S. 284 (2012) ............................................................................. 5, 6

\*_Gard v. U.S. Dep't of Educ._,
    789 F. Supp. 2d 96 (D.D.C. 2011) .................................................... 21, 27

*Gill v. Dep't of Defense*,
    92 M.S.P.R. 23 (2002) ............................................................................. 17

*Haim v. Islamic Republic of Iran*,
    784 F. Supp. 2d 1 (D.D.C. 2011) ............................................................ 13

*Hanna v. Herman*,
    121 F. Supp. 2d 113 (D.D.C. 2000) ......................................................... 19

*Henderson v. Soc. Sec. Admin.*,
    908 F.2d 559 (10th Cir. 1990) ................................................................. 19

*Herman v. Dep't of Justice*,
    115 M.S.P.R. 386 (2011) ......................................................................... 17

*Holly v. Dep't of Health & Hum. Res.*,
    No. 87-cv-3205, 1988 WL 90089 (D.D.C. Aug. 22, 1988), *aff'd on other grounds*,
    895 F.2d 809 (D.C. Cir. 1990) ................................................................. 19

\*_Houlihan v. OPM_,
    909 F.2d 383 (9th Cir. 1990) ................................................................... 18

\*_Hubbard v. EPA Adm'r_,
    809 F.2d 1 (D.C. Cir. 1986), *on reh'g sub nom.*
    *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ........................ *passim*

*Hutchinson v. CIA*,
   393 F.3d 226 (D.C. Cir. 2005) ............................................................. 24

*In re Papandreou*,
   139 F.3d 247 (D.C. Cir. 1998) ............................................................. 13

*Ingram v. Gonzales*,
   501 F. Supp. 2d 180 (D.D.C.2007) ....................................................... 34

*Johnson v. Comm'n on Presidential Debates*,
   202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd,* 869 F.3d 976 (D.C. Cir. 2017)............................ 13

*Johnson v. Dep't of Treasury*,
   8 M.S.P.R. 170 (1981) ........................................................................ 17

*Jones v. Bock*,
   549 U.S. 199 (2007) ............................................................................ 13

*Kellett v. United States*,
   856 F. Supp. 65 (D.N.H. 1994), *aff'd*, 66 F.3d 306 (1st Cir. 1995)........................ 31

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) ............................................................ 13

*\*Kleiman v. Dep't of Energy*,
   956 F.2d 335 (D.C. Cir. 1992) ............................................... 1, 14, 20, 32

*Lair v. Dep't of Treasury*,
   No. 03-cv-827 (RCL), 2005 WL 645228 (D.D.C. Mar. 21, 2005)........................ 34

*Laningham v. U.S. Navy,*
   813 F.2d 1236 (D.C. Cir. 1987) ............................................................ 29

*\*Lee v. Geren*,
   480 F. Supp. 2d 198 (D.D.C. 2007) ........................................ 21, 23, 24, 26, 27

*Lim v. United States*,
   No. 10-cv-2574, 2011 WL 2650889 (D. Md. July 5, 2011) ....................... 19

*Martinez v. Bureau of Prisons*,
   444 F.3d 620 (D.C. Cir. 2006) ............................................................. 33

*Maydak v. United States*,
   630 F.3d 166 (D.C. Cir. 2010) ......................................................... 29, 31

*McIntyre v. Fulwood*,
   892 F. Supp. 2d 209 (D.D.C. 2012) ...................................................... 30

*Minshew v. Donley*,
   911 F. Supp. 2d 1043 (D. Nev. 2012) ..................................................................................... 19

*Miriyeva v. U.S. Citizenship & Immigr. Servs.*,
   436 F. Supp. 3d 170 (D.D.C. 2019), *aff'd*, 9 F.4th 935 (D.C. Cir. 2021) ........................... 16, 17

*\*Nat'l Treasury Emps. Union v. Vought*,
   --- F.4th ----, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ................................. 5, 15, 16, 17

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................................................. 4, 5

*Paige v. DEA*,
   665 F.3d 1355 (D.C. Cir. 2012) ............................................................................................. 21

*Palmieri v. United States*,
   896 F.3d 579 (D.C. Cir. 2018) ............................................................................................... 33

*Reed v. Dep't of the Navy*,
   910 F. Supp. 2d 32 (D.D.C. 2012) ........................................................................................ 28

*Rosenfield v. Wilkins*,
   468 F. Supp. 2d 806 (W.D. Va. 2006), *aff'd*, 280 F. App'x 275 (4th Cir. 2008) ................... 35

*Skelly Oil Co. v. Phillips Petroleum Co.*,
   339 U.S. 667 (1950) .............................................................................................................. 32

*Sofi Classic S.A de C.V. v. Hurowitz*,
   444 F. Supp. 2d 231 (S.D.N.Y. 2006) ................................................................................... 32

*Steadman v. Governor, U.S. Soldiers' & Airmen's Home*,
   918 F.2d 963 (D.C. Cir. 1990) ................................................................................................ 3

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................................................................ 13

*Sterling v. United States*,
   826 F. Supp. 570 (D.D.C. 1993), *aff'd*, 1994 WL 88894 (D.C. Cir. Mar. 11, 1994) .............. 30

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ............................................................................................ 29

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) .............................................................................................................. 20

*Truesdale v. U.S. Dep't of Just.*,
   657 F. Supp. 2d 219 (D.D.C. 2009) ...................................................................................... 33

*Uncork & Create LLC v. Cincinnati Ins. Co.*,
  498 F. Supp. 3d 878 (S.D.W. Va. 2020), *aff'd*, 27 F.4th 926 (4th Cir. 2022) ........................ 35

*United States v. Fausto*,
  484 U.S. 439 (1988) ............................................................................... 3, 5, 14, 16

*Vessella v. Dep't of Air Force*,
  995 F.2d 1061 (1st Cir. 1993) ........................................................................... 19

*Washburn v. OPM*
  No. 21-cv-1281 (TJK), 2023 WL 2478160 (D.D.C. Mar. 11, 2023) ........................... 18

*White v. OPM*,
  840 F.2d 85 (D.C. Cir. 1988) ........................................................................... 29

*Williams v. Fanning*,
  63 F. Supp. 3d 88 (D.D.C. 2014) ...................................................................... 33

*Wilton v. Seven Falls Co.*,
  515 U.S. 277 (1995) ...................................................................................... 32

*Yu v. U.S. Dep't of Veterans Affs.*,
  528 F. App'x 181 (3d Cir. 2013) ....................................................................... 18

*Zimmerman v. HBO Affiliate Grp.*,
  834 F.2d 1163 (3d Cir. 1987) ........................................................................... 35

## STATUTES

5 U.S.C. § 551 ................................................................................................ 5

5 U.S.C. § 552 ................................................................................................ 5

5 U.S.C. § 552a ................................................................................... *passim*

5 U.S.C. § 1204 .............................................................................................. 3

5 U.S.C. § 2302 .............................................................................................. 4

5 U.S.C. § 7101 .............................................................................................. 4

5 U.S.C. § 7105 .............................................................................................. 4

5 U.S.C. § 7116 .............................................................................................. 4

5 U.S.C. § 7117 .............................................................................................. 4

5 U.S.C. § 7118 .............................................................................................. 4

5 U.S.C. § 7123 ................................................................................................ 4

5 U.S.C. § 7511 ................................................................................................ 4

5 U.S.C. § 7512 ......................................................................................... 3, 15

5 U.S.C. § 7513 ......................................................................................... 3, 15

5 U.S.C. § 7701 ............................................................................................... 3

5 U.S.C. § 7702 ............................................................................................. 14

5 U.S.C. § 7703 ............................................................................................. 15

28 U.S.C. § 510 ............................................................................................. 31

28 U.S.C. § 1295 ...................................................................................... 4, 16

Privacy Act of 1974,
    Pub. L. No. 93-579, 88 Stat. 1896 ............................................................ 1

Civil Service Reform Act of 1978,
    Pub. L. No. 95-454, 92 Stat. 1111 ............................................................ 1

Computer Matching and Privacy Protection Act of 1988,
    Pub. L. No. 100-503, 102 Stat. 2507 ....................................................... 6

Computer Matching and Privacy Protection Amendments of 1990,
    Pub. L. No. 101-508, 104 Stat. 1388 ....................................................... 7

**RULES**

Fed. R. Civ. P. 12 .................................................................................... 13, 20

**REGULATIONS**

5 C.F.R. § 301.806 .......................................................................................... 4

5 C.F.R. § 315.801 .......................................................................................... 4

The Computer Matching and Privacy Protection Amendments of 1990 and
    the Privacy Act of 1974,
    56 Fed. Reg. 18,599 (Apr. 23, 1991) ........................................................ 7

Annual Update of the HHS Poverty Guidelines,
    90 Fed. Reg. 5917 (Jan. 17, 2025) ......................................................... 11

Implementing the President's "Department of Government Efficiency" Workforce
  Optimization Initiative,
  Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ................................................. 7, 8

**OTHER AUTHORITIES**

9/11 World Trade Center Health Program,
  https://perma.cc/6ARL-6LLD ............................................................................................ 11

Alexander Tin, *RFK Jr. says 20% of health agency layoffs could be mistakes*,
  CBS News Health Watch (Apr. 3, 2025),
  https://perma.cc/EBD7-LEAH ........................................................................................... 29

Booz Allen Hamilton, *FDA Interim Hiring and Retention Assessment* (Apr. 13, 2020),
  https://www.fda.gov/media/138662/download?attachment ..................................................... 31

CDC, *About the FFFIPP*,
  https://perma.cc/6FWG-GJSU ........................................................................................... 11

CDC, *Coal Workers' Health Surveillance Program*,
  https://perma.cc/4AU7-DY6K ............................................................................................ 11

CDC, *National Firefighter Registry (NFR) for Cancer*,
  https://perma.cc/6434-J8Z6 ............................................................................................... 11

CDC, *Request a NIOSH Health Hazard Evaluation*,
  https://perma.cc/5P7B-ZUP8 ............................................................................................. 11

CDC, *Respirator Approval Program*,
  https://perma.cc/2K6Z-E27D ............................................................................................. 11

FDA, *Tobacco Compliance Check Outcomes*,
  https://timp-ccid.fda.gov/ .................................................................................................. 10

FDA, *Tobacco Products Marketing Orders*,
  https:// https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/
  tobacco-products-marketing-orders ..................................................................................... 10

HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025),
  https://perma.cc/DH5Q-52L4 ..................................................................................... 9, 10, 22

HHS, *HHS Competitive Areas*,
  https://www.hhs.gov/sites/default/files/hhs-competitive-areas.pdf ......................................... 26

HHS, *HHS Workforce Optimization Initiative* (content last reviewed May 7, 2025),
  https://web.archive.org/web/20250509184052/https://www.hhs.gov/about
  /agencies/asa/workforce-optimization-initiative/index.html ................................. 11, 12, 22, 26

OPM, *Competitive Areas in Reduction in Force (RIF)* (Mar. 2025),
https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-competitive-areas.pdf ............................................................................ 24, 25

OPM, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*,
https://perma.cc/Q9NH-RV8Y ............................................................................. 8, 9

## INTRODUCTION

Plaintiffs, seven former employees of the Department of Health and Human Services (HHS), bring a putative class action under the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896. Plaintiffs seek damages and declaratory relief following their separation from HHS pursuant to a Department-wide reorganization and Reduction in Force (RIF), in which roughly 10,000 employees were separated from HHS, five regional offices were closed, and 28 divisions were consolidated into 15.

The fundamental problem with Plaintiffs' approach is that the Privacy Act is not the proper mechanism for individuals aggrieved by agency personnel decisions to obtain relief. Instead, and just four years after the Privacy Act of 1974, Congress created a comprehensive remedial scheme that provides for administrative and then judicial review of federal personnel determinations through the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (CSRA). The Supreme Court has unequivocally held that this scheme is exclusive, *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012), and the D.C. Circuit had previously made clear that plaintiffs may not use the Privacy Act as an end-run around that scheme, *see, e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992). Plaintiffs fail to heed these instructions, which undermine their claims at every step of the way, from jurisdiction to the sufficiency of their factual allegations. Under either rubric, the outcome is the same: this case must be dismissed.

Start with subject-matter jurisdiction. In 2012, the Supreme Court made clear that the CSRA constitutes the "exclusive means" for vindicating injuries that arise from "personnel action taken against federal employees." *Elgin*, 567 U.S. at 5, 8. Plaintiffs' claims here fall within the heartland of this exclusive statutory scheme. Judicial review is available for separated employees to seek reinstatement and backpay before the Merits System Protection Board (MSPB), thereby fully remedying any injury Plaintiffs have suffered. Moreover, Plaintiffs' claim that they were

1

improperly terminated based on inaccurate personnel records is of a piece with (not collateral to) the statutory review of those very terminations available under the CSRA.  And the adjudication of such claims falls squarely within the MSPB's wheelhouse.  For this reason, courts around the country have held that the CSRA forecloses jurisdiction over Privacy Act claims directed at federal personnel determinations, as Plaintiffs' claims are here.  This Court should therefore dismiss this action in its entirety for lack of jurisdiction.

Plaintiffs' claims fare no better on the merits.  In decisions predating *Elgin*, the D.C. Circuit instructed district courts to closely scrutinize allegations that an alleged violation of the Privacy Act caused an adverse determination to prevent plaintiffs from evading the exclusive review scheme that Congress created through the CSRA.  Plaintiffs' allegations here cannot withstand such scrutiny.  To the contrary, HHS statements—which are subject to judicial notice and were issued before this action was brought—establish that any inaccuracies on RIF notices had no bearing on agency personnel decisions, as HHS broadly terminated entire competitive areas, which are determined by agency organizational units and geographic location.  Plaintiffs here cannot plausibly allege that any of their competitive areas were inaccurately stated and therefore fail to establish that any inaccuracies in personnel records were the proximate cause of their separations.  Independently, Plaintiffs fail to clear the high bar of plausibly alleging intentional or willful violations of the Privacy Act.  And Plaintiffs' claim under the Declaratory Judgment Act cannot salvage this lawsuit because that Act does not create a stand-alone cause of action.  *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).  Thus, if this Court exercises jurisdiction, this action should nonetheless be dismissed in its entirety for failure to state a claim.

In all events, the individual and non-HHS Defendants must be dismissed because they are not proper Defendants under the Privacy Act.  D.C. Circuit precedent is clear that the Privacy Act

creates a cause of action against only the federal agencies responsible for maintaining the records at issue—not individual officials and not other agencies allegedly involved in the adverse personnel determinations. Here, only HHS and its components are alleged to have maintained the records in question, and the remaining Defendants must therefore be dismissed.

For these reasons, explained further below, this Court should grant Defendants' motion to dismiss.

## BACKGROUND

### I. Statutory Background

#### A. The Civil Service Reform Act

In enacting the CSRA, Congress "established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin*, 567 U.S. at 5 (citation omitted). This "enormously complicated and subtle scheme" "govern[s] employee relations in the federal sector." *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990). The CRSA also sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service. *United States v. Fausto*, 484 U.S. 439, 445 (1988).

Under that scheme, if an agency takes a final adverse action against an employee no longer in his or her probationary period—including removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee may appeal to the MSPB. *Id*. § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Non-probationary employees[1] may appeal final MSPB decisions to the Federal Circuit, which generally has

---

[1] Federal employees serving in their probationary periods (for the Competitive Service) or trial periods (for the Excepted Service) generally do not enjoy a right to appeal to the MSPB, as they

"exclusive jurisdiction" over such appeals.  28 U.S.C. § 1295(a)(9).  This entire statutory review scheme, then, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.

The CSRA also includes the Federal Service Labor Management Relations Statute (FSLMRS), which governs labor relations between the Executive Branch and its employees.  *See* 5 U.S.C. §§ 7101-7135.  The FSLMRS provides "a scheme of administrative and judicial review" for federal employee union claims.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE*").  "Administrative review is provided by the Federal Labor Relations Authority (FLRA), a three-member agency charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." *Id.* (quoting 5 U.S.C. § 7105(a)).  In negotiability disputes, the FLRA determines whether agencies and unions must bargain over certain subjects.  *Id.* (citing 5 U.S.C. §§ 7105(a)(2)(E), 7117(c)(1)).  In unfair labor practice proceedings, the FLRA resolves whether an agency must bargain over a subject, has violated the duty to bargain in good faith, or has otherwise failed to comply with the FSLMRS.  *Id.* (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118).  The FLRA's decisions are subject to direct review in the courts of appeals.  *Id.* (citing 5 U.S.C. § 7123(a), (c)).

Through this scheme, Congress "regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'"  *Nyunt v. Chairman,*

---

are not considered "employee[s]" for purposes of the CSRA's Chapter 75, 5 U.S.C. § 7511(a)(1), but remain properly considered as "applicants" for employment under an extended hiring and evaluation period.  *See id.* § 7511(a)(1)(A)-(B) (one-year trial period), (C) (two-year trial period); 5 C.F.R. §§ 315.801, 301.806.  However, many of the protections of the CSRA's Chapter 23 extend to both "applicants and employees."  *See, e.g.,* 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in an agency").

*Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (quoting *Fausto*, 484 U.S. at 443).

Indeed, "the CSRA provides the exclusive means for federal employees to obtain judicial review

of adverse personnel actions even in circumstances where . . . the CSRA itself forecloses review."

*Nat'l Treasury Emps. Union v. Vought*, --- F.4th ----, 2025 WL 2371608, at *5 (D.C. Cir. Aug. 15,

2025) ("*NTEU*") (citing *Fausto*, 484 U.S. at 447).

### B. The Privacy Act

The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal

agencies that maintain systems of records containing individuals' personal information. *Fed.

Aviation Admin. v. Cooper*, 566 U.S. 284, 287 (2012). The Privacy Act thus regulates the

collection, maintenance, use, and dissemination of an individual's personal information by federal

government agencies. *See* 5 U.S.C. § 552a(e). The Privacy Act applies only to agencies, which

Congress defined as "any executive department, military department, Government corporation,

Government controlled corporation, or other establishment in the executive branch of the [federal]

Government (including the Executive Office of the President), or any independent regulatory

agency." 5 U.S.C. § 552a(a)(1) (incorporating 5 U.S.C. § 552(f)(1), which in turn incorporates 5

U.S.C. § 551(1)).

The form of civil relief authorized by the Privacy Act depends on the particular violation

alleged. The Privacy Act authorizes courts to award monetary damages when the agency:

> fails to maintain any record concerning any individual with such accuracy,
> relevance, timeliness, and completeness as is necessary to assure fairness in any
> determination relating to the qualifications, character, rights, or opportunities of, or
> benefits to the individual that may be made on the basis of such record, and
> consequently a determination is made which is adverse to the individual.

*Id.* § 552a(g)(1)(C). Additionally, the Privacy Act authorizes courts to award monetary damages

when the agency fails "to comply with any other provision of this section, or any rule promulgated

thereunder, in such a way as to have an adverse effect on an individual." *Id.* § 552a(g)(1)(D),

(g)(4).  Section 552a(g)(1)(D) is thus described as the Privacy Act's "catchall" provision.  *Dick v. Holder*, 67 F. Supp. 3d 167, 176–77 (D.D.C. 2014) (quoting *Cacho v. Chertoff*, No. 06-cv-00292, 2006 WL 3422548, at \*4 (D.D.C. Nov. 28, 2006)).

To state a claim for monetary damages under either of these two provisions in the Privacy Act, however, a plaintiff must make a heightened showing in two regards.  First, "to accommodate" the CSRA as the exclusive "statutory scheme" for adverse personnel decisions, the Privacy Act "requires the district courts to carefully analyze the asserted causation link" "between the allegedly erroneous record and an adverse determination based on that record."  *Hubbard v. EPA Adm'r*, 809 F.2d 1, 5 (D.C. Cir. 1986) (quoting *Clarkson v. IRS*, 678 F.2d 1368, 1377 (11th Cir. 1982)), *on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988).

Second, the plaintiff must plead facts showing "that the agency acted in a manner which was intentional or willful" and that, as a result, the plaintiff suffered "actual damages."  5 U.S.C. § 552a(g)(4).  "[A]ctual damages" under the Privacy Act "are limited to actual pecuniary loss, which must be specially pleaded and proved."  *Cooper*, 566 U.S. at 295-96, 299.  The federal government retains sovereign immunity from liability for all other kinds of injury.  *Id.* at 304.

The Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, 102 Stat. 2507, amended the Privacy Act to add several new provisions.  *See* 5 U.S.C. § 552a(a)(8)-(13), (e)(12), (o), (p), (q), (r), (u).  These added provisions include procedural requirements for agencies to follow when creating or utilizing "matching programs," defined as computerized comparisons of different automated systems of records for specified purposes.  *See id.* § 552a(a)(8).  The added provisions also require that agencies provide the subjects of matching with notice and the opportunity to refute adverse information before having a benefit denied or terminated.  *See id.* § 552a(p).  Finally, the added provisions direct agencies engaged in matching

activities to establish Data Protection Boards to oversee those activities. *See id.* § 552a(u). Subsequently, Congress enacted the Computer Matching and Privacy Protection Amendments of 1990, Pub. L. No. 101-508 § 7201, 104 Stat. 1388, 1388-334, which further clarified the due process provisions found in § 552a(p). *See* The Computer Matching and Privacy Protection Amendments of 1990 and the Privacy Act of 1974, 56 Fed. Reg. 18,599 (Apr. 23, 1991).

## II.   HHS Reductions in Force

### A.  Executive Order 14,210

On February 11, 2025, President Trump issued Executive Order No. 14,210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce Executive Order"). One subpart, titled "Reductions in Force," directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). That subpart further directs that:

> All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website.

*Id*.

Additionally, the Workforce Executive Order directs agency heads to submit to the U.S. Office of Personnel Management (OPM) and the Office of Management and Budget (OMB) a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities" within 30 days of the Executive Order's issuance (*i.e.*, by March 13, 2025). *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents

should be eliminated or consolidated." *Id.* The Executive Order also allows agency heads to "exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id.* § 4(b). And it provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 5(b).

### B. February 26, 2025, Workforce Memorandum

On February 26, 2025, OPM and OMB jointly issued a memorandum providing guidance for complying with the Workforce Executive Order. *See* OPM & OMB, *Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, https://perma.cc/Q9NH-RV8Y ("Workforce Memorandum"). Pursuant to this memorandum, "agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." *Id.* at 2.

The Workforce Memorandum also identifies certain "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* In addition, the Workforce Memorandum directs agencies to "review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Workforce Memorandum states that agencies should submit Agency RIF and Reorganization Plans (ARRPs) in two phases. Phase 1 ARRPs, to be submitted by March 13, 2025, were to "focus on initial agency cuts and reductions." *Id.* at 3. Phase 1 ARRPs were to

provide, among other things:  a list of agency subcomponents or offices that provide direct services to citizens' any statutes that establish those agency or subcomponents; any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations; "[a] list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs"; and the agency's timetable for implementation of each part of the Phase 1 ARRP.  *Id.* at 4.

Phase 2 ARRPs were to be submitted by April 14, 2025, and were to "outline a positive vision for more productive, efficient agency operations going forward."  *Id.*  Agencies were to provide, among other things:  confirmation that the agency has reviewed all its personnel data and plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible; all reductions of full-time-employee (FTE) positions and otherwise; an explanation of how the ARRP will improve services for Americans and advance the President's priorities; and, for agencies providing direct services to citizens, "the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services," including "a written explanation from the Agency Head."  *Id.* at 4–6.  The Workforce Memorandum also directs that Phase 2 ARRPs should be planned for implementation by September 30, 2025.  *Id.* at 4.

### C.  HHS's Implementation of the Workforce Executive Order and the Workforce Memorandum

Pursuant to the Workforce Executive Order and the Workforce Memorandum, Secretary Robert F. Kennedy, Jr., publicly announced on March 27, 2025, the planned reorganization of HHS.  *See* HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), https://perma.cc/DH5Q-52L4.  The Secretary's announcement does not contemplate the elimination of any statutorily mandated HHS programs or divisions.  Instead, the focus of the

announcement is the reduction of wasteful spending, increased efficiency, and increased responsiveness to the needs of the American people.

Specifically, the announcement stated that HHS planned to consolidate its existing 28 divisions into 15 new divisions; reduce regional offices from 10 to 5; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; and appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs. *Id.* The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow the Department to perform its core functions more efficiently. As the announcement explained, the Department intends to accomplish its goals "without impacting critical services." *Id.*

As the Department and its operating divisions have continued to plan this restructuring, they are also working to ensure that statutorily-mandated programs continue to function. For example, critical Center for Tobacco Products' functions like tobacco compliance checks and review of pre-market tobacco product applications are continuing. *See* FDA, *Tobacco Compliance Check Outcomes*, https://timp-ccid.fda.gov/ (last visited Sep. 4, 2025) (demonstrating that compliance checks have continued to occur from January through July 2025); FDA, *Tobacco Products Marketing Orders*, https:// https://www.fda.gov/tobacco-products/market-and-distribute-tobacco-product/tobacco-products-marketing-orders (last visited Sep. 4, 2025) (demonstrating continued review of applications and issuance of decisions from January through mid-August 2025). The National Institute for Occupational Safety and Health is also continuing to operate the Coal Miner Health Surveillance Program, the Health Hazard Evaluations, the Fire

10

Fighter Fatality Investigation and Prevention Program, the National Firefighter Registry for Cancer, the World Trade Center Health Program, and the National Personal Protective Technology Laboratory.[2]  Similarly, employees from the Division of Data and Technical Analysis within the Office of the Assistant Secretary for Planning and Evaluation were subject to the RIF, but the annual requirement for the Department to revise the Federal Poverty Guidelines—a function that had been managed by this office—has already been completed for this year, *see* Annual Update of the HHS Poverty Guidelines, 90 Fed. Reg. 5917 (Jan. 17, 2025), allowing ample time for this function to be consolidated with other functions before the next annual revision is due in January 2026.

While maintaining these operations, HHS began issuing RIF notices on March 31, 2025, pursuant to the Workforce Executive Order and the Workforce Memorandum.  *See* HHS, *HHS Workforce Optimization Initiative*, (content last reviewed May 7, 2025), https://web.archive.org/web/20250509184052/https://www.hhs.gov/about/agencies/asa/workforce-optimization-initiative/index.html.  In a webpage intended to provide "general information regarding the Department's reduction in force," HHS explained that "veterans' preference, service computation date, performance ratings, and/or tenure" may be "incorrect and/or not included on the RIF notice." *Id.*  HHS explained that because, "[i]n most cases, entire competitive areas are being abolished in this RIF," "employees are being separated without regard to retention standing." *Id.*  HHS therefore noted that, "although some RIF notices included information about retention

---

[2] *See* CDC, *Coal Workers' Health Surveillance Program*, https://perma.cc/4AU7-DY6K (last visited Aug. 14, 2025); CDC, *Request a NIOSH Health Hazard Evaluation*, https://perma.cc/5P7B-ZUP8 (last visited Aug. 14, 2025); CDC, *About the FFFIPP*, https://perma.cc/6FWG-GJSU (last visited Aug. 14, 2025); CDC, *National Firefighter Registry (NFR) for Cancer*, https://perma.cc/6434-J8Z6 (last visited Aug. 14, 2025); 9/11 World Trade Center Health Program, https://perma.cc/6ARL-6LLD (last visited Aug. 14, 2025), CDC, *Respirator Approval Program*, https://perma.cc/2K6Z-E27D (last visited Aug. 14, 2025).

standing and retention registers based on veterans' preference, service computation date, performance ratings, and tenure, these were not a factor in [an employee's] separation under this RIF." *Id.*

That webpage also informed HHS employees of the mechanisms available to challenge their separation under the RIF. *Id.* Those mechanisms include: "Direct Appeal to the Merit Systems Protection Board"; a "Negotiated Grievance Procedure" for employees "covered by a collective bargaining agreement that provides negotiated grievance procedures that cover RIF action"; a "Mixed-Case Equal Employment Opportunity (EEO) Complaint" for employees that "believe[] the Agency's action was based on prohibited discrimination"; and the "Office of Special Counsel," "[i]f an employee believes the Agency's action was . . . in reprisal for engaging in protected activity under 5 U.S.C. § 2302(b)(8)-(9), including whistleblowing activity." *Id.* Finally, the webpage provided a link to a full list of HHS's competitive areas. *Id.*

## III.    Plaintiffs and this Action

On June 3, 2025, Plaintiffs filed this putative class action on behalf of individuals employed by HHS who received a RIF notice or notice of intent to conduct a RIF on April 1, 2025, and whose notice contained information "inconsistent with official personnel records." *See* Class Action Compl. ¶¶ 146-51, ECF No. 1 ("Compl."). The Complaint contains three counts: (1) violations of 5 U.S.C. § 552a(g)(1)(C) of the Privacy Act, alleging that Defendants maintained and used inaccurate personnel records to terminate Plaintiffs' employment; (2) violations of 5 U.S.C. § 552a(g)(1)(D), (o), (p), (q) of the Privacy Act, alleging that Defendants failed to comply with Privacy Act requirements concerning "matching programs" in a manner that had an adverse effect on the employees who received a RIF notice or notice of intent to conduct a RIF; and (3) a claim under the Declaratory Judgment Act. *See* Compl. ¶¶ 152-71.

12

## LEGAL STANDARDS

The "first and fundamental" question for any court is that of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted). Thus, "resolving a merits issue while jurisdiction is in doubt 'carries the courts beyond the bounds of authorized judicial action.'" *See In re Papandreou*, 139 F.3d 247, 254–55 (D.C. Cir. 1998) (citation omitted). And the plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). If the plaintiff is unable to do so, the Court must dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Steel Co.*, 523 U.S. at 94.

"A complaint is subject to dismissal for failure to state a claim" pursuant to Federal Rule of Civil Procedure 12(b)(6) "if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock*, 549 U.S. 199, 215 (2007). The complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). A complaint falls short of this standard if the facts pled are "'merely consistent with' a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Id.* (citation omitted).

"In deciding a motion under Rule 12(b)(6), a court may consider the complaint's factual allegations, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd,* 869 F.3d 976 (D.C. Cir. 2017). "[J]udicial notice may be taken of public records and government documents available from reliable sources." *Id.* Judicial notice may also be taken "of court records in related proceedings." *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 6 (D.D.C. 2011) (citation omitted).

**ARGUMENT**

I.    **Because Plaintiffs are ultimately challenging adverse federal personnel decisions, the CSRA's exclusive remedy scheme precludes jurisdiction.**

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Exercising that authority, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *AFGE*, 929 F.3d at 754.

Under that framework, this Court lacks jurisdiction over claims arising from Plaintiffs' employment-related injuries because those claims must be pressed through the statutorily prescribed channels for litigating federal employment disputes. As explained *supra* pp. 3-5, the CSRA provides a "comprehensive and integrated . . . scheme" for resolving agency personnel decisions, *Fausto*, 484 U.S. at 454-55. As a result, the CSRA provides the "exclusive means" for vindicating injuries relating to federal employment, *Elgin*, 567 U.S. at 5, 8. And as relevant here, Plaintiffs may not circumvent the CSRA by using the Privacy Act to collaterally attack agency personnel decisions. *See Kleiman*, 956 F.2d at 338 ("This court has refused to allow 'the exhaustive remedial scheme of the CSRA' to be 'impermissibly frustrated,' by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA.") (citation omitted). The CSRA thus precludes this Court from exercising jurisdiction over Plaintiffs' claims.

Indeed, the CSRA expressly exempts certain types of claims—not including claims under the Privacy Act—from the scope of its exclusive scheme. "When a covered employee 'alleges that a basis for the action was discrimination' prohibited by enumerated federal employment laws, 5 U.S.C. § 7702(a)(1)(B), the CSRA allows the employee to obtain judicial review of an unfavorable MSPB decision by filing a civil action as provided by the applicable employment

14

law." *Elgin*, 567 U.S. at 13 (citing 5 U.S.C. § 7703(b)(2)).  That provision "demonstrates that Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim."  *Id.*  That Congress, just four years after passing the Privacy Act, declined to authorize civil actions for Privacy Act claims arising from federal personnel decisions "indicates that Congress intended no such exception" from the exclusive CSRA scheme.  *Id.*

The D.C. Circuit's test for assessing whether claims fall outside a preclusive statutory scheme confirms as much.  "Claims will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency."  *AFGE*, 929 F.3d at 755 (cleaned up). None of those three conditions is satisfied here, and the CSRA therefore forecloses jurisdiction.

*First*, meaningful judicial review remains available.  As the D.C. Circuit recently explained in a similar action brought by plaintiffs whose "injuries arise from [their] termination," the MSPB and FLRA may remedy that injury "by ordering reinstatement with backpay."  *NTEU*, 2025 WL 2371608, at *5.  Here, there can be no dispute that Plaintiffs' claims pertain entirely to such adverse personnel actions:  the opening sentence of the Complaint makes clear that this action was brought because HHS "notified thousands of federal workers that they were being terminated," Compl. ¶ 1.  And the adverse determination and adverse effect alleged for each specific Privacy Act claim is the "end [of] Plaintiffs' employment," *id.* ¶ 154 (Count 1), and that Plaintiffs "were terminated when they otherwise would not have been.," *id.* ¶ 168 (Count II).  The CSRA expressly provides for administrative and then judicial review of such personnel decisions:  if an agency takes a final adverse action against an employee no longer in his or her probationary period such as removal, *see* 5 U.S.C. § 7512, the employee may appeal to the MSPB, *see id.* § 7513(d).  And final MSPB

15

decisions are then appealable to the Federal Circuit.  *See* 28 U.S.C. § 1295(a)(9).  Meaningful

judicial review is therefore available for Plaintiffs.[3]

   *Second*, Plaintiffs' Privacy Act claims are not wholly collateral to the statutory review that

the CSRA affords.  As the Supreme Court held in *Elgin*, "[a] challenge to removal is precisely the

type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the

CSRA scheme."  567 U.S. at 22.  And that is precisely what Plaintiffs' Privacy Act claims

challenge—whether Plaintiffs' separations from HHS were unlawful because HHS based those

separations on inaccurate personnel information.  Indeed, as detailed *infra* pp. 21-28, an

assessment of the sufficiency of Plaintiffs' Privacy Act claims necessarily entails an assessment

of the propriety of Plaintiffs' separations, including whether those separations were caused by

inaccurate personnel information.  Plaintiffs' claims are therefore embedded within—not wholly

collateral to—the CSRA's review scheme.

   To be sure, the relief available through the CSRA's review scheme is not identical to the

relief that Plaintiffs seek under the Privacy Act.  Whereas the MSPB may remedy terminations by

"ordering reinstatement with backpay," *NTEU*, 2025 WL 2371608, at *5, Plaintiffs here request

statutory damages and declaratory relief, *see* Compl., Prayer for Relief.  But that does not render

Plaintiffs' claims sufficiently collateral to evade the exclusive scheme that Congress created

through the CSRA.  *Cf. Miriyeva v. U.S. Citizenship & Immigr. Servs.*, 436 F. Supp. 3d 170, 185

(D.D.C. 2019), ("[T]here is no requirement that the alternative remedy be identical."), *aff'd*, 9

F.4th 935 (D.C. Cir. 2021).

---

[3] In any event, "the Supreme Court has held that the CSRA provides the exclusive means for
federal employees to obtain judicial review of adverse personnel actions even in circumstances
where, unlike here, the CSRA itself forecloses review."  *NTEU*, 2025 WL 2371608, at *5 (citing
*Fausto*, 484 U.S. at 447).

*Third*, the "claims are not beyond the expertise of the MSPB and the FLRA" because the claims "seek redress for allegedly unlawful terminations—the heartland of CSRA coverage." *NTEU*, 2025 WL 2371608, at *6. That redress may come in a different form than the statutory damages Plaintiffs seek here, but that is a decision for Congress to make. *See Miriyeva*, 436 F. Supp. 3d at 185. And there can be no question that the MSPB possesses the expertise necessary to resolve Privacy Act claims; indeed, it routinely adjudicates asserted violations of the Privacy Act when directly implicated in matters over which the MSPB has jurisdiction. *See, e.g.*, *Herman v. Dep't of Justice*, 115 M.S.P.R. 386, 391 (2011) (determining that the appellant raised a nonfrivolous allegation of a protected disclosure based on an alleged violation of the Privacy Act); *Gill v. Dep't of Defense*, 92 M.S.P.R. 23, 31-33 (2002) (finding in a demotion appeal that the agency failed to prove its charge that the appellant violated the Privacy Act); *Johnson v. Dep't of Treasury*, 8 M.S.P.R. 170, 178 n.5 (1981) (holding employee's "rights under the Privacy Act were not violated"). Moreover, the Supreme Court in *Elgin* held that the CSRA "provides the exclusive avenue to judicial review" even where "a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional," 567 U.S. at 5. It follows that the CSRA would similarly preclude the statutory challenges to Plaintiffs' terminations brought here because the MSPB possesses no greater expertise to adjudicate constitutional claims than it does to adjudicate statutory claims under the Privacy Act.

At bottom, Plaintiffs "really allege[] only a wrongful personnel decision," not a violation of the Privacy Act. *Hubbard*, 809 F.2d at 5-6. Plaintiffs' claims are therefore precluded by the exclusive remedy scheme that Congress created through the CSRA: "Since Congress specifically chose to oust the district courts of jurisdiction to review government personnel practices, it would be anomalous to construe the pre-existing Privacy Act to grant the district court power to do

indirectly that which Congress precluded directly." *Id.* at 5. Put simply, "the Privacy Act was not intended to shield [federal] employees from the vicissitudes of federal personnel management decisions." *Albright v. United States*, 732 F.2d 181, 190 (D.C. Cir. 1984).

This principle makes perfect sense. As the Ninth Circuit explained in *Houlihan v. OPM*, if a plaintiff could use claims of inaccurate records under the Privacy Act to challenge a termination or other adverse personnel decision, courts "would have to compare [the agency's] decision to the decision it would have made had the agency properly maintained its records," which "would necessitate a careful review of the [agency's adverse personnel] decision." 909 F.2d 383, 385 (9th Cir. 1990). This review "'would open the back door to judicial review to perhaps an overwhelming number' of CSRA claims, thereby frustrating Congress's decision to assign to the OSC the task of policing alleged prohibited personnel practices. A disgruntled federal employee would need only to argue that her employer failed to comply with the Privacy Act to obtain judicial review of an employment decision." *Id.* (citation omitted). That is not the scheme for judicial review of adverse personnel decisions that Congress created, and courts therefore lack jurisdiction over Privacy Act claims that merely collaterally attack agency personnel decisions. *Id.*

Numerous other courts—both in this District and around the country—have reached the same conclusion. *See, e.g.*, *Washburn v. OPM*, No. 21-cv-1281 (TJK), 2023 WL 2478160, at *4 (D.D.C. Mar. 11, 2023) (holding CSRA "removes the jurisdiction given to the federal courts" to resolve claims under the Privacy Act that fall within the scope of the CSRA) (citation omitted); *Doe v. FDIC*, 545 F. App'x 6, 8 (2d Cir. 2013) (holding that because "Doe's Privacy Act claims fall within the definition of a 'prohibited personnel action,' the CSRA dictates that Doe may not pursue her claims in federal court"); *Yu v. U.S. Dep't of Veterans Affs.*, 528 F. App'x 181, 184 (3d Cir. 2013) (holding that the CSRA "forecloses Yu's damages claims" where agency's challenged

"actions are personnel decisions because they 'occurred only as a result of the employment relationship'") (citation omitted); *Vessella v. Dep't of Air Force*, 995 F.2d 1061, at *2 (1st Cir. 1993) (unpublished table decision) (affirming dismissal of Privacy Act claims for lack of jurisdiction because "[t]he Privacy Act . . . cannot be used . . . to frustrate the exclusive, comprehensive scheme provided by the CSRA for federal employee challenges to adverse agency personnel decisions."); *Henderson v. Soc. Sec. Admin.*, 908 F.2d 559, 560–61 (10th Cir. 1990) ("We agree with the district court that the Privacy Act does not vest the court with jurisdiction to review personnel decisions where the Civil Service Reform Act precludes such review."); *Lim v. United States*, No. 10-cv-2574, 2011 WL 2650889, at *8 (D. Md. July 5, 2011) ("[W]hile labeled as a Privacy Act violation, [plaintiff] is ultimately challenging the basis for his discharge, a personnel decision which cannot be challenged outside the framework of the CSRA."); *Minshew v. Donley*, 911 F. Supp. 2d 1043, 1067 (D. Nev. 2012) (explaining that CSRA precludes jurisdiction over plaintiff's Privacy Act claim because "the CSRA is the exclusive means for federal employees to challenge prohibited personnel practices" and "a federal employee may not resort to other statutes to effectively challenge . . . or otherwise collaterally attack a decision falling within the scope of the CSRA"); *Hanna v. Herman*, 121 F. Supp. 2d 113, 124 (D.D.C. 2000) (holding "plaintiff cannot rely on any arguable violation of the Privacy Act to collaterally attack the agency's decision to demote him"); *Holly v. Dep't of Health & Hum. Res.*, No. 87-cv-3205, 1988 WL 90089, at *2 (D.D.C. Aug. 22, 1988) ("[T]his Court concludes that Mr. Holly's attempt to obtain judicial review of his RIF under the guise of a Privacy Act action also is precluded by the CSRA" because action "clearly is a challenge to a federal employment determination and therefore implicates the CSRA"), *aff'd on other grounds*, 895 F.2d 809 (D.C. Cir. 1990).

Accordingly, because Plaintiffs ultimately challenge agency personnel decisions subject to the CSRA's exclusive remedy scheme, Plaintiffs' Privacy Act claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).[4]  And because Plaintiffs' Declaratory Judgment Act claim rises and falls with their Privacy Act claims, *infra* pp. 32-33, dismissal of the Privacy Act claims requires dismissal of the action in its entirety.

## II.    Plaintiffs fail to state a claim under the Privacy Act.

Even if this Court exercises jurisdiction over Plaintiffs' claims, those claims should be dismissed under Rule 12(b)(6) for failure to state a claim.  Plaintiffs allege violations of both § 552a(g)(1)(C) and § 552a(g)(1)(D).  To state a claim under § 552a(g)(1)(C), an individual must plausibly allege that: (1) he or she "has been aggrieved by an adverse determination"; (2) the agency "failed to maintain his or her records with the degree of accuracy necessary to assure fairness in the determination"; (3) the agency's "reliance on the inaccurate records was the proximate cause of the adverse determination"; and (4) the agency "acted intentionally or willfully in failing to maintain accurate records." *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).  Similarly, to state a claim under § 552a(g)(1)(D), a plaintiff must establish that (1) the

---

[4] Defendants acknowledge that the D.C. Circuit in 1992 declined to hold that the CSRA functions as a *jurisdictional* bar on Privacy Act claims that challenge adverse personnel decisions, directing dismissal under Rule 12(b)(6) rather than Rule 12(b)(1).  *Kleiman*, 956 F.2d at 339 ("[W]e agree with the district court's reasoning about the scope of the Privacy Act and its interrelation with the CSRA. We disagree, however, with the district court's conclusion that it therefore lacked jurisdiction over the action.").  Other D.C. Circuit precedent, however, suggests that the availability of review through the CSRA forecloses jurisdiction over Privacy Act claims that challenge adverse personnel decisions.  *See Hubbard*, 809 F.2d at 5 ("[T]he obvious need to accommodate the two statutory schemes requires the district courts to carefully analyze the asserted causation link to be certain they are not *exceeding their jurisdiction*.") (emphasis added).  And the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202 (1994), subsequently held that an exclusive statutory review scheme precludes a district court from exercising jurisdiction over claims encompassed by that review scheme, confirming that dismissal under Rule 12(b)(1) is the appropriate outcome.  In any event, that dispute is ultimately academic because the outcome—dismissal of Plaintiffs' claims—is the same under either framework.

agency violated another provision of the Privacy Act, (2) the violation was intentional or willful, and (3) the violation had an adverse effect on the plaintiff. *See Paige v. DEA,* 665 F.3d 1355, 1358–59 (D.C. Cir. 2012); *see also Dick*, 67 F. Supp. 3d at 177.

As to both claims, Plaintiffs fail to establish that any of the alleged Privacy Act violations were causally linked to the claimed adverse determinations or effects—*i.e.*, Plaintiffs' separation from HHS—and that Defendants' alleged violations were carried out intentionally or willfully. Both Privacy Act claims must therefore be dismissed.

### A. Plaintiffs fail to establish that any Privacy Act violations were causally linked to their terminations.

1. "In order to prevail on [an] adverse-determination claim" under § 552a(g)(1)(C) of the Privacy Act, a "plaintiff must demonstrate that the [agency's] reliance on the allegedly inaccurate records proximately caused [the adverse determination]." *Lee v. Geren*, 480 F. Supp. 2d 198, 210 (D.D.C. 2007). This is a particularly searching inquiry even at the motion to dismiss stage. The D.C. Circuit has instructed that district courts must "carefully analyze the asserted causation link" in light of the CSRA's limits on judicial review of personnel actions. *Hubbard,* 809 F.2d at 5; *see also Gard v. U.S. Dep't of Educ.*, 789 F. Supp. 2d 96, 106 (D.D.C. 2011) ("To ensure that the plaintiff has not merely disguised a complaint governed by the CSRA as a series of claims under the Privacy Act, it is necessary to scrutinize closely any 'asserted causation link' between the Privacy Act violations alleged and adverse federal personnel actions.") (quoting *Hubbard*, 809 F.2d at 5). Plaintiffs' allegations, in light of materials subject to judicial notice (*see supra* p. 13), fail to clear this high bar.

To start, materials subject to judicial notice establish that performance ratings and other information contained in the RIF notices would have no bearing on decisions to terminate certain employees. Specifically, before any RIFs were initiated, HHS made clear that that it was enacting

a far-reaching transformation of the Department "through a reduction in workforce of about 10,000 full-time employees," a significant reduction in regional offices "from 10 to 5," and a consolidation of "redundant units" from 28 divisions of HHS into "15 new divisions." *See* HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), https://perma.cc/DH5Q-52L4.

None of these reorganization efforts would turn on employees' performance ratings, service computation date, and/or tenure. After the reduction in force notices were issued but well before this lawsuit was brought, HHS made clear that "veterans' preference, service computation date, performance ratings, and/or tenure" may be "incorrect and/or not included on the RIF notice." *See* HHS, *HHS Workforce Optimization Initiative*, (content last reviewed May 7, 2025), https://web.archive.org/web/20250509184052/https://www.hhs.gov/about/agencies/asa/workforce-optimization-initiative/index.html. HHS explained that, because "[i]n most cases, entire competitive areas are being abolished in this RIF," "employees are being separated without regard to retention standing." *Id.* HHS therefore noted that "although some RIF notices included information about retention standing and retention registers based on veterans' preference, service computation date, performance ratings, and tenure, these were not a factor in [an employee's] separation under this RIF." *Id.*

Plaintiffs' allegations concerning alleged inaccuracies in their performance ratings therefore fail to plausibly assert a causal link between the purported Privacy Act violations and adverse determinations. Plaintiffs' allegations to connect performance ratings to the adverse consequences consist of the conclusory assertion that the incorrect performance ratings resulted in Plaintiffs' loss "of retention credit, which should have been used to determine whether [they] would be retained, terminated, or offered alternative assignments." *E.g.*, Compl. ¶ 111. But as

22

HHS explained before this suit was brought, entire competitive areas were abolished in this RIF, so retention standing was not a factor in any separation.

Plaintiffs thus fail to allege facts to support the inference that those allegedly incorrect performance ratings caused their termination.  The Plaintiffs that allege Privacy Act claims based solely on inaccuracies in performance rating—Shawn Chenault, *id.* ¶¶ 127-28; Brandon Demich, *id.* ¶¶ 130-31; and Fonda Kornegay, *id.* ¶¶ 133-34—therefore fail to state a claim and must be dismissed.  *See Lee*, 480 F. Supp. 2d at 213 (dismissing claims where Plaintiff's "inability to set forth facts demonstrating a causal link between the allegedly inaccurate records and the adverse personnel action once again reveals the true purpose of this suit: to obtain judicial review of an otherwise unreviewable [adverse personnel determination]").  Insofar as the remaining Plaintiffs' claims rest on purportedly inaccurate performance ratings to sustain their Privacy Act claims, they too must be dismissed.

2.    To be sure, certain Plaintiffs allege inaccuracies on their RIF notices beyond performance ratings.  But those allegations similarly fail to hold up to the "careful[] analy[sis]" of causation that the D.C. Circuit requires, *Hubbard,* 809 F.2d at 5.

Apart from the performance rating allegations, which are insufficient for the reasons explained *supra* pp. 22-23, Plaintiff Catherine Jackson alleges that her RIF notice designated her competitive area as "OFFICE OF CHILD CARE REGIONAL-" and incorrectly stated that "[a]ll employees in your competitive area will be separated," when only 5 of the 10 regional offices that included employees in the "Office of Child Care" were closed.  Compl. ¶¶ 111-12.  But Jackson does not allege that her competitive area or her geographic location were inaccurately stated in the RIF notice, and HHS unequivocally stated *prior* to issuing the RIF notices that 5 out of 10 regional offices would be closed.  Thus, the sole statement alleged to be inaccurate on the RIF notice—that

"[a]ll employees in [her] competitive area will be separated," *id.* ¶ 112—is not personnel information pertaining to Jackson subject to protection under the Privacy Act. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 794–95 (D. Md. 2025) ("the Privacy Act only protects information regarding individuals").

Nor is that statement even incorrect. Pursuant to OPM guidelines on RIFs, a competitive area is defined by both "Organizational unit(s), *and* Geographical location (e.g., local commuting area)." *See* OPM, *Competitive Areas in Reduction in Force (RIF)*, at 1 (Mar. 2025), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-competitive-areas.pdf (emphasis added); *see also id.* ("The minimum standard is: Organizational unit: a subdivision of the agency under separate administration[;] Geographical: within the local commuting area"). Accordingly, that HHS retained employees in other regional offices who also worked in the Office of Child Care organizational unit does not establish the inaccuracy of the RIF notice as to Jackson—she was simply in a different commuting area, and thus different competitive area, than those employees at other regional offices.

Accordingly, Jackson's allegations do no more than identify "a document memorializing an adverse personnel decision." *Lee*, 480 F. Supp. 2d at 210. But it is a "guiding principle" of the D.C. Circuit's Privacy Act analysis that such a document "does not constitute the proximate cause of that personnel decision for purposes of an adverse-determination claim." *Id.* Jackson therefore fails to state a § 552a(g)(1)(C) claim under Privacy Act. *Hutchinson v. CIA,* 393 F.3d 226, 230 (D.C. Cir. 2005) (affirming dismissal of § 552a(g)(1)(C) claim because "record fails to show proximate cause—a vital element").

Plaintiff Melissa Adams's allegations are similarly deficient. Like Jackson, she alleges inaccuracies on her RIF notice pertaining to one incorrect performance rating and the statement

that "[a]ll employees in your competitive area will be separated" when some employees in the "Office of Grants Management-" competitive area allegedly were not terminated.  Compl. ¶¶ 115-16.  But Adams does not dispute that her competitive area is the Office of Grants Management—to the contrary, she pleads that she worked as a "supervisory grants management specialist in the Strategic Operations and Innovation Division in the Office of Grants Management."  *Id.* ¶ 114. Accordingly, the only alleged non-performance-rating inaccuracy is the statement that "[a]ll employees in [her] competitive area will be separated," which is not personnel information. Moreover, her duty station was, in fact, the Boston regional office, *id.* ¶ 116, which renders inapt her comparison to other people in her division at other regional offices because competitive areas are based on both division *and* geographic area, with the latter defined as the "the local commuting area," *see* OPM, *Competitive Areas in Reduction in Force (RIF)*, at 1 (March 2025), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-competitive-areas.pdf.

Plaintiff Carrie Greene's allegations fare no better.  She, too, alleges inaccuracies on her RIF notice pertaining to one recent performance rating and the statement that "[a]ll employees in your competitive area will be separated" when some employees in the competitive area of "DIVISION OF TRIBAL TANF MANAGE-" were not separated.  Compl. ¶¶ 119-20.  But as with Adams and Jackson, Greene's listed competitive area was accurate:  she alleges that she was "branch chief in the Division of Tribal TANF Management in the Office of Family Assistance at ACF."  *Id.* ¶ 118.  Greene also alleges "[o]n information and belief" that she was "included in the RIF because her personnel records incorrectly listed her duty station as the San Franciso, CA regional office," *id.* ¶ 120.  But she acknowledges that her duty station was in Auburn, California, *id.*, and thus would fall within the San Francisco "[g]eographical location (e.g., local commuting

25

area)." *See* OPM, *Competitive Areas in Reduction in Force (RIF)*, at 1 (March 2025), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-competitive-areas.pdf.

Greene finally alleges that the "competitive level" on her RIF notice "appears to be inaccurate or incomplete." Compl. ¶ 121. But she offers no basis to suggest that this alleged error caused her termination. And because entire competitive areas were eliminated, there can be no causal link between a competitive level and a separation. Greene therefore fails to state a Privacy Act claim because she has merely identified "a document memorializing an adverse personnel decision," not an inaccuracy that proximately caused her termination. *Lee*, 480 F. Supp. 2d at 210.

Finally, Plaintiff Vid Desai alleged performance rating inaccuracies and that the competitive areas in which he was listed "d[id] not match any of the competitive areas on the list that HHS recently published." Compl. ¶¶ 124-25. The performance-rating allegations fail to establish a causal link for the reasons explained *supra* pp. 22-23, and the competitive-areas allegation is flatly refuted by HHS records. Indeed, both of the competitive areas listed on his RIF notice ("OFC OF DIGITAL TRANSFORMATION-OFC OF THE COMMISSIONER," Compl. ¶ 125) are included on HHS's published list. *See* HHS, *HHS Competitive Areas*, at 1, 8, https://www.hhs.gov/sites/default/files/hhs-competitive-areas.pdf.

Mr. Desai also alleged that his competitive level was blank and that, "[w]ithout a competitive level, it is impossible to know how Mr. Desai's ranking on the retention register was generated." Compl. ¶ 125. But he provides no basis to believe that any competitive level would have altered his termination in light of HHS's statement that most employees would "be separated without regard to retention standing." *See* HHS, *HHS Workforce Optimization Initiative*, (content last               reviewed               May               7,               2025),

https://web.archive.org/web/20250509184052/https://www.hhs.gov/about/agencies/asa/workforce-optimization-initiative/index.html.

At bottom, none of the Plaintiffs' allegations plausibly establish that any inaccuracies contained in their personnel files were the proximate cause of Plaintiffs' separations from HHS. Plaintiffs therefore fail to state claims under § 552a(g)(1)(C) of the Privacy Act. *See Gard*, 789 F. Supp. 2d at 107 ("Mr. Gard's claims based on that determination fail, however, because Mr. Gard has failed to identify any evidence suggesting that the agency relied on inaccurate records in making that determination."); *Lee*, 480 F. Supp. 2d at 210.

3.  For this same reason, Plaintiffs' also fail to state a claim under § 552a(g)(1)(D). The "adverse effect" that Plaintiffs allege in support of that claim is their termination. *See* Compl. ¶ 168 ("As a result, Plaintiffs were subject to an adverse effect: they were terminated when they otherwise would not have been and suffered harms, including actual damages."). But in light of the record establishing that the RIFs were not dependent on the accuracy of information contained in personnel records, the Complaint fails to plausibly allege that any incorrect records had a causal link to that adverse effect.

Indeed, Plaintiffs' allegations are even more deficient in establishing a causal link between the alleged violations of § 552a(g)(1)(D) and their terminations than their allegations of causation in support of their claim under § 552a(g)(1)(C). Recall that § 552a(g)(1)(D) is a "catchall" provision, *Dick*, 67 F. Supp. 3d at 176-77, that allows aggrieved parties to seek damages for violations of other provisions in the Privacy Act. And Plaintiffs base their claim under § 552a(g)(1)(D) on violations of the Privacy Act's matching-program provisions. Accordingly, Plaintiffs must plausibly allege that the following purported violations of other provisions in the Privacy Act were causally linked to their terminations: (1) HHS's disclosure of records to DOGE,

27

OPM, and OMB without having entered into a "written agreement between the source agency and the recipient agency" in violation of § 552a(o), Compl. ¶ 162; (2) HHS's failure to "independently verif[y] the information" produced by a matching program or "use[] a Data Integrity Board" in violation of § 552a(p), Compl. ¶ 163; and (3) HHS's disclosure of records to DOGE, OPM, and OMB when HHS had "reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency" in violation of § 552a(q), Compl. ¶ 164.

But Plaintiffs do not even attempt to allege that HHS's disclosure of records to any other federal entities *caused* their termination, much less that the existence of a written agreement governing that disclosure would have averted their termination. *See generally* Compl. ¶¶ 159-169. Nor is there any basis to conclude that their terminations were caused by HHS's failure to verify information or use a Data Integrity Board in a Department-wide reorganization that eliminated entire competitive areas and regional offices. Like Plaintiffs' claim under § 552a(g)(1)(C), then, the § 552a(g)(1)(D) claim must also be dismissed for failure to plausibly allege a causal link between the alleged Privacy Act violations and the alleged adverse effects. *See Dick*, 67 F. Supp. 3d at 182-83 (dismissing § 552a(g)(1)(D) claim because plaintiff failed to provide allegations plausibly suggesting causal link between disclosure warning and claimed adverse effects); *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 45 (D.D.C. 2012) (plaintiff failed to state a § 552a(g)(1)(D) claim where alleged violations did not cause plaintiff to be constructively discharged because "the causal link between the disclosures and plaintiff's separation from [his employer] is broken by intervening events").

**B. Plaintiffs fail to plausibly allege intentional or willful violations of the Privacy Act.**

Independently, Plaintiffs fail to state a claim for damages under the Privacy Act because Plaintiffs fail to plausibly allege that any violations were intentional or willful. *See* 5 U.S.C. §

552a(g)(4).  The words "intentional" and "willful" in subsection (g)(4) are "terms of art."  *White v. OPM*, 840 F.2d 85, 87 (D.C. Cir. 1988) (per curiam).  "Specifically, '[s]ection 552a(g)(4) imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.'"  *Id.* (quoting *Albright,* 732 F.2d at 189).  Thus, allegations that establish a mere negligent or inadvertent violation of the Privacy Act are insufficient.  *Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010).  This is an unusually high bar:  to qualify, "a violation of the statute 'must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful.'"  *Id.* (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007)); *see also Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C. Cir. 1987) (same).

Plaintiffs fail to clear that high bar here.  To start, Plaintiffs rely heavily on Secretary Kennedy's statement that "Personnel that should not have been cut, were cut.  We're reinstating them.  And that was always the plan.  Part of the – at DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."  *E.g.*, Compl. ¶ 101.  But that quotation does not suggest that HHS made mistakes concerning agency personnel records, and therefore cannot establish that any mistakes would constitute willful violations of the Privacy Act.  To the contrary, the article that Plaintiffs cite continues by explaining that Secretary "Kennedy said that the elimination of the Centers for Disease Control and Prevention's entire Lead Poisoning Prevention and Surveillance Branch was among the mistakes."  *See* Alexander Tin, *RFK Jr. says 20% of health agency layoffs could be mistakes*, CBS News Health Watch (Apr. 3, 2025), https://perma.cc/EBD7-LEAH.  That

29

suggests the mistakes that Secretary Kennedy referenced did not involve personnel records, but rather whether certain divisions were statutorily required or consistent with HHS priorities.

More fundamentally, that the Secretary of HHS acknowledged the possibility of mistakes and stated that corrective action would be taken is evidence that any mistakes would be inadvertent or, at most, negligent—not willful or intentional.  *See McIntyre v. Fulwood*, 892 F. Supp. 2d 209, 218 (D.D.C. 2012) (finding defendant's actions were not intentional or willful because "[t]he Commission ceased reliance on the erroneous information") (citation omitted); *Colley v. James*, 254 F. Supp. 3d 45, 67 (D.D.C. 2017) (finding no intentional or willful Privacy Act violation because agency had corrected inaccurate information).  For this same reason, Plaintiffs' allegations regarding HHS spokesperson Andrew Nixon's statements cannot establish a willful or intentional violation:  he explained that any errors are "exactly why HHS is reorganizing its administrative functions to streamline operations and fix the broken systems," *see* Compl. ¶ 71.

Indeed, Plaintiffs allege that the RIF notices were delayed "so that all the data could be triple checked over the weekend."  Compl. ¶ 43 (citation omitted).  This demonstrates an attempt to avoid inaccuracies, not an intentional or willful embrace of any Privacy Act violations.  *Cf. Sterling v. United States*, 826 F. Supp. 570, 572 (D.D.C. 1993) (finding intentional and willful standard not met where agency's "efforts both before and after the release of information . . . indicate a sensitivity to the potential harm the release might cause and represent attempts to avert that harm"), *aff'd*, 1994 WL 88894 (D.C. Cir. Mar. 11, 1994).

That HHS subsequently acknowledged that certain performance ratings on RIF notices were inaccurate also does not establish a willful or intentional violation of the Privacy Act.  That is because HHS made clear that any inaccuracies were not relevant to RIF determinations.  *See supra* pp. 11-12; 22-23.  And where the agency "officials involved did not substantially rely on

30

the inaccurate information in [plaintiff's] file in reaching their decision, it follows that they could not have intended to deprive him of his rights." *Kellett v. United States*, 856 F. Supp. 65, 71 (D.N.H. 1994), *aff'd*, 66 F.3d 306 (1st Cir. 1995).

Plaintiffs also suggest that an April 2020 Booz Allen Hamilton report regarding the FDA's personnel systems renders HHS's actions willful or international. *See* Compl. ¶ 81. But that report—which merely alleges that a "lack of integration" across different systems "introduces quality control issues," *id.*—addressed "recruiting and hiring challenges," and did not purport to suggest that HHS's human resources systems in any way violate Privacy Act requirements. *See* Booz Allen Hamilton, *FDA Interim Hiring and Retention Assessment*, at 27 (Apr. 13, 2020), https://www.fda.gov/media/138662/download?attachment. Accordingly, that report cannot establish intentionality or willfulness. *See Maydak*, 630 F.3d at 179-83 (holding that BOP did not intentionally or willfully commit Privacy Act violations because, among other reasons, "BOP officials were still never placed on clear notice that their practices violated the Act").

In all events, allegations regarding the April 2020 report are relevant only as to FDA employees because FDA's record-keeping practices were the sole subject of that report. But only two Plaintiffs—Vid Desai and Shawn Chenault, Compl. ¶¶ 123, 127—were FDA employees. Accordingly, insofar as this Court credits the allegations regarding the April 2020 report as sufficient to raise a plausible inference of intentional or willful Privacy Act violations, the remaining non-FDA Plaintiffs must be dismissed.

\*\*\*

At bottom, Plaintiffs' allegations regarding willfulness and intentionality amount to a dispute about HHS's judgment embodied in the RIF and reorganization, with Plaintiffs opposing HHS's desire to rapidly implement the President's directives. But the Privacy Act is not the proper

mechanism for airing such grievances; rather, "[t]he Privacy Act allows for amendment of factual or historical errors.  It is not . . . a vehicle for amending the *judgments* of federal officials." *Kleiman,* 956 F.2d at 337–38 (citation omitted).

### III.    Because Plaintiffs fail to state a claim under the Privacy Act, their claim for declaratory relief must also be dismissed.

Plaintiffs also bring a cause of action under the Declaratory Judgment Act, 28 U.S.C. § 510.  *See* Compl. ¶¶ 170-71.  But such claims must be tethered to some other viable claim for non-declaratory relief arising from the same issue because the Declaratory Judgment Act does not create a stand-alone cause of action.  *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (The Declaratory Judgment Act does not itself "provide a cause of action," as the "availability of [declaratory] relief presupposes the existence of a judicially remediable right.") (citation omitted).  That is because the Declaratory Judgment Act is purely "procedural" in nature—it is meant to augment the remedial options available to district courts, not expand their jurisdiction.  *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  Accordingly, because Plaintiffs lack a valid Privacy Act claim, they cannot state a claim under the Declaratory Judgment Act.

Furthermore, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  For example, courts may dismiss claims under the Declaratory Judgment Act when those claims are duplicative or redundant of other claims.  *See, e.g.*, *Boone v. MountainMade Found.*, 684 F. Supp. 2d 1, 12 (D.D.C. 2010).  Thus, to the extent that Plaintiffs' Declaratory Judgment Act claim is duplicative of their Privacy Act claims, it should be dismissed as such.  *See Sofi Classic S.A de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the

32

litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action.").

## IV.    All individual and non-HHS Defendants must be dismissed.

A.    The individual Defendants[5] named in their official capacities should be dismissed because "the Privacy Act creates a cause of action against only federal government agencies and not . . . individual officials." *Abdelfattah v. DHS*, 787 F.3d 524, 533 n.4 (D.C. Cir. 2015); *see also* 5 U.S.C. § 552a(g)(1) (only authorizing suit against an "agency"); *Dick*, 67 F. Supp. 3d at 176 ("[T]he law is clear that only federal agencies, not individuals, are the proper defendants for a Privacy Act cause of action."); *Williams v. Fanning*, 63 F. Supp. 3d 88, 90 n.2 (D.D.C. 2014) ("[T]he only proper defendant in a suit under the Privacy Act is the agency . . ."); *Truesdale v. U.S. Dep't of Just.*, 657 F. Supp. 2d 219, 227 (D.D.C. 2009) (similar).   Thus, courts routinely dismiss Privacy Act claims against individual officials. *See, e.g.*, *Abdelfattah*, 787 F.3d at 533 n.4 (affirming sua sponte dismissal of Privacy Act claims against individual officials, because it was "patently obvious" that such claims "cannot prevail") (citation omitted).

Here, Plaintiffs purport to assert Privacy Act claims against "all" Defendants, alleging that "[a]ll Defendants are 'agencies' as defined by 5 U.S.C. § 552a(1)," Compl. ¶ 156.   But the individual defendants are plainly not agencies. *See Palmieri v. United States*, 896 F.3d 579, 586 (D.C. Cir. 2018) (explaining that "[u]nder the Privacy Act, an individual person is not an 'agency'") (quoting 5 U.S.C. § 552a(a)(1)).   The individual defendants should therefore be dismissed. *Martinez v. Bureau of Prisons*, 444 F.3d 620, 624 (D.C. Cir. 2006) ("the district court

---

[5] The individual Defendants, all named in their official capacities, are the following:  Robert F. Kennedy, Jr., Russell Vought, Elon Musk, Amy Gleason, Charles Ezell, Andrew Gradison, Martin Makary, and Jim O'Neill.  *See* Compl. ¶¶ 23, 25, 27-28, 31, 33, 35, 37.

properly dismissed the named individual defendants because no cause of action exists that would entitle appellant to relief from them under the Privacy Act . . .").

B.  Independently, the Defendants other than HHS and its components must be dismissed because they are not proper defendants to these Privacy Act claims.[6]  "The only proper defendant in an action under the Privacy Act 'is the agency maintaining the challenged record.'"  *Bailey v. Fulwood*, 780 F. Supp. 2d 20, 27 (D.D.C. 2011) (quoting *Ingram v. Gonzales,* 501 F. Supp. 2d 180, 185 n.2 (D.D.C.2007)); *see also Armstrong v. U.S. Bureau of Prisons*, 976 F. Supp. 17, 23 (D.D.C. 1997) ("Since plaintiff's complaint alleges improper maintenance of her federal prison record, the court concludes that the BOP is the only proper defendant in this action, and dismisses all other federal agencies listed in plaintiff's complaint."), *aff'd*, No. 97-5208, 1998 WL 65543 (D.C. Cir. Jan. 30, 1998).  Plaintiffs have not alleged that any of the non-HHS Defendants are responsible for maintaining the records at issue, and those Defendants therefore must be dismissed.

## V.    Plaintiffs' class allegations do not prevent dismissal of this action in its entirety.

For the reasons set forth above, this action should be dismissed in its entirety because Plaintiffs fail to state a claim on behalf of their putative class representatives, or any other Plaintiff identified in the Complaint under the Privacy Act or Declaratory Judgment Act.  And because the claims of all named Plaintiffs (including those of putative class representatives) fail as a matter of law, "it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove," thereby warranting dismissal of the action in its entirety.  *Cnty.*

---

[6] The non-HHS entity defendants are:  OMB; the United States Department of Government Efficiency (DOGE); the United States DOGE Service Temporary Organization; and OPM.  *See* Compl. ¶¶ 26, 29-30, 32.  Although redundant, the HHS component entities may remain as Defendants.  *See Cloonan v. Holder,* 768 F. Supp. 2d 154, 162 (D.D.C. 2011) ("naming components as defendants under the Privacy Act is appropriate since the statute's plain language is clear that 'an agency need not be a cabinet-level agency such as the DOJ' to be liable") (quoting *Lair v. Dep't of Treasury,* No. 03-cv-827 (RCL), 2005 WL 645228, at *3 (D.D.C. Mar. 21, 2005)).

*of Dorchester v. AT&T Corp.,* 407 F. Supp. 3d 561, 565-66 (D.S.C. 2019) (dismissing class allegations before the plaintiff filed a motion for class certification) (citation omitted).

Indeed, dismissal of class complaints at the motion to dismiss stage is routine practice in courts across the country upon a finding that the complaint fails to state a claim as to the named Plaintiffs. *See, e.g., Rosenfield v. Wilkins*, 468 F. Supp. 2d 806, 807 (W.D. Va. 2006) (dismissing underlying claims without addressing class certification), *aff'd*, 280 F. App'x 275 (4th Cir. 2008); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878 (S.D.W. Va. 2020) (same), *aff'd*, 27 F.4th 926 (4th Cir. 2022); *Eye Care Ctr. of New Jersey, PA v. Twin City Fire Ins. Co.*, 522 F. Supp. 3d 72, 78 (D.N.J. 2021) ("Because [plaintiff] fails to state an individual claim, its claims on behalf of a class fail too"), *aff'd sub nom. Wilson v. USI Ins. Serv*. LLC, 57 F.4th 131 (3d Cir. 2023); *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987) ("[T]o be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim"). Because Plaintiffs fail to state a claim with respect to the putative class representatives and all other Plaintiffs identified in the Complaint, the Court need not wait for a motion for class certification to dismiss the class claims and enter judgment of dismissal. Instead, Plaintiffs' putative class action Complaint should be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: September 5, 2025                   Respectfully submitted,


                                           BRETT A. SHUMATE
                                           Assistant Attorney General

                                           ELIZABETH J. SHAPIRO
                                           Deputy Director, Federal Programs Branch

                                           */s/ Alexander W. Resar*
                                           ALEXANDER W. RESAR
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L ST. N.W.
                                           Washington, DC 20005
                                           Tel:  (202) 616-8188
                                           alexander.w.resar@usdoj.gov

                                           *Counsel for Defendants*