# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHERINE JACKSON, et al.,

       *Plaintiffs*,

   vs.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al.,

       *Defendants*.

Case No.: 1:25-cv-01750-BAH

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

A.     Legal Background ....................................................................................................... 3

      i.     The Privacy Act of 1974 ..................................................................... 4

      ii.    The Civil Service Reform Act of 1978 ............................................... 6

      iii.   The Computer Matching and Privacy Protection Act of 1988 .............. 7

B.     Factual Background ................................................................................................... 9

      i.     The April 1 Cuts at HHS ..................................................................... 9

      ii.    Plaintiffs' Experiences ...................................................................... 10

      iii.   This Lawsuit ...................................................................................... 12

LEGAL STANDARDS ...................................................................................................... 12

ARGUMENT ..................................................................................................................... 13

I.     Defendants' jurisdictional arguments fail. ............................................................... 13

      A.    The D.C. Circuit has long recognized that the CSRA does not preclude federal employees from bringing Privacy Act claims in federal court. ............... 13

            i.     Plaintiffs' Privacy Act claims may proceed under the law of this circuit .......................................................................................... 13

            ii.    Defendants' authorities are not to the contrary. ......................... 17

      B.    Traditional tools of statutory interpretation confirm that the CSRA does not preclude Plaintiffs' Privacy Act claims. ............................................................ 22

            i.     Defendants fail to identify any conflict between the Privacy Act and the CSRA ................................................................................... 24

            ii.    Defendants fail to clear the high bar for showing the Privacy Act has been repealed by implication as to federal employees. ................ 30

**TABLE OF CONTENTS**                                                                    **PAGE**

C.    To the extent relevant, the *Thunder Basin* factors favor Plaintiffs. ...................... 31

II.    Defendants' Rule 12(b)(6) arguments fail. ...................................................................... 34

A.    Plaintiffs plausibly allege that their RIFs were "actually caused" by inaccurate or incomplete records. ..................................................... 34

B.    Plaintiffs plausibly allege that the Privacy Act violations were "intentional or willful." .......................................................................... 38

III.    Defendants' remaining arguments are unpersuasive and do not warrant dismissal.......... 42

A.    DOGE, OPM, and OMB are proper Defendants. ................................................. 42

B.    Individuals sued in their official capacity are proper Defendants. ...................... 44

C.    The Court does not need to address Defendants' arguments about declaratory relief or class allegations.................................................................... 45

CONCLUSION.................................................................................................................................. 45

## TABLE OF AUTHORITIES

**CASES:**                                                                        **PAGE**

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) ................................................ 23

*Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1 (D.D.C. 2018) ....................................... 16

*Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112 (D.D.C. 2013) ..................... 35

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
   771 F. Supp. 3d 717 (D. Md. 2025) ...................................................................................... 35

*Ashbourne v. Hansberry*, 302 F. Supp. 3d 338 (D.D.C. 2018) ...................................................... 40

*Ashbourne v. Hansberry*, 2014 WL 12666716 (D.D.C. Sept. 3, 2014) .......................................... 15

*Ashbourne v. Hansberry*, 2015 WL 11303198 (D.D.C. Nov. 24, 2015),
   *aff'd*, 703 F. App'x 3 (D.C. Cir. 2017) ................................................................................ 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 13

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) ................................................... 33

*Beach TV Props., Inc. v. Solomon*, 324 F. Supp. 3d 115 (D.D.C. 2018) ...................................... 38

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................... 13, 35

*Calhoon v. Dep't of Treasury*, 2001 WL 1590500 (M.S.P.B. Oct. 18, 2001) .............................. 21

*Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ........................................ 33

*Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378 (D.C. Cir. 2024) .............................. 22

*\*Carell v. Merit Sys. Prot. Bd.*, 131 F. App'x 296 (Fed. Cir. 2005) ................................... 5, 20–21

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ...................................................................... 26

*Cofield v. United States*, 64 F. Supp. 3d 206 (D.D.C. 2014) .................................................... 5, 21

*Crumpacker v. Ciraolo-Klepper*, 715 Fed. App'x 18 (D.C. Cir. 2018) ....................................... 35

*Davis v. Jumio Corp.*, 2023 WL 2019048 (N.D. Ill. Feb. 14, 2023) ............................................ 36

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024) ................................ 23

**CASES (continued):**                                                                                    **PAGE**

*Deters v. U.S. Parole Comm'n*, 85 F.3d 655 (D.C. Cir. 1996) ........................................ 5

*Dick v. Holder*, 67 F. Supp. 3d 167 (D.D.C. 2014) ....................................................... 35

*Dickson v. OPM*, 828 F.2d 32 (D.C. Cir. 1987) ........................................................... 42

*Doe P v. Goss*, 2007 WL 106523 (D.D.C. Jan. 12, 2007) ............................................. 15

*Doe v. Chao*, 540 U.S. 614 (2004) ................................................................... *passim*

*Elgin v. Dep't of the Treasury*, 567 U.S. 1 (2012) ................................................. *passim*

*\*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ................................................... *passim*

*Esparraguera v. Dep't of the Army*, 981 F.3d 1328 (Fed. Cir. 2020) ............................... 7

*Feldman v. CIA*, 797 F. Supp. 2d 29 (D.D.C. 2011) ............................................... 15, 40

*Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ............................... 34

*Gard v. U.S. Dep't of Educ.*, 789 F. Supp. 2d 96 (D.D.C. 2011) ............................... 34–35

*Gerlich v. U.S. Dep't of Just.*, 659 F. Supp. 2d 1 (D.D.C. 2009) ............................... 14, 17

*Gerlich v. U.S. Dep't of Just.*, 711 F.3d 161 (D.C. Cir. 2013) ...................................... 14

*Gill v. Dep't of Def.*, 92 M.S.P.R. 23 (2002) ......................................................... 21

*Greenhouse v. Geren*, 574 F. Supp. 2d 57 (D.D.C. 2008) ............................................. 15

*Hafer v. Melo*, 502 U.S. 21 (1991) .................................................................... 44

*Hanna v. Herman*, 121 F. Supp. 2d 113 (D.D.C. 2000) ................................................ 18

*Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025) ................................................ 7

*Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65 (D.C. Cir. 2015) ............................... 38

*Herman v. Dep't of Just.*, 115 M.S.P.R. 386 (2011) .................................................. 21

*Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017) ............................................... 22

*Holly v. Dep't of Health & Hum. Res.*,
    1988 WL 90089 (D.D.C. Aug. 22, 1988), *aff'd*, 895 F.2d 809 (D.C. Cir. 1990) ............. 17

**CASES (continued):**                                                          **PAGE**

*Holly v. Dep't of Health & Hum. Res.*,
    895 F.2d 809 (D.C. Cir. 1990) ................................................................. 18

*Houlihan v. OPM*,
    909 F.2d 383 (9th Cir. 1990) ................................................................. 16

*\*Hubbard v. EPA Adm'r*, 809 F.2d 1 (D.C. Cir. 1986) ........................................ *passim*

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .................................... 25

*Hutchinson v. CIA*, 393 F.3d 226 (D.C. Cir. 2005) ........................................ 35

*Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022) ........................ 34

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.*, 533 U.S. 124 (2001) ...................... 26, 28

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) ............................................. 31–32

*Jarrell v. Tisch*, 656 F. Supp. 237 (D.D.C. 1987) ........................................ 44

*Jingjing Liu v. Mayorkas*, 2021 WL 2115209 (D.D.C. May 25, 2021) ........................ 35

*Johnson v. Dep't of the Treasury*, 8 M.S.P.R. 170 (1981) ................................. 21

*Jones v. Kirchner*, 835 F.3d 74 (D.C. Cir. 2016) ......................................... 41

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................ 44

*\*Kleiman v. Dep't of Energy*,
    956 F.2d 335 (D.C. Cir. 1992) ............................................................ *passim*

*Kursar v. Transp. Sec. Admin.*, 581 F. Supp. 2d 7 (D.D.C. 2008) .......................... 29

*Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170 (D.C. Cir. 2013) ...................... 20, 28, 30

*Lee v. Geren*, 480 F. Supp. 2d 198 (D.D.C. 2007) ........................................ 17, 34

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ................................... 34

*\*Lucas v. Am. Fed'n of Gov't Emps.*, --- F.4th ----,
    2025 WL 2371197 (D.C. Cir. Aug. 15, 2025) .............................................. *passim*

*Martin v. Dep't of Army*, 2000 WL 1807419 (Fed. Cir. Dec. 8, 2000) ....................... 21

**CASES (continued):**                                                           **PAGE**

*Maydak v. United States*, 630 F.3d 166 (D.C. Cir. 2010)................................... 39

*McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006) ................................... 14

*Mordi v. Zeigler*, 870 F.3d 703 (7th Cir. 2017) .......................................... 42

*Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999)....................................... 34

*Morton v. Mancari*, 417 U.S. 535 (1974)................................................ 23

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020)..................... 12

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ..................... 23

*Nat'l Treasury Emps. Union v. Vought*, --- F.4th ----,
    2025 WL 2371608 (D.C. Cir. Aug. 15, 2025)............................................ 21–22

*Normoyle v. Dep't of Air Force*, 1994 WL 580174 (M.S.P.B. Oct. 18, 1994) .............. 21

*Paige v. DEA*, 665 F.3d 1355 (D.C. Cir. 2012).......................................... 5

*Palmer v. Merit Sys. Prot. Bd.*, 550 F.3d 1380 (Fed. Cir. 2008) ....................... 7

*Peter B. v. CIA*, 620 F. Supp. 2d 58 (D.D.C. 2009) .................................... 15

\**POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014)............................*passim*

*Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32 (D.D.C. 2012)....................... 35

*Risley v. Hawk*, 108 F.3d 1396 (D.C. Cir. 1997)........................................ 28

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013 (D.C. Cir. 1988)......................... 38-39

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................. 20, 31–34

*United States v. Fausto*, 484 U.S. 439 (1988)........................................*passim*

*United States v. Newman*, 2017 WL 3575848 (D.D.C. Aug. 17, 2017)...................... 42

*VoteVets Action Fund v. U.S. Dep't of Veterans*, 992 F.3d 1097 (D.C. Cir. 2021) ........ 13

*Washburn v. OPM*, 2023 WL 2478160 (D.D.C. Mar. 11, 2023)............................... 17

**CASES (continued):** **PAGE**

*Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder LLC,*
  2021 WL 1198143 (D.D.C. Mar. 30, 2021) ....................................................... 35

*Young v. U.S. Postal Serv.*, 2010 WL 2016529 (M.S.P.B. May 21, 2010) .................................... 21

**STATUTES:**

*5 U.S.C. § 552a
  5 U.S.C. § 552a(a)(2) ........................................................................................ 25
  5 U.S.C. § 552a(a)(3) ............................................................................ 25, 43–44
  5 U.S.C. § 552a(a)(4) ........................................................................................ 25
  5 U.S.C. § 552a(a)(8)–(13) .................................................................................. 7
  5 U.S.C. § 552a(a)(8)(A)(ii) ........................................................................... 7, 25
  5 U.S.C. § 552a(a)(8)(B)(v) ........................................................................... 8, 25
  5 U.S.C. § 552a(b) ........................................................................................... 27
  5 U.S.C. § 552a(e)(5) ....................................................................................... 42
  5 U.S.C. § 552a(e)(12) ....................................................................................... 8
  5 U.S.C. § 552a(g) ......................................................................................... 4, 8
  5 U.S.C. § 552a(g)(1) ................................................................................. *passim*
  5 U.S.C. § 552a(g)(1)(C) ............................................................................ *passim*
  5 U.S.C. § 552a(g)(1)(D) ............................................................................ *passim*
  5 U.S.C. § 552a(g)(4)(A) ................................................................................ 5, 29
  5 U.S.C. § 552a(g)(4)(B) ..................................................................................... 5
  5 U.S.C. § 552a(g)(5) ..................................................................................... 5, 20
  5 U.S.C. § 552a(o) ............................................................................................. 8
  5 U.S.C. § 552a(o)(1)(D) ................................................................................ 8, 25
  5 U.S.C. § 552a(p) ........................................................................................... 38
  5 U.S.C. § 552a(p)(1)(A) ............................................................................... 8, 38
  5 U.S.C. § 552a(p)(1)(B) ............................................................................... 8, 38
  5 U.S.C. § 552a(q)(1) ........................................................................................ 25
  5 U.S.C. § 552a(r) ............................................................................................. 7
  5 U.S.C. § 552a(u) ............................................................................................. 7
  5 U.S.C. § 552a(v)(1) ......................................................................................... 8

5 U.S.C. § 1204(a)(2) .............................................................................................. 28

5 U.S.C. § 1214 ..................................................................................................... 28

5 U.S.C. § 2301 ................................................................................................. 6, 27

5 U.S.C. § 2302 ................................................................................................. 6, 27
  5 U.S.C. § 2302(b) ............................................................................................ 31
  5 U.S.C. § 2302(b)(14) ....................................................................................... 27

**STATUTES (continued):**                                                                  **PAGE**

5 U.S.C. § 4301 ................................................................................................... 6

5 U.S.C. § 5596(b) ............................................................................................ 28

5 U.S.C. § 7501 ................................................................................................. 6

5 U.S.C. § 7701(a) ............................................................................................ 7

5 U.S.C. § 7702(a)(1)(B) ................................................................................. 31

5 U.S.C. § 8345(j)(1)(A) ................................................................................. 18

28 U.S.C. § 1295(a)(9) ..................................................................................... 7

28 U.S.C. § 1331 .............................................................................................. 20

Civil Service Reform Act of 1978,
   Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (Oct. 13, 1978) ................................. 6, 26

Pub. L. No. 115-73, 131 Stat. 1235 (Oct. 26, 2017) ...................................... 27

**RULES AND REGULATIONS:**

5 C.F.R. § 351.605 ........................................................................................... 36

Fed. R. Civ. P. 12(b) .......................................................................... 12, 16, 34–35, 39

Fed. R. Evid. 201(b)(2) .................................................................................... 36

Final Guidance Interpreting the Provisions of Public Law 100-503,
   the Computer Matching and Privacy Protection Act of 1988,
   54 Fed. Reg. 25,818 (June 19, 1989) ........................................................... 8, 29

**LEGISLATIVE HISTORY:**

S. Comm. on Gov't. Operations & H.R. Comm. on Gov't. Operations, 94th Cong.,
   2d Sess., Legislative History of the Privacy Act of 1974 S. 3418 (Public Law 93-579):
   Source Book on Privacy (Comm. Print 1976), https://perma.cc/XB27-SH4J ................. 27

**MISCELLANEOUS:**

*Office of Privacy & Civil Liberties, U.S. Dep't of Justice,
   *Overview of the Privacy Act: 2020 Edition* ............................................................. *passim*

**MISCELLANEOUS (continued):**                                    **PAGE**

U.S. General Accounting Office, *Report to the Congress* (May 13, 1980),
    https://www.gao.gov/assets/fpcd-80-38.pdf.........................................................................6

## INTRODUCTION

This case arises from the decision by the U.S. Department of Health and Human Services (HHS), made in concert with other Defendants, to fire 10,000 people based on records that an HHS spokesperson has since admitted were "inaccurate." Plaintiffs—seven workers impacted by the cuts—filed this class action lawsuit to vindicate their rights under the Privacy Act. Defendants moved to dismiss, arguing primarily that Plaintiffs' Privacy Act claims are precluded by the Civil Service Reform Act (CSRA). But Defendants' arguments under the CSRA ignore binding precedent and misunderstand the relationship between the two statutes. Defendants' merits arguments fare no better, as they rely on factual disputes that may not be resolved at this early stage of the litigation. The motion to dismiss should be denied.

Defendants' principal argument is that the CSRA precludes Privacy Act claims brought by federal employees. But the CSRA and Privacy Act have coexisted for 46 years, and Defendants' theory of preclusion was long ago rejected by the D.C. Circuit in *Hubbard v. EPA Administrator*, 809 F.2d 1 (D.C. Cir. 1986). While Defendants rely on *Hubbard* throughout their brief, they omit its central holding, which recognized that Privacy Act claims are permitted in the federal employment context so long as the "adverse personnel action" was "*actually caused* by an inaccurate or incomplete record." *Id.* at 5 (emphasis in original). That holding was reaffirmed in *Kleiman v. Department of Energy*, 956 F.2d 335, 339 n.5 (D.C. Cir. 1992), on which Defendants also rely. Outside of court, even the Department of Justice has recognized the effect of this authority: "To date, the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act claim for damages." *Overview of the Privacy Act: 2020 Edition*, U.S. Dep't of Justice, https://perma.cc/W9G2-BFB7.

More generally, Defendants ignore the fundamental principle that when multiple statutes touch on the same topic, courts should seek harmony, not conflict.  Even where a party claims that two statutes conflict, courts are bound by "the strong presumption that repeals by implication are disfavored."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up).  Here, Defendants fail to identify any conflict between the Privacy Act and the CSRA that would require the Court to choose one over the other, and even if they could, nothing in the CSRA demonstrates a clear intent by Congress to repeal the Privacy Act's explicit grant of jurisdiction to district courts—including as to federal employees.  *See* 5 U.S.C. § 552a(g)(1), (a)(8)(A)(ii).  Neither *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), nor any other case cited by Defendants supports the blanket invalidation of all other federal statutes that apply to federal workers.  To the contrary, the D.C. Circuit recently clarified that courts considering the CSRA's reach must follow a "statute-specific analysis . . . rather than [a] categorical preclusion rule."  *Lucas v. Am. Fed'n of Gov't Emps.*, --- F.4th ----, 2025 WL 2371197, at *11 (D.C. Cir. Aug. 15, 2025).

Nor is this a matter of simply channeling Plaintiffs' claims elsewhere.  Because the Privacy Act's grant of jurisdiction is exclusive, only federal district courts—not administrative bodies or the Federal Circuit—have jurisdiction to hear Privacy Act claims.  Elsewhere, the Department of Justice has agreed with this well-settled point.  If Defendants' argument prevails, federal employees will be left with no way to vindicate their rights under the Privacy Act, even though it is undisputed that they are covered by the plain text of the statute's protections.  Defendants' preclusion arguments under the CSRA should therefore be rejected.

Defendants' fallback arguments on the merits fail for a more routine reason: they depend on disputes of fact that cannot be resolved at the pleading stage.  Defendants rely heavily on self-serving statements from government websites, clearly written in anticipation of litigation, under

the guise of "judicial notice." Although the Court may take judicial notice of what government websites say, those statements may not be noticed or accepted *for their truth*. Meanwhile, Defendants give short shrift to the allegations in the complaint, ignoring entire theories of causation and other facts that flatly contradict Defendants' arguments. Accepting Plaintiffs' allegations as true, as this Court must for purposes of Defendants' motion, the Complaint has plausibly alleged causation and intent under the Privacy Act.

Defendants may well believe it is good policy for all cases that touch on federal employment to be adjudicated by administrative boards in the Executive Branch (or not at all). But when it comes to the Privacy Act—a law passed to restrain the Executive Branch in the aftermath of Watergate—Congress determined that these claims should be adjudicated by the courts. "Respect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work," and "[a]llowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*." *Epic Sys.*, 584 U.S. at 511. Properly in federal court, Plaintiffs are entitled at this stage to an assumption of the truth of their allegations and all reasonable inferences that can be drawn from them. For all of these reasons, Defendants' motion should be denied.

## BACKGROUND

### A. Legal Background

This dispute concerns the interaction between two statutory schemes: the Privacy Act and the CSRA. Three enactments by Congress are most relevant here: (1) the Privacy Act of 1974, (2) the Civil Service Reform Act of 1978, and (3) the Computer Matching and Privacy Protection Act of 1988, which amended the Privacy Act.

i.  *The Privacy Act of 1974*

Passed in the wake of the Watergate and COINTELPRO scandals, the Privacy Act was designed "to restore trust in government" by defining what information the government was permitted to collect and how that information should be maintained and used.  *Overview of the Privacy Act: 2020 Edition*, U.S. Dep't of Justice, https://perma.cc/VJE8-YULF.[1]  The Act "gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).

The Privacy Act provides four separate causes of action.  5 U.S.C. § 552a(g).  This case is brought pursuant to the final two causes of action, 5 U.S.C. § 552a(g)(1)(C) and 552a(g)(1)(D).  Count 1 of the complaint is based on 5 U.S.C. § 552a(g)(1)(C), which provides a claim when an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."  *Id.*  In other words, it provides recourse when an agency reaches an adverse determination based on an inaccurate, irrelevant, untimely, or incomplete record.  Count 2 of the complaint is based on 5 U.S.C. § 552a(g)(1)(D), which provides a claim when an agency "fails to comply with any other provision of [the Privacy Act], or any rule promulgated thereunder, in such

---

[1] This publication by the U.S. Department of Justice, Office of Privacy and Civil Liberties, is available on the Department's website and for download in full here: https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition.  Citations throughout this brief (hereinafter "DOJ Overview") provide links to the relevant section of the website.  The publication is dated 2020, but the website reflects updates as of October 2022.

a way as to have an adverse effect on an individual." *Id.* This provision incorporates the other substantive requirements of the Act.[2]

"By its very terms," the Privacy Act "limits jurisdiction over Privacy Act matters to the federal district courts." DOJ Overview, https://perma.cc/W9G2-BFB7; *see also Cofield v. United States*, 64 F. Supp. 3d 206, 214 (D.D.C. 2014) ("The federal courts . . . have exclusive jurisdiction over any claim Plaintiff may be asserting under . . . the Privacy Act."). That exclusive jurisdiction is provided in 5 U.S.C. § 552a(g)(1): "the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection." It is further refined and restricted by 5 U.S.C. § 552a(g)(5), which establishes (among other things) venue rules among the district courts. Under these provisions, neither the Merit Systems Protection Board (MSPB) nor any other court or administrative body has jurisdiction to hear Privacy Act claims. *See, e.g., Carell v. Merit Sys. Prot. Bd.*, 131 F. App'x 296, 299 (Fed. Cir. 2005) ("[T]he Privacy Act also does not provide a basis for [MSPB] jurisdiction. . . . [C]laims under the Privacy Act must be brought in federal district court."). That exclusivity covers violations of the statute and "any rule promulgated thereunder." *See* 5 U.S.C. § 552a(g)(1)(D).

For the types of claims brought here, the Privacy Act waives sovereign immunity for violations that are "intentional or willful," and provides that the United States may be held liable for "actual damages." 5 U.S.C. § 552a(g)(4)(A). A plaintiff who can prove any pecuniary loss is entitled to statutory damages of $1000 or their full "actual damages," whichever is greater. 5 U.S.C. § 552a(g)(4)(B); *Chao*, 540 U.S. at 620.

---

[2] Plaintiffs agree with Defendants' recitation of the elements for each claim, as discussed in *Deters v. U.S. Parole Commission*, 85 F.3d 655, 657 (D.C. Cir. 1996), and *Paige v. DEA*, 665 F.3d 1355, 1358–59 (D.C. Cir. 2012). *See* Defs.' Mem. in Supp. of Mot. to Dismiss (ECF No. 12-1) (Mem.) at 20–21.

*ii.  The Civil Service Reform Act of 1978*

Passed just four years after the Privacy Act, the CSRA was designed "to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service."  CSRA, Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (Oct. 13, 1978); *see also Elgin v. Dep't of the Treasury*, 567 U.S. 1, 26 (2012) (Alito, J., dissenting).  The CSRA "provide[d] greater protection of individual Federal employee rights, provide[d] greater protection of the career civil service system from political abuses, and [gave] a statutory basis to labor-management relations."  U.S. General Accounting Office, *Report to the Congress* (May 13, 1980), https://www.gao.gov/assets/fpcd-80-38.pdf.  Those protections were balanced against offering "greater flexibility for Federal managers in managing human resources."  *Id.*  The statute also replaced a "patchwork system" of outdated civil service laws with an "integrated scheme of administrative and judicial review."  *United States v. Fausto*, 484 U.S. 439, 445 (1988).

"Three main sections of the CSRA govern personnel action taken against members of the civil service."  *Id.*  One section deals with "unacceptable job performance."  *Id.* at 445–446 (citing 5 U.S.C. § 4301).  Another deals with actions "based on misconduct."  *Id.* at 446–447 (citing 5 U.S.C. § 7501 *et seq.*).  And Chapter 23, perhaps most relevant here, "establishes the principles of the merit system of employment" and "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers."  *Id.* at 446 (citing 5 U.S.C. §§ 2301, 2302).  These "merit system principles" and "prohibited personnel practices" are specifically enumerated in the statute.  *See* 5 U.S.C. §§ 2301 (merit systems principles), 2302 (prohibited personnel practices).

The CSRA created the MSPB, an administrative body whose "primary function is to review federal employee appeals of adverse actions 'which [are] appealable to the Board under any law,

rule, or regulation,' including those related to removal or suspension for periods greater than fourteen days." *Harris v. Bessent*, 775 F. Supp. 3d 164, 170 (D.D.C. 2025) (alteration in original) (quoting 5 U.S.C. § 7701(a)).  The MSPB is a body of limited jurisdiction.  *See Palmer v. Merit Sys. Prot. Bd.*, 550 F.3d 1380, 1382 (Fed. Cir. 2008).  Adverse MSPB decisions may be appealed to the Federal Circuit, which has exclusive jurisdiction over those appeals.  28 U.S.C. § 1295(a)(9).  Importantly, the Federal Circuit may adjudicate the merits of a claim under this scheme only when the MSPB had jurisdiction over the matter originally.  *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1337 (Fed. Cir. 2020).  In other words, "the CSRA channels judicial review of an adverse action exclusively through the Federal Circuit only if it first channels review through the Board."  *Id.* at 1338.  The CSRA does not mention the Privacy Act.  *See* CSRA, 92 Stat. 1111 *et seq.*

### iii.   The Computer Matching and Privacy Protection Act of 1988

The Computer Matching and Privacy Protection Act of 1988 amended the Privacy Act to add restrictions on the use of so-called "matching programs"—computerized comparisons of different systems of records.  *See* 5 U.S.C. § 552a(a)(8)–(13), (e)(12), (o), (p), (q), (r), & (u).  Like the rest of the Privacy Act, these provisions are enforceable by private right of action under 5 U.S.C. § 552a(g)(1)(D).  Count 2 of the complaint is based on violations of these matching program requirements.

By their own terms, the matching program provisions apply to federal employees and their records.  For example, the statute defines "matching program" to include "any computerized comparison" of "two or more automated Federal personnel or payroll systems of records," or of "a system of Federal personnel or payroll records with non-Federal records."  5 U.S.C. § 552a(a)(8)(A)(ii).  That same definitions section also refers to "records predominantly relating to Federal personnel," and specifically includes those records within the Act's coverage when "the purpose of the match" is "to take any adverse . . . action against Federal personnel."  5 U.S.C.

§ 552a(a)(8)(B)(v).  Elsewhere, the matching program provisions provide specific protections to "holders of positions as Federal personnel."  5 U.S.C. § 552a(o)(1)(D)(ii).

As relevant here, 5 U.S.C. §§ 552a(o), (p), and (q) set restrictions on the use of these matching programs.  In short, subpart (o) requires agencies sharing records for use in a matching program to enter into a written agreement that covers certain terms.  Subpart (p) requires agencies to independently verify the accuracy of information produced by a matching program (or consult with the agency's "Data Integrity Board").  5 U.S.C. § 552a(p)(1)(A).  Subpart (p) also grants individuals subject to a matching program due-process-like rights, including notice and an opportunity to contest the agencies' findings.  5 U.S.C. § 552a(p)(1)(B).  And subpart (q) prohibits agencies, "[n]otwithstanding any other provision of law," from sharing records with other agencies for use in a matching program if the requirements of subparts (o) or (p) "are not being met."

The year after the Computer Matching and Privacy Protection Act was enacted, the Office of Management and Budget (OMB) published guidance (as required by 5 U.S.C. § 552a(v)(1)) outlining how the new law's requirements applied to federal personnel records.  *See* Final Guidance Interpreting the Provisions of Public Law 100-503, the Computer Matching and Privacy Protection Act of 1988, 54 Fed. Reg. 25,818 (June 19, 1989) (OMB 1989 Guidelines).  In particular, OMB explained that, "where Federal personnel records are involved," certain types of matching that might otherwise be allowed are not permitted if "adverse intent as to a Federal employee motivates the match."  *Id.* at 25,824.  OMB also recognized that the matching program provisions may be enforced under the pre-existing "civil remedies provisions" in 5 U.S.C. § 552a(g).  *Id.* at 25,829.  "Given the large numbers of record subjects typically involved in a matching program," OMB warned, "agencies should be especially diligent in guarding against actions that would create liabilities."  *Id.*

### B. Factual Background

#### i. The April 1 Cuts at HHS

Defendants in this case include several federal agencies, all of which were involved in the flawed record-keeping leading up to the April 1 layoffs: HHS and its subcomponents the Administration for Children and Families (ACF), the U.S. Food and Drug Administration (FDA), and the Centers for Disease Control and Prevention (CDC); as well as the U.S. Office of Personnel Management (OPM), the Office of Management and Budget (OMB), and the U.S. DOGE Service (DOGE). Compl., ECF No. 1. As pleaded in the complaint, shortly following President Trump's inauguration, OPM, OMB, and DOGE began to collect personnel records and other data regarding employees at various federal agencies, including HHS. *Id.* ¶¶ 84–99. HHS duly worked to gather the requested information, both for its own use and to transmit it to the other Defendants. *Id.* ¶¶ 87, 99. Defendants collected and reviewed these records, at breakneck speed, to determine who to fire in mass terminations. *Id.* ¶ 12.

OPM, for example, directed HHS to send a list of its employees who received a less than "fully successful" performance rating in the last three years. *Id.* ¶ 86. OMB and OPM directed HHS to send lists of employees who performed functions "not mandated by statute or regulation." *Id.* ¶ 90. And DOGE collected records through channels across HHS, while also gaining access to certain HHS HR databases. *Id.* ¶¶ 93–98. Defendants then matched together these and other records and used the results to decide where to cut and who to fire at HHS. *Id.* ¶ 100. Shortly thereafter, HHS sent reduction-in-force (RIF) notices to 10,000 of their then-80,000 employees informing them that they would be laid off. *Id.* ¶¶ 42, 45.

Unfortunately, the personnel records underlying the cuts at HHS were "hopelessly error-ridden." *Id.* ¶ 1. These systemic errors can be attributed to various factors, including the "haphazard" and rushed way the data was collected by DOGE and others, *see id.* ¶ 95, and the

sheer number of personnel systems across HHS that cannot communicate directly and must therefore be checked manually for accuracy. *Id.* ¶¶ 74, 80. Despite knowing that their data was deeply flawed, Defendants forged ahead and used those inaccurate and incomplete records to fire 10,000 people across the country. *Id.* ¶ 1. As soon as the layoffs were announced, mistakes quickly became apparent, and an HHS spokesperson conceded that the errors had occurred "because the data collected by HHS's multiple, siloed HR divisions is inaccurate." *Id.* ¶ 9, 71. The following week, HHS Secretary Robert F. Kennedy, Jr., told reporters that HHS had not taken the time to check and correct employee records because it "takes too long and you lose political momentum." *Id.* ¶ 102. Secretary Kennedy also said that he and DOGE knew ahead of time that a significant portion of the cuts would be mistakes. *Id.* ¶ 10.

Aside from a few offices, HHS has rejected the need for widespread reconsideration of these mistakes. *Id.* ¶ 107. The decision to continue firing people using data Defendants knew was wrong was a calculated political strategy motivated at least in part by longstanding animus toward federal workers. *Id.* ¶ 12, 145. Whatever the reason, Defendants' reliance on these error-ridden records caused them to fire thousands of workers they would not have otherwise cut. *Id.* ¶ 168. Not only did the flawed data "prevent[] Defendants from understanding even the basic composition of HHS offices" they were cutting, it inaccurately reflected employee and office performance and also made it impossible for the agency to properly generate and use the "retention registers" necessary for this kind of agency reorganization. *Id.* ¶ 53.

### ii. *Plaintiffs' Experiences*

This case is brought on behalf of seven individual Plaintiffs and the putative class they represent. Compl. ¶¶ 16–22. Catherine Jackson, Melissa Adams, and Carrie Greene worked at ACF. *Id.* ¶¶ 16–18. Vid Desai and Shawn Chenault worked at FDA. *Id.* ¶¶ 19–20. Fonda Kornegay worked at CDC. *Id.* ¶ 22. And Brendan Demich worked at the National Institute for

Occupation Safety and Health (NIOSH), a subcomponent of CDC.  *Id.* ¶ 21.  Each Plaintiff received a RIF notice (or notice of intent) that reflected at least one factual error in the personnel records used to terminate them.  All seven received RIF Notices that reflected inaccurate, lower performance ratings.  *Id.* ¶¶ 111, 115, 119, 124, 128, 131, 134.  Notably, "[t]he Trump Administration has consistently insisted that performance is an important and decisive factor in its approach to cutting the federal government."  *Id.* ¶ 54.  Plaintiffs' inaccurate records would have affected retention registers and also made each Plaintiff's office "appear[] to decision-makers to have lower-performing employees than was accurate."  *See, e.g.*, *id.* ¶ 111.  This "marred the image" of these offices in the minds of decisionmakers and made Plaintiffs' subcomponents "more likely to be targeted by DOGE and others for elimination."  *Id.* ¶ 53.

Certain Plaintiffs also received RIF notices reflecting inaccurate or incomplete "competitive areas."  *Id.* ¶¶ 112, 116, 120, 125.  These RIF notices sometimes falsely noted that "[a]ll employees in [a Plaintiff's] competitive area will be separated."  *See, e.g.*, *id.* ¶ 120 (first alteration in original).  Inaccurate competitive areas also "reflected inaccurate records regarding which offices or subdivisions employees were assigned to."  *Id.* ¶ 64.  These basic errors "swept employees into the RIF who should not have been," and also caused errors in retention registers. *Id.* ¶¶ 64–65.

These inaccuracies and the totality of the circumstances described in the complaint give rise to the reasonable inference that *additional* records, within the exclusive control of Defendants, were both inaccurate or incomplete and considered by relevant decision-makers when making termination decisions.  *See, e.g.*, *id.* ¶ 78 ("On information and belief, SAC Codes were an important determiner of competitive areas and competitive levels used by HHS for the April 1 cuts.").  Even where underlying records may not have been directly noted on the face of a RIF

notice, they could result in additional liability under the Privacy Act, depending on the outcome of discovery.

As a result of these inaccuracies in their personnel records, Plaintiffs have suffered significant harms, both pecuniary and non-pecuniary. Most obviously, Plaintiffs have suffered lost wages and retirement benefits, *see, e.g.*, *id.* ¶ 113, and diminished future job opportunities, *id.* ¶¶ 60, 126. One Plaintiff has lost the opportunity to have his student loans forgiven through the Public Service Loan Forgiveness program. *Id.* ¶ 129. And multiple Plaintiffs have suffered increased medical costs to treat mental and physical conditions caused by their unlawful terminations. *Id.* ¶¶ 113, 122, 129, 132.

### iii. This Lawsuit

Plaintiffs filed this putative class action lawsuit on June 3, 2025, asserting two distinct claims under the Privacy Act. In Count 1, brought pursuant to 5 U.S.C. § 552a(g)(1)(C), Plaintiffs allege that their terminations are "adverse determinations" caused by Defendants' failure to maintain their records with "accuracy, relevance, timeliness, and completeness." *Id.* ¶¶ 152–158. In Count 2, brought pursuant to 5 U.S.C. § 552a(g)(1)(D), Plaintiffs contend that they were terminated because of Defendants' violations of the Privacy Act's requirements for matching programs. *Id.* ¶¶ 159–169. Individually, and on behalf of a class, they seek actual damages and declaratory relief. *Id.* ¶¶ 170–171.

## LEGAL STANDARDS

In considering Defendants' facial Rule 12(b)(1) and 12(b)(6) arguments, the Court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a complaint need not include "detailed factual allegations," but "must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  Further, a "complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible."  *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (cleaned up).

## ARGUMENT

### I.    Defendants' jurisdictional arguments fail.

#### A.    The D.C. Circuit has long recognized that the CSRA does not preclude federal employees from bringing Privacy Act claims in federal court.

Defendants' leading argument, that federal workers cannot bring Privacy Act claims for adverse personnel actions, is foreclosed by binding circuit precedent on which Defendants themselves rely.

##### i.    Plaintiffs' Privacy Act claims may proceed under the law of this circuit.

In *Hubbard v. EPA Administrator*, cited *passim* throughout Defendants' brief, the D.C. Circuit considered a Privacy Act claim by a federal job applicant who alleged that the record used to document his rejection was inaccurate.  809 F.2d 1 (D.C. Cir. 1986).  After carefully considering the interplay between the Privacy Act and the CSRA, the court of appeals concluded that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record."  *Id.* at 5 (emphasis in original).  Six years later, *Kleiman v. Department of Energy*—also featured heavily in Defendants' brief—reaffirmed

that holding, stating: "[N]othing we say today should be taken to cast doubt on *Hubbard*'s statement that 'the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action *actually caused* by an *inaccurate* or incomplete record.'" 956 F.2d 335, 339 n.5 (D.C. Cir. 1992) (emphasis in original) (quoting *Hubbard*, 809 F.2d at 5).

Each of these decisions squarely held that federal courts have jurisdiction to hear Privacy Act challenges to adverse personnel actions. Although both cases ultimately rejected Privacy Act claims, they did so on the merits because each plaintiff had failed to make out a necessary factual element—causation in *Hubbard*, 809 F.2d at 5, and inaccuracy in *Kleiman*, 956 F.2d at 338. *See also Hubbard*, 809 F.2d at 6 ("[Plaintiff] simply did not provide enough factual material on this issue to escape a summary dismissal of his Privacy Act damage claim."). In neither case were the claims dismissed on jurisdictional grounds under the CSRA. Indeed, *Kleiman* specifically "disagree[d] . . . with the district court's conclusion" that it "lacked jurisdiction over the action." 956 F.2d at 339. By 2006, the issue was sufficiently settled that the court of appeals reversed summary judgment against an employee at the Department of Veterans Affairs who alleged that record inaccuracies caused her reassignment, without any reference to the CSRA or question as to the courts' jurisdiction. *McCready v. Nicholson* 465 F.3d 1, 4 (D.C. Cir. 2006); *see also Gerlich v. U.S. Dep't of Just.*, 711 F.3d 161, 173 (D.C. Cir. 2013) (reversing summary judgment against Department of Justice job applicants without mentioning CSRA). Even DOJ has recognized that "the D.C. Circuit has declined to rule that the CSRA bars a Privacy Act claim for damages." DOJ Overview, https://perma.cc/W9G2-BFB7.

Relying on this line of authority, district courts in this circuit have faithfully applied the Privacy Act in federal employment matters. *See, e.g., Gerlich v. U.S. Dep't of Just.*, 659 F. Supp. 2d 1, 15 (D.D.C. 2009) ("[T]he Court concludes that plaintiffs have satisfied their pleading burden

by alleging that their deselections were caused by the records at issue here."); *Peter B. v. CIA*, 620 F. Supp. 2d 58, 77 (D.D.C. 2009) ("Peter B. has met his minimal burden of pleading facts suggesting that the defendants' violation of § 552a(e)(2) actually caused his termination."); *Greenhouse v. Geren*, 574 F. Supp. 2d 57, 68–69 (D.D.C. 2008) ("While Defendants argue that Plaintiff is improperly using the Privacy Act to challenge a personnel decision subject only to the CSRA, the Court finds that Plaintiff has alleged facts that, if true, could make out a claim of an adverse personnel decision based upon an erroneous record in violation of the Privacy Act."); *Doe P v. Goss*, 2007 WL 106523, at *9–10 (D.D.C. Jan. 12, 2007) ("A Privacy Act claim survives CSRA preclusion in this jurisdiction if a plaintiff shows the harm alleged was *actually caused* by the alleged violation."); Minute Entry, *Strzok v. Barr*, No. 1:19-cv-02367 (D.D.C. Sept. 25, 2020) (denying government's motions and allowing fired FBI employees' Privacy Act claims to move forward).

This Court has likewise rejected the same CSRA argument Defendants press here.  In *Feldman v. CIA*, for example, the Court recognized that federal workers are not categorically precluded from bringing Privacy Act claims related to their employment.  797 F. Supp. 2d 29, 45 (D.D.C. 2011) (Howell, J.) ("[T]he D.C. Circuit has recognized that 'the Privacy Act permits a federal job applicant [or employee] to recover damages for an adverse personnel action *actually caused* by an inaccurate or incomplete record.'" (alteration in original) (quoting *Hubbard*, 809 F.2d at 5)).  Instead of dismissing the claim at the outset, the Court considered the claim on the merits and ultimately determined the plaintiff in that case had failed to identify any errors or inaccuracies in the records at issue.  *Id.* at 47.[3]

---

[3] *See also Ashbourne v. Hansberry*, 2014 WL 12666716, at *1 (D.D.C. Sept. 3, 2014) (Howell, J.) (denying motion to dismiss Privacy Act claims by terminated federal employee, where government had argued CSRA preclusion (citing ECF No. 52 at 5–6, 36, *Ashbourne*, No. 12-1153 (D.D.C. Dec.

To be sure, *Hubbard* and *Kleiman* (and the cases applying them) recognize factual limits on Privacy Act claims in the federal employment context.  As those cases make clear, the proper way "to accommodate the two statutory schemes" is to ensure that the Privacy Act is not given sweeping breadth.  *Hubbard*, 809 F.2d at 5.  *Hubbard* did so by interpreting causation under the Privacy Act to require a direct "causal link" between the records at issue and the adverse determination.  *Id.*  And *Kleiman* understood the accuracy prong to address "factual or historical errors," not "the judgments of federal officials" that are "reflected in" agencies' records.  956 F.2d at 337–338 (emphasis omitted).  As another example, Justice Breyer has suggested in dissent that the "intentional or willful" requirement places a meaningful check on "liability based upon a technical, accidental, or good-faith violation of the statute's detailed provisions."  *Doe v. Chao*, 540 U.S. 614, 642 (2014) (Breyer, J., dissenting).

These factual limitations—not a rule of categorical preclusion—are the way courts in this circuit "read the Privacy Act without doing violence to the [CSRA]."  *Kleiman*, 956 F.2d at 338.[4] But those objections are properly addressed under Rule 12(b)(6) or at summary judgment, not as a jurisdictional matter without any reference to the underlying facts.  *See id.* at 339.  For that reason, courts in this district evaluate Privacy Act claims on the merits based on an examination of the facts, either as pleaded in the complaint or—more often—on a factual record developed through discovery.  *See, e.g.*, *Ashbourne v. Hansberry*, 2015 WL 11303198, at *6 (D.D.C. Nov. 24, 2015); *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 14–15 (D.D.C. 2018); *see also Lee*

---

16, 2013)); *Ashbourne*, 2015 WL 11303198, at *6 (D.D.C. Nov. 24, 2015) (Howell, J.) (granting summary judgment to the government, after discovery, where plaintiff failed to meet factual elements), *aff'd*, 703 F. App'x 3 (D.C. Cir. 2017).

[4] This approach also explains why the Ninth Circuit's concerns in *Houlihan v. OPM*, 909 F.2d 383, 385 (9th Cir. 1990), fail to persuade.  To the extent the Privacy Act could be read as broadly as the Ninth Circuit suggests, the D.C. Circuit has addressed this issue by adopting narrower interpretations.

*v. Geren*, 480 F. Supp. 2d 198, 206 (D.D.C. 2007) ("[T]his Court will follow the course set by the Court of Appeals—it will proceed to evaluate the merits of plaintiff's claims, but will do so in a way that does not do violence to the CSRA.").  On those points, Defendants do not contest that Plaintiffs adequately plead that the relevant records were inaccurate, and Defendants' causation and intentionality arguments fail for the reasons discussed below.  *See infra* at 34–42.

> ii.  *Defendants' authorities are not to the contrary.*

a.    Defendants cite *Hubbard* repeatedly, apparently in agreement that it controls.  *See* Mem. 6, 17, 20, 21, 23.  But Defendants simply ignore that case's holding that federal employees may, under certain circumstances, bring Privacy Act claims in federal court.  Rather than engaging with or attempting to distinguish *Hubbard*'s holding, Defendants instead defend their contrary position with largely out-of-circuit decisions.  *See* Mem. 18–19.  But this Court is bound by controlling precedent, and "[t]he D.C. Circuit . . . has taken a much narrower view of CSRA preemption in Privacy Act cases."  *Lee*, 480 F. Supp. 2d at 205; *see also Gerlich*, 659 F. Supp. 2d at 14 ("The D.C. Circuit has . . . taken a rather narrow view of CSRA preemption in Privacy Act cases.").

The three D.D.C. opinions Defendants do cite, Mem. 18–19, are readily distinguishable. In *Washburn v. OPM*, 2023 WL 2478160 (D.D.C. Mar. 11, 2023), the "Privacy Act" claim was premised specifically on a violation of the CSRA itself.  *Id.* at *4 ("Plaintiff claims OPM must pay her directly under 5 U.S.C. § 8345(j)(1)(A).").  The opinion in *Holly v. Department of Health and Human Resources*, 1988 WL 90089 (D.D.C. Aug. 22, 1988), *aff'd on other grounds*, 895 F.2d 809 (D.C. Cir. 1990), rests on the unpersuasive premise that *Hubbard* "did not face the jurisdictional question directly," *id.* at *2, and in any case pre-dates *Kleiman*'s clarification that limitations on

Privacy Act claims are factual rather than jurisdictional matters.[5]  *See Kleiman*, 956 F.2d at 339. And in *Hanna v. Herman*, 121 F. Supp. 2d 113 (D.D.C. 2000), the court reached the merits of the plaintiff's Privacy Act claim, deciding on the factual record at summary judgment that the plaintiff "ha[d] not demonstrated that the agency committed a violation of the Privacy Act."  *Id.* at 123.

b.      Despite their reliance on *Hubbard*, Defendants seem to suggest that case has been implicitly abrogated by *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012).  *See* Mem. 2, 14. But their characterization of the case overstates the Supreme Court's holding.  *Elgin* involved former federal employees who were fired for failing to comply with the Military Selective Service Act by registering for the military draft.  567 U.S. at 6–7.  The plaintiffs filed suit in district court, challenging the constitutionality of the draft's registration requirement and seeking "equitable relief," including "reinstatement to their former positions, backpay, benefits, and attorney's fees." *Id.* at 7–8.  The Supreme Court held that the CSRA's remedial scheme provided "the exclusive means of review *for constitutional claims*."  *Id.* at 8 (emphasis added).  *Elgin* did not involve a competing statutory scheme, much less a Privacy Act claim.  And, given the primacy of Congress's intent in the Court's reasoning, *see, e.g.*, *id.* at 11, there is every reason to think that explicit congressional guidance in the form of another statute would present a different case.

The Court should not extend the reasoning of *Elgin* to the Privacy Act for four reasons. *First*, the D.C. Circuit just last month adopted a far narrower interpretation of CSRA preclusion than Defendants advance here.  In *Lucas v. American Federation of Government Employees*, the plaintiff brought Title VII and ADA claims against her union, and the district court dismissed those

---

[5] On appeal, moreover, the D.C. Circuit declined to embrace the breadth of the district court's ruling on this point, affirming instead on the basis of issue preclusion following binding arbitration. *Holly*, 895 F.2d at 809 (declining to decide whether "the Civil Service Reform Act regime" would "in all events preclude a Privacy Act claim here").

claims as precluded by the Federal Service Labor-Management Relations Statute, part of the CSRA.  --- F.4th ---, 2025 WL 2371197, at *1–2 (D.C. Cir. Aug. 15, 2025).  On appeal, the defendant argued for a "categorical preclusion rule" under the CSRA—similar to what Defendants seek here—but the court of appeals held instead that a "statute-specific analysis" was more appropriate.  *Id.* at *11.  After considering *Elgin*, *Fausto*, and many of the other cases on which Defendants here rely, the court explained that "a variety of statute-specific considerations inform our analysis of the CSRA's preclusive effect, including the breadth of the statute under which the employee seeks relief, the statute's text, and the timing of its enactment."  *Id.*  Because there is no categorical preclusion rule, there is no reason to believe *Elgin* abrogated *Hubbard*'s statute-specific analysis.

*Second*, the Privacy Act accords with *Lucas*'s further guidance on which federal statutes are likely to survive CSRA preclusion.  Corralling decades of Supreme Court and D.C. Circuit precedent, the court drew a line between "general, catchall statutes that could cover a vast number of cases that Congress intended to funnel through the CSRA's process" on one side, and more "specific" statutes that do not suffer from such a "defect of generality" on the other.  *Id.* at *10–11 (quotation marks omitted).  The court identified the Administrative Procedures Act (APA) as an illustrative example in the "general, catchall" category, while Title VII and the Americans with Disabilities Act qualified as more "specific."  *Id.* (quotation marks omitted).  With respect to the Privacy Act, even a cursory look at the "detailed instructions" the law gives agencies to "manag[e] their records," *Chao*, 540 U.S. at 618, suggests no such "defect of generality" that would land that statute on the precluded side of the line under the CSRA.  *Lucas*, 2025 WL 2371197, at *11.  And even if the causes of action could be interpreted broadly, as explained above (*supra* at 16), *Hubbard*

and *Kleiman* have recognized factual limitations that narrow the scope of the Privacy Act when necessary "to accommodate the two statutory schemes." *Hubbard*, 809 F.2d at 5.

*Third*, unlike the constitutional claims at issue in *Elgin*—which relied on general federal question jurisdiction under 28 U.S.C. § 1331—the Privacy Act contains its own express grant of jurisdiction to the federal courts. *See* 5 U.S.C. § 552a(g)(1) ("[T]he district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."); *see also* 5 U.S.C. § 552a(g)(5) (setting forth venue rules to govern district court jurisdiction). This type of "express" jurisdictional grant is "significant" to the preclusion analysis, the D.C. Circuit has explained, because "when Congress wants to preserve remedies outside the CSRA, it does so expressly." *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 176–177 (D.C. Cir. 2013) (cleaned up) (holding that TSA review statute with express grant of jurisdiction was not precluded by the CSRA).

And *fourth*, the claims in *Elgin* were merely being channeled to another forum, not foreclosed altogether. *See Elgin*, 567 U.S. at 10 ("[T]he CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit."). By contrast, the court in *Lucas* suggested that *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)—the precedent that underlies *Elgin*—is not "the right frame of analysis" in a case where defendants argue that the relevant statutory claims cannot be brought "*in any venue*." *Lucas*, 2025 WL 2371197, at *12 (emphasis in original). That is exactly the case here. As the Federal Circuit has explained, "the Privacy Act . . . does not provide a basis for [MSPB] jurisdiction" because "claims under the Privacy Act must be brought in federal district court." *Carell v. Merit Sys. Prot. Bd.*, 131 F. App'x 296, 299 (Fed. Cir. 2005). Even the Department of Justice agrees. *See* DOJ Overview, https://perma.cc/W9G2-BFB7 ("[N]either the Merit

Systems Protection Board nor the U.S. Tax Court has jurisdiction over Privacy Act claims."); *see also Cofield v. United States*, 64 F. Supp. 3d 206, 214 (D.D.C. 2014) ("The federal courts . . . have exclusive jurisdiction over any claim Plaintiff may be asserting under . . . the Privacy Act."). If federal district courts cannot hear federal employees' Privacy Act claims, no one can.

Defendants protest that the MSPB "routinely adjudicates asserted violations of the Privacy Act when directly implicated in matters over which the MSPB has jurisdiction." Mem. 17. But discussing the Privacy Act when tangential to a CSRA claim is not the same as adjudicating Privacy Act claims. And the clear weight of authority holds that the MSPB lacks jurisdiction over Privacy Act claims. *See Carell*, 131 F. App'x at 299; *Martin v. Dep't of Army*, 2000 WL 1807419, at *2 (Fed. Cir. Dec. 8, 2000) (per curiam); *Young v. U.S. Postal Serv.*, 2010 WL 2016529, at *13 (M.S.P.B. May 21, 2010); *Calhoun v. Dep't of Treasury*, 2001 WL 1590500, at *4 (M.S.P.B. Oct. 18, 2001); *Normoyle v. Dep't of Air Force*, 1994 WL 580174, at *2 (M.S.P.B. Oct. 18, 1994).[6]

Nor is this an example where "the CSRA itself forecloses review" of an employee's claim. *See Nat'l Treasury Emps. Union v. Vought*, --- F.4th ----, 2025 WL 2371608, at *5 (D.C. Cir. Aug. 15, 2025) ("*NTEU*"); *see also United States v. Fausto*, 484 U.S. 439, 455 (1988). MSPB review is unavailable because of the plain text of the Privacy Act, which vested jurisdiction exclusively with the federal district courts. 5 U.S.C. § 552a(g)(1). Unlike in *Fausto*, then, the CSRA does not reflect any considered judgment by Congress to foreclose judicial review of Privacy Act claims.

---

[6] The cases Defendants cite on this point, Mem. 17, discuss the Privacy Act only in the context of other CSRA-related proceedings; none adjudicated claims that adverse employment action violated the Privacy Act. *See Herman v. Dep't of Just.*, 115 M.S.P.R. 386, 391 (2011) (whether employee's allegation that agency violated the Privacy Act was a protected disclosure under whistleblower law); *Gill v. Dep't of Def.*, 92 M.S.P.R. 23, 31–33 (2002) (whether employee's alleged violation of the Privacy Act could support his demotion); *Johnson v. Dep't of the Treasury*, 8 M.S.P.R. 170, 178 n.5 (1981) (whether agency's disclosures related to adverse action amounted to a prohibited personnel practice).

*See* 484 U.S. at 448–449.  And unlike in *Elgin*, dismissing Plaintiffs' claims under the CSRA would not leave Plaintiffs free to have their claims adjudicated in another forum.  They would have nowhere else to go, contrary to what Congress intended.

        c.        Finally, the D.C. Circuit's decision in *NTEU* is no help to Defendants.  Released on the same day as *Lucas*, the decision in *NTEU* held that certain claims were precluded under the CSRA.  But the claims at issue were limited to (1) standalone constitutional claims, like those in *Elgin*, and (2) APA claims, like those distinguished in *Lucas*.  *NTEU*, 2025 WL 2371608, at \*3.  The case did not involve any claims under the Privacy Act, as Plaintiffs assert here, and the court made no mention at all of *Hubbard* or *Kleiman*.  Of course, the panel in *NTEU* was not at liberty to overrule *Hubbard* or *Kleiman* (or *Lucas*, for that matter), as "[o]ne three-judge panel" of the D.C. Circuit "does not have the authority to overrule another three-judge panel of the court." *Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378, 386 n.\* (D.C. Cir. 2024).  And to the extent Defendants suggest that *NTEU* somehow casts doubt on the continued viability of those cases, it is unlikely the court would have done so *sub silentio*.  *Cf. Herron v. Fannie Mae*, 861 F.3d 160, 168 (D.C. Cir. 2017) ("[W]e generally presume that the [Supreme] Court does not overturn or limit its prior holdings through silence or implication.").

    **B.  Traditional tools of statutory interpretation confirm that the CSRA does not preclude Plaintiffs' Privacy Act claims.**

        The Court can and should stop there, resting on D.C. Circuit precedent.  But traditional tools of statutory interpretation lend further support to Plaintiffs' claims.

        When analyzing "alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute," courts use a framework under which "[a]nalysis of the statutory text, aided by established principles of interpretation, controls."  *POM Wonderful LLC v.*

*Coca-Cola Co.*, 573 U.S. 102, 111–112 (2014).  The argument that one statute overrides another "faces a stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

The Supreme Court in *Epic Systems* outlined a two-step framework to consider questions of statutory preclusion.  *First*, the party arguing for preclusion must identify an actual conflict between the laws.  *Id.*; *see also Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014) (holding that canon of interpretation was "impotent . . . unless the compared statutes are 'irreconcilably conflicting'").  "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  *Second*, "in approaching a claimed conflict, [courts] come armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys.*, 584 U.S. at 510 (cleaned up).  Courts generally "will not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (cleaned up).

The Supreme Court has never considered the interaction between the Privacy Act and the CSRA specifically.  But the Court has followed an approach in line with this two-step framework when interpreting the Privacy Act and CSRA separately.  *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (holding that Privacy Act did not preclude FCRA because they were "merely complementary"); *Fausto*, 484 U.S. at 453 (holding when interpreting the CSRA that "it can be strongly presumed that Congress will specifically address language on

the statute books that it wishes to change"). Applying a similar approach here shows that Plaintiffs' claims are not precluded at either step.

      *i.   Defendants fail to identify any conflict between the Privacy Act and the CSRA.*

In determining whether these two statutes can be harmonized, the Supreme Court's analysis in *POM Wonderful* is instructive. *POM Wonderful* arose from a lawsuit by beverage company POM Wonderful against Coca-Cola, alleging that Coca-Cola's labeling of a competitor juice drink was misleading to consumers. 573 U.S. at 105–106. POM Wonderful sued under the Lanham Act, which contains a provision allowing "one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions." *Id.* at 106. Coca-Cola argued that "a separate federal statutory regime," the Food, Drug, and Cosmetic Act (FDCA), "allow[ed] it to use the label in question" and thus "preclude[d] the Lanham Act claim." *Id.* at 108. The Supreme Court disagreed and allowed POM Wonderful's Lanham Act claims to proceed. *Id.* at 112–113.

The Court can readily give effect to both the Privacy Act and the CSRA for many of the same reasons highlighted by the Supreme Court in *POM Wonderful*.

      a.      First, there is no textual evidence of conflict. The Court in *POM Wonderful* began with the text, observing that "neither the Lanham Act nor the FDCA, in express terms, forbids or limits Lanham Act claims." *Id.* at 113. Meanwhile, "[b]y its terms," the Lanham Act extended to conduct at issue in the suit. *Id.* Similarly, here, neither the Privacy Act nor the CSRA explicitly limit Privacy Act claims for federal employees, and Defendants do not argue otherwise. Nor could they—the Privacy Act plainly encompasses federal employees, who are "individuals" for whom Defendants "maintain any record." *See* 5 U.S.C. § 552a(g)(1)(C), (a)(2)–(4). Similarly, a termination plainly qualifies as both an "adverse determination" and the broader "adverse effect." 5 U.S.C. § 552a(g)(1)(C), (D). If any doubt remained, the Privacy Act's matching program provisions explicitly cover "Federal personnel or payroll systems," 5 U.S.C. § 552a(a)(8)(A)(ii),

and elsewhere provide specific protections to "Federal personnel," 5 U.S.C. § 552a(a)(8)(B)(v); (o)(1)(D)(ii).  And the CSRA is entirely silent on the Privacy Act.  That a plain reading of the Privacy Act encompasses federal employees weighs strongly against Defendants' preclusion arguments.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("[W]here the statutory language provides a clear answer, [the analysis] ends there as well.").

b.    Next, Congress' course of conduct shows no evidence of conflict.  In *POM Wonderful*, the Court noted that the Lanham Act and the FDCA had coexisted for 70 years without further intervention by Congress.  *POM Wonderful*, 573 U.S. at 113.  Similarly, the Privacy Act and CSRA have coexisted for a respectable 46 years.  *Supra* at 6.  Indeed, it has been 38 years since the D.C. Circuit—surely the most frequent destination for Privacy Act challenges—decided that the law applied in the realm of federal employment.  *Hubbard*, 809 F.2d at 5.  And, as noted above, lower courts have been applying the Privacy Act to federal employment without issue since that time.  *Supra* at 14–15.  Yet Congress has never taken action to upset that precedent.  Instead, Congress chose just two years after the *Hubbard* decision to amend the Privacy Act by *adding provisions* that squarely addressed federal employment.  *Supra* at 7–8.  That would make no sense if Congress had intended the CSRA to displace the Privacy Act as to federal workers.

Moreover, in its 1988 amendments to the Privacy Act, Congress went even further in ensuring that the matching program provisions (the basis for Count 2 of the complaint) would have continued effect regardless of pre-existing statutory schemes like the CSRA.  After spelling out the restrictions on matching programs, defined to include "Federal personnel or payroll systems," Congress included a provision forbidding noncompliance "*[n]otwithstanding any other provision of law*." 5 U.S.C. § 552a(q)(1) (emphasis added).  "[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override

conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). Congress's use of a "notwithstanding" clause for these matching provisions also demonstrates what Congress could have written into the CSRA but chose not to.

      c.    The structure and application of the Privacy Act and CSRA also demonstrate that they "complement each other." *POM Wonderful*, 573 U.S. at 115. In reaching the same conclusion in *POM Wonderful*, the Court focused on each statute's distinct "scope and purpose," *id.*, as well as whether the statutes "impose different requirements and protections." *Id.* (quotation marks omitted); *see also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.*, 533 U.S. 124, 144 (2001) ("[T]his Court has not hesitated to give effect to two statutes that overlap, so long as each reaches some distinct cases."). The Court reasoned that because the statutes had different focuses, they did not conflict in a way that required preclusion of the Lanham Act claim.

      So too here. Considering "purpose," the CSRA is focused on preserving a merit-based civil service. The statute's stated purpose is "to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service." CSRA, Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (Oct. 13, 1978).[7] The Privacy Act, on the other hand, is focused on information: what records the government collects about people and how it must maintain those records. According to the bill's principal sponsor, the Privacy Act was designed "to create safeguards against the present and potential abuse of information about people." S. Comm. on Gov't Operations & H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 S. 3418

---

[7] It is also true that Congress passed the CSRA "to streamline preexisting litigation and consolidate review of similar issues in a single forum," but "[n]o statute pursues a single policy at all costs." *Lucas*, 2025 WL 2371197, at *9 (alteration in original).

(Public Law 93-579): Source Book on Privacy 6 (Comm. Print 1976), https://perma.cc/XB27-SH4J.

The statutes' "requirements and protections," *POM Wonderful*, 573 U.S. at 115, also differ. The Privacy Act covers all individuals whose records are kept by the government, and "gives agencies detailed instructions for managing" those records. *Chao*, 540 U.S. at 618. Some of these instructions, including those related to matching programs, are "highly complex and specialized." DOJ Overview, https://perma.cc/VJE8-YULF. Claims under 5 U.S.C. § 552a(g)(1)(C) and (g)(1)(D) also require proving additional elements, including that the government's actions were "intentional or willful."

The CSRA, by contrast, applies to only specific individuals in the sphere of federal employment, who are meant to be protected against enumerated "prohibited personnel practices" in service of enumerated "merit-system principles." 5 U.S.C. §§ 2301; 2302. None of these enumerated restrictions appear to address, in any amount of detail, recordkeeping about employees.[8] There is no analogue, for example, to 5 U.S.C. § 552a(g)(1)(C)'s requirement that records be maintained with "accuracy, relevance, timeliness, and completeness." And there is certainly nothing about matching programs. Without "some comparably specific guidance," *Epic Sys.*, 584 U.S. at 513, it is unclear how an administrative board adjudicating CSRA claims could approach records issues like those covered by the Privacy Act. Indeed, the paucity of guidance about record-keeping in the CSRA as compared to the Privacy Act indicates that Congress never intended the CSRA to be a vehicle for record-related issues. *See id.* ("[I]t is hard to fathom why

---

[8] One prohibited personnel practice (added in 2017) restricts supervisors' ability to "access . . . medical record[s]." 5 U.S.C § 2302(b)(14); *see* Pub. L. No. 115-73, 131 Stat. 1235 (Oct. 26, 2017). This does not appear to be an area of overlap, however, because unless the medical records were disclosed outside of the agency, this prohibited personnel practice likely would not constitute a Privacy Act violation. *See* 5 U.S.C. § 552a(b).

Congress would take such care to regulate all the other matters mentioned in Section 7 yet remain mute about this matter alone—unless, of course, Section 7 doesn't speak to class and collective action procedures in the first place."). Because of these differences, there are certain to be "some distinct cases," *J.E.M. Ag Supply*, 533 U.S. at 144, where a worker could have a valid Privacy Act claim but not a valid CSRA claim, or vice versa.[9]

Defendants may argue that the difference in forum—administrative scheme vs. federal court—is the conflict. But different enforcement mechanisms are common in statutory interpretation questions. In *POM Wonderful*, enforcement of the FDCA was "largely committed to the FDA," while the Lanham Act allowed for civil litigation in federal court. 573 U.S. at 115. In *Epic Systems*, one statute enforced agreements to arbitrate individually, while the other permitted class or collective proceedings. 584 U.S. at 502. In neither case did the Court hold that there was a conflict between the two statutes, nor is there one here.

      d.     The differences in available remedies are also notable and provide further evidence that the Privacy Act and the CSRA cover different ground and present no conflict. An employee pursuing relief from the MSPB can obtain reinstatement, 5 U.S.C. § 1204(a)(2), and statutory back pay, 5 U.S.C. § 5596(b). Neither of these are generally available to a plaintiff under the Privacy Act. *See Risley v. Hawk*, 108 F.3d 1396, 1397 (D.C. Cir. 1997) (holding that "injunctive relief is not available"); 5 U.S.C. § 5596(b)(1) (limiting statutory back pay to employees who prevail "on the basis of a timely appeal of an administrative determination"). Instead, the Privacy Act provides

---

[9] That is not to say that individuals with valid Privacy Act claims might not also have valid CSRA claims for the same termination. Although the two sets of claims would likely be based on different sets of relevant facts and seek different remedies, the possibility of some overlapping facts does not mandate preclusion. *See Lacson*, 726 F.3d at 175 (allowing statutory claim challenging TSA order despite the fact that it "supplie[d] much of the legal basis for TSA's adverse personnel action against" the plaintiff).

for "actual damages."[10]  5 U.S.C. § 552a(g)(4)(A).  As one court put it, "there is no possibility that the plaintiff could achieve through § 552a(g)(1)(C) the relief denied him under the CSRA, and correspondingly no chance that the Court would lack subject-matter jurisdiction due to the exclusivity of the latter statute's application."  *Kursar v. Transp. Sec. Admin.*, 581 F. Supp. 2d 7, 19 (D.D.C. 2008).

Moreover, providing for damages reflects "a distinct compensatory function that may motivate injured persons to come forward," which "provide[s] incentives" for the federal government to "behave well."  *POM Wonderful*, 573 U.S. at 115.  OMB recognized this feature early on: the year after the matching program provisions were adopted, the agency warned that, "[g]iven the large numbers of record subjects typically involved in a matching program, agencies should be especially diligent in guarding against actions that would create liabilities."  OMB 1989 Guidelines, 54 Fed. Reg. 25,818, 25,829.  By contrast, reinstatement and back pay preserve the merit-based system by returning unfairly targeted federal employees to government service.

***

As this analysis makes clear, Congress enacted the CSRA and the Privacy Act to grant different rights to different groups of people in different situations, even if there is some potential for overlap.  Instead of presenting any conflict, these two laws are "quite consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection."  *POM Wonderful*, 573 U.S. at 116.  Restricting federal employees from raising Privacy Act claims would frustrate this congressional judgment by preferencing the CSRA at the expense of the Privacy Act, without any indication that Congress so chose.  "[R]espect for the separation

---

[10] Damages are available from the MSPB only under limited circumstances, including a claim of retaliation.  *See* 5 U.S.C. § 1214.

of powers counsels restraint," because "it's the job of Congress by legislation, not [the courts] by supposition, both to write the laws and to repeal them." *Epic Sys.*, 584 U.S. at 511. In the absence of conflict, that is the end of the statutory analysis, and Plaintiffs' Privacy Act claims may proceed.

ii. *Defendants fail to clear the high bar for showing the Privacy Act has been repealed by implication as to federal employees.*

Even if the Court were to find a conflict between the two statutes, step two would also favor giving effect to the Privacy Act in federal employment because Defendants have failed to show any repeal of the Privacy Act by implication. The CSRA—which was passed shortly after the Privacy Act—does not explicitly address the Privacy Act, much less repeal it as to federal workers. *Supra* at 6–7.

In *United States v. Fausto*—one of the key cases on which Defendants rely, *see* Mem. 3, 5, 14, 16—the Court indicated that the presumption against implied repeal applies to the CSRA just like any other statute. Although *Fausto* held that the claim at issue was precluded by the CSRA, the competing statutory right in that case was an "implied" "legal disposition" according to a "judicial interpretation" of the statute at issue. 484 U.S. at 453. "Repeal by implication of an express statutory text," the Court explained, would be something else entirely, as "*it can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change*." *Id.* (emphasis added).

Unlike the statute in *Fausto*, the Privacy Act's jurisdictional provision is the kind of "express statutory text" that Congress would have explicitly addressed in the CSRA if it wished to make any changes.[11]  *See Lacson*, 726 F.3d at 176 (noting that *Fausto* refused to recognize independent federal court jurisdiction to hear employee claims "in part because" the statute at issue

---

[11] This element of consistency with *Hubbard*—which allowed Privacy Act claims to proceed despite the CSRA—makes sense: Justice Scalia wrote the majority in *Fausto* just 14 months after joining the opinion in *Hubbard* as then-Chief Judge of the D.C. Circuit.

"said nothing about jurisdiction"). Nor is there any way to "channel" Plaintiffs' claims through the CSRA without repealing the Privacy Act's explicit grant of jurisdiction to the district courts.

Defendants turn this presumption on its head by arguing that the CSRA "declined to authorize civil actions for Privacy Act claims arising from federal personnel decisions." Mem. 15. In Defendants' view, every time Congress enacts a new statute that might be related to something already on the books, the new law must specifically recite each and every pre-existing provision on the same subject if those provisions are to remain in effect. *See* Mem. 14–15. But that is the opposite of the test outlined by the Supreme Court. *See Epic Sys.*, 584 U.S. at 510–511. New laws do not displace others by default.

Defendants note that 5 U.S.C. § 7702(a)(1)(B) "exempts certain types of claims" from the CSRA's exclusive scheme without any reference to the Privacy Act. Mem. 14–15. But Congress only needed to "exempt" the claims listed in § 7702(a)(1)(B) because it was, at the same time, explicitly including those claims elsewhere in the CSRA scheme. *See Lucas*, 2025 WL 2371197, at *8 (discussing 5 U.S.C. § 2302(b)). The same is not true for the Privacy Act. Congress did not need to address the Privacy Act specifically to keep it in place for federal employees; the presumption against implied repeals already did that.

If Congress wanted to repeal some portion of the Privacy Act, it would have said so explicitly. Without any evidence that Congress intended to repeal the Privacy Act, courts are obligated to continue giving that statute its full effect.

### C. To the extent relevant, the *Thunder Basin* factors favor Plaintiffs.

Although Plaintiffs do not believe *Thunder Basin* is the correct framework for assessing CSRA preclusion in the context of the Privacy Act, Plaintiffs' claims also survive a motion to dismiss under that framework. *Thunder Basin*'s two-step framework is used for determining whether an alternative remedial scheme displaces the jurisdiction of the federal courts. *See Jarkesy*

*v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015). As discussed above, the traditional *Thunder Basin* test is likely not the proper standard for cases involving multiple specific statutes, especially where the effect is to preclude, rather than channel the claims. *Supra* at 20.[12]

Even so, Plaintiffs' Privacy Act claims would withstand Defendants' motion under this framework as well. The relevant analysis proceeds in two steps. First, Congress's intent to preclude the claims at issue must be "fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207. Second, the claims must be "of the type Congress intended to be reviewed within [the] statutory structure." *Id.* at 212.

a.     Defendants fail the first prong based on the textual analysis discussed above. *See supra* at 24–31. Because there is no identified conflict between the statutes, and the presumption against implied repeals suggests the CSRA would have addressed the Privacy Act explicitly if Congress intended to remove the Privacy Act's explicit grant of jurisdiction, it is not "fairly discernible" in the CSRA that Congress did in fact intend to divest courts' jurisdiction to hear Privacy Act claims. *Id.*; *see also Lucas*, 2025 WL 2371197, at *11 (holding that courts consider a competing "statute's text" when determining whether it is preempted by the CSRA). And as similarly discussed above, that accords with D.C. Circuit precedent holding that the CSRA does not preclude Privacy Act claims. *Supra* at 13–14.

b.     In evaluating the second prong, courts consider three factors: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim

---

[12] Another reason this framework proves unhelpful is that it is unclear which of the statutory schemes should be treated as the "alternative remedial scheme." After all, DOJ argues when advantageous that *the Privacy Act* is a "'comprehensive remedial scheme' akin to . . . the [CSRA]" that precludes other laws where it applies. *See* Defs.' Br. at 12, *Alliance for Retired Americans v. Bessent*, No. 1:25-cv-00313 (D.D.C. May 5, 2025), ECF No. 65. Plaintiffs nevertheless respond to Defendants' argument applying the CSRA as the relevant remedial scheme.

wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (cleaned up). "The ultimate question is how best to understand what Congress has done." *Id.* Each of these factors favors Plaintiffs.

As to the first factor, because Privacy Act claims are within the exclusive purview of the federal district courts, divesting the district courts of jurisdiction would leave Privacy Act claims by federal employees entirely unreviewable in any forum. *Supra* at 20–21. This stark reality makes the first factor is "all but dispositive here." *Lucas*, 2025 WL 2371197, at *12. The second factor also favors Plaintiffs, for similar reasons to why the Privacy Act and CSRA are "complementary." *Supra* at 26–29. And the first and second factors are often "analyzed together." *Lucas*, 2025 WL 2371197, at *12.

The third factor likewise supports Plaintiffs. Even if the MSPB could consider Privacy Act claims, they would have no special expertise in doing so. While the MSPB undoubtedly has expertise in federal employment generally, it has little experience in the kind of information-related violations at issue in the Privacy Act. Moreover, adjudicating Plaintiffs' claims will require significant fact-finding and intensive statutory analysis of the sort that falls well within the district courts' institutional expertise—which may explain why Congress granted district courts exclusive jurisdiction over Privacy Act claims. For example, there has been virtually no litigation applying the statutory text about matching programs that forms the basis for Count 2 of Plaintiffs' complaint. *But see Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1099 (N.D. Cal. 2018) (holding that the Department of Education and Social Security Administration likely violated matching program requirements). And although the Supreme Court has previously credited the possibility that agency expertise could "be brought to bear" on certain statutory questions, *see Thunder Basin*, 510 U.S.

at 214, the Court has since clarified that "Congress expects courts to handle technical statutory questions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024). "[L]egal interpretation . . . has been, 'emphatically,' 'the province and duty of the judicial department' for at least 221 years." *Id.* at 412. The courts are therefore best equipped to interpret and apply the Privacy Act's statutory provisions to the facts of this case.

For these reasons, Plaintiffs' Privacy Act claims may proceed even under the *Thunder Basin* factors.

## II.    Defendants' Rule 12(b)(6) arguments fail.

### A.    Plaintiffs plausibly allege that their RIFs were "actually caused" by inaccurate or incomplete records.

"[T]he question of causation is 'intensely factual.'" *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999). And "[f]act-specific questions cannot be resolved on the pleadings." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022); *cf. Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *7 (C.D. Cal. Mar. 5, 2013) ("Because of the 'fact-intensive' nature of a causation analysis, it usually must be established in summary judgment or trial, not a motion to dismiss.").

Defendants cite no support for their claim that causation under the Privacy Act is "a particularly searching inquiry even at the motion to dismiss stage." Mem. 21. To be sure, Plaintiffs must plausibly allege facts that allow a reasonable inference of causation under the relevant standard, *see Hubbard v. EPA Adm'r*, 809 F.2d 1, 5 (D.C. Cir. 1986), but nothing in the Privacy Act or case law applying it imposes any special or heightened *pleading* burden. Indeed, virtually all of the authority on which Defendants rely for their Rule 12(b)(6) arguments was in fact *not* decided at the motion-to-dismiss stage. *See id.* at 2 (summary judgment); *Lee v. Geren*, 480 F. Supp. 2d 198, 200, 207 (D.D.C. 2007) (motion to dismiss and summary judgment on a factual

record); *Gard v. U.S. Dep't of Educ.*, 789 F. Supp. 2d 96, 103 (D.D.C. 2011) (summary judgment);

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 737

(D. Md. 2025) (preliminary injunction); *Hutchinson v. CIA*, 393 F.3d 226, 228 (D.C. Cir. 2005)

(summary judgment); *Reed v. Dep't of the Navy*, 910 F. Supp. 2d 32, 34 (D.D.C. 2012) (trial).[13]

Defendants nevertheless move to dismiss Plaintiffs' complaint on causation grounds, based largely on factual statements added to a government website. Mem. 22. But Defendants' arguments reflect a fundamental misunderstanding of how judicial notice works. While it is true that, under certain circumstances, the Court may "take notice of the *existence* of official statements" on a government website, the Court may not take notice of "the accuracy of any legal or factual assertions made therein." *Jingjing Liu v. Mayorkas*, 2021 WL 2115209, at *4 (D.D.C. May 25, 2021) (emphasis added) (quoting *Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder LLC*, 2021 WL 1198143, at *23 (D.D.C. Mar. 30, 2021) and *Crumpacker v. Ciraolo-Klepper*, 715 Fed. App'x 18, 19 (D.C. Cir. 2018)). That makes sense: "Judicial notice cannot be used to circumvent the rule against hearsay and thereby deprive a party of the right of cross-examination on a contested material issue of fact." *Wharf, Inc.*, 2021 WL 1198143, at *23. Such a construction of judicial notice would also contradict the well-trod ground that courts assume "all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Am. Action Network, Inc. v. Cater Am., LLC*, 983 F. Supp. 2d 112, 126 n.7 (D.D.C. 2013) ("[I]t is inappropriate for the Court to weigh evidence at the Rule 12(b)(6) stage.").

The unsigned "Questions and Answers" on which Defendants rely are also far from a trustworthy source "whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid.

---

[13] *Dick v. Holder*, 67 F. Supp. 3d 167, 182 (D.D.C. 2014)—the only case Defendants cite that *was* decided on a motion to dismiss—is not on point because "[t]he plain language of the complaint" in that case directly undermined plaintiff's own causation theory, which is not the case here.

201(b)(2).  Regardless of whether the webpage was created "before this lawsuit was brought," Mem. 22, it was certainly created *after* Defendants relied on systemic errors to fire 10,000 people. Compl. ¶ 1.  Any agency official would have good reason to believe that litigation was forthcoming, and it was transparently self-serving to claim that any mistakes in the data did not actually matter.  *See Davis v. Jumio Corp.*, 2023 WL 2019048, at *3 (N.D. Ill. Feb. 14, 2023) (holding that party's "self-serving statements . . . need not be accepted as true," and did not "support taking judicial notice of [a] contested fact").  Judicial notice is not appropriate for the additional reason that the website's claim that employees were "separated without regard to retention standing" because "entire competitive areas [were] being abolished," Mem. 11, is contrary to the facts of the complaint, *see, e.g.*, Compl. ¶ 116, and may be inconsistent with OPM regulations, *see* 5 C.F.R. § 351.605.  Defendants will have a full opportunity to present their merits defense on this point at the proper stage in litigation with the benefit of a factual record that Plaintiffs have had an opportunity to contest.  But it is not a basis on which Plaintiffs' claims may be dismissed.

Setting aside the question of whether inaccurate records caused terminations by affecting retention standing—which is thoroughly alleged at Compl. ¶¶ 53, 57–59, 65, 68, 111, 115, 119, 124, 128, 131, 134—Defendants entirely ignore Plaintiffs' additional causation theory that inaccurate records led to their offices being cut or reduced.  As Plaintiffs allege in the complaint, their inaccurate records "hopelessly marred the image of various HHS offices and subcomponents that were being considered by Defendants for significant cuts, making entire offices more likely to be targeted."  *Id.* ¶ 53.  So when, for example, Plaintiff Vid Desai's records falsely stated that he had only scored performance ratings of "3" on his three previous evaluations, his entire office "appeared to decisionmakers as an office led by an under-performing executive when that was not

accurate." *Id.* ¶ 124.  This caused Defendants to "cut Mr. Desai and much of his team while keeping other IT functions." *Id.*  Indeed, given the emphasis Defendants repeatedly placed on performance, *id.* ¶¶ 54–56, it is reasonable to infer that Defendants cut far more offices and employees in HHS than they would have if employees' performance ratings had been correct.

Defendants' failure to reckon with this theory infects much of their causation analysis. They note, for example, that HHS announced they were cutting 10,000 full-time employees and 5 of 10 regional offices "before any RIFs were initiated," Mem. 21–22, as if that outcome was always fated to be.  But Plaintiffs allege throughout their complaint that the structure of the cuts themselves was based on systemically inaccurate data that prevented Defendants from "understanding even the basic composition of HHS offices."  Compl. ¶ 53.  Defendants' decision to cut five regional offices instead of four or six or zero was based on their collection of personnel data that was deeply and concededly flawed.  *Id.* ¶ 100.  This lawsuit is not about one-off sloppiness; even HHS officials have since acknowledged that the underlying personnel records were systemically inaccurate, and that these led to mistakes in the thousands.  *Id.* ¶¶ 9–10.  Defendants' failure to maintain their records with accuracy and completeness caused each Plaintiff's office to be targeted in the layoffs. *Id.* ¶¶ 53, 56, 100, 111, 124, 128, 131, 134.

Plaintiffs' matching program claims rise and fall on a similar causation analysis.  *See* Mem. 27.  As discussed, Plaintiffs adequately allege that their terminations were caused by inaccurate or incomplete records.  Normally, the matching program provisions provide safeguards to make sure that agencies correct inaccuracies before they are used—at scale—to take "adverse action" against individuals.  *See* 5 U.S.C. § 552a(p).  Here, Defendants' violations of those provisions ensured that they would be.  If Defendants had acted pursuant to a written agreement that included "information on assessments that have been made on the accuracy of the records that

will be used in such matching program," as required by § 552a(o), the inaccurate records would have been fixed.  *Id.* § 552a(o)(1)(J).  If Defendants had "independently verified the information," as required by § 552a(p), the inaccurate records would have been fixed.  *Id.* § 552a(p)(1)(A)(i). And if Defendants had provided each individual "notice" and an "opportunity to contest" findings, the inaccurate records would have been fixed.  *Id.* § 552a(p)(1)(B).  Instead, according to Secretary Kennedy, Defendants specifically decided not to verify employee information so that they could avoid losing "political momentum."  Compl. ¶ 102.  The agency's inaccurate records were used in a matching program, the results of which were used to "inform and carry out the April 1 cuts."  *Id.* ¶ 100.  The adverse effects that Plaintiffs suffered were thus caused as much by Defendants' failure to verify their records as by Defendants' decision to use the flawed records in the first place.  *See id.* ¶¶ 167–168.

Plaintiffs understand that Defendants contest the factual underpinnings of the complaint. That's not uncommon, and they will have every opportunity to support their position prior to a final judgment.  But at the motion-to-dismiss stage, the court's "role is not to speculate about which factual allegations are likely to be proved after discovery."  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).  And "defendants' remedy is not to move for dismissal but to serve contention interrogatories or to proceed to summary judgment."  *Beach TV Props., Inc. v. Solomon*, 324 F. Supp. 3d 115, 123 (D.D.C. 2018) (cleaned up).  As such, the Court should deny Defendants' motion as to causation.

### B.  Plaintiffs plausibly allege that the Privacy Act violations were "intentional or willful."

Defendants' argument that Plaintiffs have not plausibly alleged violations that were "intentional or willful," Mem. 28, suffers from similar flaws.  Again, Defendants' argument amounts to a dispute of fact that is inappropriate at this early stage.  *See Stewart v. D.C. Armory*

*Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) ("[I]dentifying the government's intent in this case raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion."). And again, Defendants flatly ignore ample support in the complaint for a reasonable inference that Defendants' Privacy Act violations were "intentional or willful."

Plaintiffs agree that "intentional or willful" in the context of the Privacy Act are terms of art, although the standard is not quite as demanding as Defendants suggest. "Intentional or willful" means: "somewhat greater than gross negligence, or, an act committed without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010) (emphasis omitted). That standard is clearly met here. Defendants are federal agencies that should be aware of the Privacy Act's requirements. Indeed, in the run-up to the layoffs at issue here, Defendants OMB and OPM directed agencies, including HHS, to confirm "that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status." Compl. ¶ 91. Plaintiffs' complaint alleges that Defendants knew there were significant accuracy issues before the cuts, *id.* ¶ 3, and certainly afterwards, *id.* ¶ 9.

Defendants spill much ink trying to explain away Secretary Kennedy's statement that a significant portion of fired workers would "have to be reinstated, because we'll make mistakes." *See* Mem. 29–30. But Secretary Kennedy's April 9 interview confirming that HHS had not reviewed individual employee cuts ahead of time because it "takes too long and you lose political momentum," Compl. ¶ 12, is at least equally probative of intent. Secretary Kennedy said there would be "casualties," referring to HHS employees like Plaintiffs. *Id.* Together, these statements indicate a flagrant disregard for both Defendants' obligations and Plaintiffs' rights under the

Privacy Act.  Adding on to that, the Complaint additionally details vitriolic comments by the leadership of HHS, OMB, and DOGE expressing open hostility towards federal workers, *see id.* ¶¶ 136, 138, 140, 143, 145—which could plausibly explain why Defendants would continue to fire employees even in the face of these serious record issues.  Together with the complaint's allegations as a whole, Plaintiffs support a reasonable inference that Defendants committed these Privacy Act violations intentionally or willfully.  *See Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 347 (D.D.C. 2018) (intent element plausible where plaintiff alleged that defendants "intentionally and deliberately fail[ed] to verify facts"); *Feldman v. CIA*, 797 F. Supp. 2d 29, 42 (D.D.C. 2011) (intent element met where "totality of the plaintiff's allegations . . . adequately allege intentional or willful conduct").

Defendants' remaining arguments to the contrary are readily dispensed with.  Whether "corrective action" bears on intentionality, Mem. 30, is irrelevant, because outside of a handful of politically sensitive offices, "HHS has rejected the need for more widespread reconsideration of the April 1 cuts."  Compl. ¶ 107.  Defendants' argument that an HHS spokesperson said that RIF notices were delayed "over the weekend" so they could re-check the data, Mem. 30, ignores (1) the absurdity of the premise that systemic inaccuracies for 10,000 people could be fixed in one weekend, Compl. ¶ 4, (2) the alternative explanation that "the delay was also caused by infighting between DOGE and HHS officials," *id.* ¶ 3, and (3) that HHS knew the data remained deeply flawed at the time Defendants nevertheless proceeded with their cuts, *id.* ¶ 9.  And Defendants' argument that "HHS made clear" (after the fact, on its website) "that any inaccuracies were not relevant to RIF determinations," Mem. 30, fails for the same reason Defendants' causation argument fails: the court cannot take judicial notice of the truth of disputed facts.  *See supra* at 35–36.

Defendants next argue that because the April 2020 Booz Allen Hamilton report does not explicitly claim that FDA was "violat[ing] Privacy Act requirements," it cannot "establish intentionality or willfulness." Mem. 31; *see also* Compl. ¶ 81. For one thing, Plaintiffs are not required to establish anything at the motion-to-dismiss stage with evidence. *See Jones v. Kirchner*, 835 F.3d 74, 79–80 (D.C. Cir. 2016). Additionally, the Booz Allen Hamilton report is merely illustrative of the broader allegations in the complaint about records systems across HHS (and OPM). The complaint alleges that "HHS utilizes many different personnel systems of records." Compl. ¶ 74. It quotes Secretary Kennedy as saying that HHS has "nine HR departments and many of them have computer systems that can't talk to each other, that are incompatible." *Id.* ¶ 73. It quotes an HHS spokesperson who described HHS's systems as "broken." *Id.* ¶ 71. While the complaint goes into more detail about FDA as an example—noting that "[n]early all [of the personnel systems] have inaccuracies that are slowly compounded" and that "any attempt to match these records together *en masse* will result in systemically inaccurate and incomplete results"— the complaint alleges that this is "true for the systems maintained across HHS." *Id.* ¶ 80. And it quotes an OPM report noting that OPM's records systems "often propagate incorrect data across records." *Id.* ¶ 83. In short, the complaint adequately alleges that Defendants broadly knew that they had significant accuracy issues across their personnel systems and nevertheless proceeded to use those records to fire Plaintiffs and the putative class.

Defendants close with a half-hearted effort to cast Plaintiffs' complaint as a disagreement with Defendants' policy judgment. Mem. 31–32. As explained in the complaint, however, "[t]his lawsuit is not focused on whether HHS should have engaged in layoffs or restructuring generally, whether its decision to do so was legal, or whether the agency complied with RIF-specific rules and regulations." Compl. ¶ 109. "Instead," the complaint continues, "this lawsuit is focused on

. . . the Privacy Act." *Id.* And Plaintiffs are "the master[s] of [their] own complaint." *Mordi v. Zeigler*, 870 F.3d 703, 707 (7th Cir. 2017). Moreover, the language Defendants quote from *Kleiman* is about whether a record is inaccurate—that is, because a "judgment" is subjective, it cannot be said to be "inaccurate" in the same way as "factual or historical errors." *See* 956 F.2d at 337–338. But Defendants nowhere argue that Plaintiffs failed to plausibly plead inaccuracy. The argument is therefore inapposite.

The Court should "not dismiss this case at the outset merely because the allegations in the complaint are rebutted by assertions about Defendant[s'] state of mind in [their] briefing on [their] motion to dismiss." *United States v. Newman*, 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017). The Court should deny Defendants' motion to dismiss as to intent.

## III. Defendants' remaining arguments are unpersuasive and do not warrant dismissal.

### A. DOGE, OPM, and OMB are proper Defendants.

As Defendants acknowledge, agencies that allegedly "maintain[ed] the challenged record" are proper defendants for Privacy Act claims. Mem. 34. Defendants nevertheless argue that the non-HHS agencies—specifically, DOGE, OPM, and OMB—must be dismissed because Plaintiffs "have not alleged that [those agencies] are responsible for maintaining the records at issue." *Id.* That argument fails twice.

*First*, Defendants incorrectly suggest that the Privacy Act requires an agency to have been "*responsible for* maintaining" the challenged records. *Id.* (emphasis added). But maintaining records is enough under the text of the statute, *see* 5 U.S.C. § 552a(g)(1)(C), (g)(1)(D), (e)(5) (providing causes of action when agency fails to "maintain" records as required), as well as binding precedent, *see Dickson v. OPM*, 828 F.2d 32, 33 (D.C. Cir. 1987) (holding that federal agency "is subject to a damage action whenever it maintains a record violating the standard of fairness mandated by the Privacy Act"). In terms of what it means to "maintain" a record, the Privacy Act

defines that term broadly to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3).[14]  Defendants cite no support for the requirement that Privacy Act plaintiffs must additionally allege that defendant agencies had some legal obligation or other "responsib[ility]" to maintain the relevant records.  Mem. 34.

*Second*, Defendants entirely ignore large swaths of allegations in the complaint.  In a standalone section entitled "Sending Records to Other Agencies," the complaint recounts a lengthy back-and-forth throughout February and March 2025 during which OPM, OMB, and DOGE requested, received, accessed, and reviewed relevant personnel records from HHS.  Compl. ¶¶ 84–100.  Plaintiffs allege that, beginning shortly after inauguration, OPM directed federal agencies (including HHS) to submit certain employee-specific data—including "[n]ame, job title, pay plan, series, grade, agency, component, and duty station"—about employees who received a less than "fully successful" performance rating in the last three years."  *Id.* ¶ 86.  HHS "sought to comply" with this request by gathering and transmitting personnel data as directed.  *Id.* ¶ 87.  Around the same time, OPM and OMB ordered agencies to prepare and submit "Agency RIF and Reorganization Plans" "to OMB and OPM for review."  *Id.* ¶ 88.  As part of that process, agencies (including HHS) were required to list "employees performing functions not mandated by statute or regulation" and certain "essential" job positions "by agency and subcomponent."  *Id.* ¶ 90.  HHS again complied with these requests, and in doing so, provided "granular record data about their employees" for OMB and OPM to "review."  *Id.* ¶¶ 88, 90.

DOGE likewise collected and reviewed personnel data from across HHS, including the records alleged here to be inaccurate or incomplete.  *Id.* ¶ 95.  In one striking example detailed in

---

[14] According to DOJ, the definition of "maintain" in the Privacy Act "embraces various activities with respect to records and has a meaning much broader than the common usage of the term." DOJ Overview, https://perma.cc/V5ZV-4JP9.

the Complaint, DOGE representatives demanded—and received—flawed data from FDA that included lists of employees supporting "mission critical" systems. *Id.* DOGE officials also secured access to HR databases at HHS, such as the Enterprise Human Capital Management System and the NIH Workforce Analytics Workbench, which had been plagued for years by well-known accuracy and reliability issues. *Id.* ¶¶ 75, 77, 81, 97. The Complaint further alleges that DOGE used the personnel data it collected from HHS to evaluate proposed layoffs and weigh in on the final decisions "about who and where to cut." *Id.* ¶ 99.

Taken together, these allegations more than adequately allege that OPM, OMB, and DOGE "maintain[ed], collect[ed], [or] use[d]" the personnel records at issue here. 5 U.S.C. § 552a(a)(3).

**B.  Individuals sued in their official capacity are proper Defendants.**

Defendants contend that all individual Defendants named in their official capacities should be dismissed. Mem. 33. Although Plaintiffs agree that only an "agency" is a proper defendant under the Privacy Act, *see* 5 U.S.C. § 552a(g)(1), when an agency official is sued in his or her official capacity, the official *becomes* the agency for purposes of litigation. As the Supreme Court noted in *Hafer v. Melo*, "[s]tate officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them." 502 U.S. 21, 27 (1991); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

That principle holds true in Privacy Act cases. *See Jarrell v. Tisch*, 656 F. Supp. 237, 238 (D.D.C. 1987) ("The current Postmaster, sued in his official capacity as the legal embodiment of the Postal Service, would also be the appropriate defendant under the Privacy Act."). By contrast, in every case Defendants cite on this point, Mem. 33, the individual defendants who were dismissed were sued in their *individual* capacities, which is, of course, a different story. Plaintiffs

here have not sued anyone in their individual capacity, *see* Compl., so Defendants are wrong that any individuals should be dismissed.

Either way, Plaintiffs have also named as Defendants every relevant agency directly. Thus, even if Defendants were correct that the official-capacity Defendants should be dismissed, that would have no effect on the scope of the litigation.

### C. The Court does not need to address Defendants' arguments about declaratory relief or class allegations.

Because the Court has jurisdiction to hear this case, and because the individual Plaintiffs have plausibly alleged viable claims under the Privacy Act, the Court need not reach Defendants' arguments regarding class allegations, Mem. 34, or declaratory relief, *id.* 32.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in full. Plaintiffs respectfully request oral argument.

Dated: September 19, 2025                    Respectfully submitted,


   */s/ Clayton L. Bailey*
_____

Clayton L. Bailey (DC Bar No. 1644867)
Jessica Merry Samuels (DC Bar No. 1552258)
**Civil Service Law Center LLP**
1325 G Street NW, Suite 500, PMB 801
Washington, DC 20005
(202) 571-7836
cbailey@civilservicellp.com